**REDACTED PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| **IN RE: BROILER CHICKEN GROWER ANTITRUST LITIGATION (NO II)** | MDL No. 6:20-2977-RJS-CMR<br><br>Honorable Chief Judge Robert J. Shelby<br><br>Honorable Cecilia M. Romero |

**PLAINTIFFS' OMNIBUS OPPOSITION TO NON-PARTIES
PENN'S AND LOVETTE'S MOTIONS TO STAY THEIR DEPOSITIONS
AND REQUEST FOR AN EXPEDITED HEARING**

REDACTED PUBLIC VERSION

## **TABLE OF CONTENTS**

I.   Introduction ................................................................................................................. 1

II.  Factual Background ....................................................................................................... 2

   A. Penn and Lovette Are Key Players with Unique Knowledge of the Broiler Grower-Facing
      Conspiracy Alleged in this Action ....................................................................... 2

   B. There is No Overlap Between the Allegations in the Criminal Indictments and Civil
      Securities Suits and the Allegations in this Action ............................................ 6

      1.  There is No Overlap Between This Action and the Criminal Indictment ...................... 7

      2.  There is No Overlap Between This Action and the Shareholder Action ........................ 8

      3.  There is No Overlap Between This Action and the Derivative Action ........................... 9

   C. Penn Falsely Suggests that the *Broiler* Court Granted His Request to Stay His Deposition
      ........................................................................................................................ 10

   D. Penn and Lovette Misstate the Chronology Concerning Plaintiffs' Requests to Take Their
      Depositions in This Action ................................................................................ 11

III. Argument ................................................................................................................... 12

   A. Legal Standard ................................................................................................. 12

   B. There is No Overlap Between This Action and Those That Have Named Penn and
      Lovette Criminally or Civilly ............................................................................ 13

   C. The Status of the Criminal Case Does Not Favor A Stay ................................... 17

   D. Plaintiffs Will Be Prejudiced If They Are Forced to Take These Critical Depositions at
      the Eleventh Hour ............................................................................................ 18

   E. Penn's and Lovette's "Hobson's Choice" is Illusory ....................................... 21

   F. The Court Has an Interest in The Expedient Resolution of This Action ............ 23

   G. The Public Has an Interest in the Expedient Resolution of This Action ........... 24

IV.  Conclusion ................................................................................................................. 24

i

REDACTED PUBLIC VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bd. of Cnty. Comm'rs of Cnty. of Adams v. Asay*,
No. 11-cv-02238, 2012 WL 6107949 (D. Colo. Dec. 10, 2012) ...........................................15

*Berreth v. Frazee*,
No. 19-cv-27, 2019 WL 10250759 (D. Colo. Apr. 1 2019) ...................................................16

*In re CFS-Related Sec. Fraud Litig.*,
256 F. Supp. 2d 1227 (N.D. Okla. 2003) ........................................................................ *passim*

*Chagolla v. City of Chicago*,
529 F. Supp. 2d 941 (N.D. Ill. 2008) .................................................................................16

*Chapman v. Hedderman*,
No. 20-cv-825, 2021 WL 3686687 (W.D. Okla. July 30, 2021) ...........................................16

*Clark v. Colbert*,
No. 16-cv-115, 2016 WL 11671910 (E.D. Okla. Dec. 7, 2016)............................................14

*Creative Consumer Concepts, Inc. v. Kreisler*,
563 F.3d 1070 (10th Cir. 2009) ...............................................................................12, 13, 16

*Cruz v. Cnty. of Dupage*,
No. 96-cv-7170, 1997 WL 370194 (N.D. Ill. June 27, 1997)................................................16

*De v. United States*,
No. 16-cv-2162, 2016 WL 4919468 (D. Kan. Sept. 15, 2016)..............................................20

*Farrah v. Chacon*,
No. 18-cv-895, 2018 WL 7141329 (D. Colo. Dec. 6, 2018) .................................................22

*Fine v. Tumpkin*,
No. 17-cv-2140, 2018 WL 317466 (D. Colo. Jan. 8, 2018) ..................................................16

*Garcia v. City of Leavenworth, Kansas*,
No. 19-cv-2049, 2019 WL 3302306 (D. Kan. July 23, 2019) ...............................................15

*Glover v. Upmann*,
No. 19-cv-3738, 2020 WL 1433801 (N.D. Ill. Mar. 24, 2020) ........................................16, 18

*U.S. ex rel. Gonzalez v. Fresenius Med. Care N. Am.*,
571 F. Supp. 2d 758 (W.D. Tex. 2008)................................................................................15

### REDACTED PUBLIC VERSION

*Graham v. Garfield Cnty. Det. Ctr.*,
  No. 17-cv-634, 2018 WL 4035971 (W.D. Okla. Aug. 23, 2018) ...........................................16

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
  No. 04-cv-698, 2005 WL 8179401 (N.D. Ill. July 15, 2005) .............................................16, 20

*Leland v. Short*,
  No. 16-cv-142, 2016 U.S. Dist. LEXIS 140544 (N.D. Okla. Oct. 11, 2016) .........................16

*Lizarraga v. City of Nogales Arizona*,
  No. 06-cv-474, 2007 WL 215616 (D. Ariz. Jan. 24, 2007) ..............................................15-16

*Martindell v. Int'l Tel. & Tel. Corp.*,
  594 F.2d 291 (2d Cir. 1979)...............................................................................................16

*McGarvey v. Special*,
  No. 6-cv-576, 2007 WL 222018 (N.D. Okla. Jan. 25, 2007) ...............................................16

*Estate of Morad v. City of Long Beach*,
  No. 16-cv-6785, 2017 WL 5187826 (C.D. Cal. Apr. 28, 2017) ...........................................21

*Myers v. Brewer*, No. 17-cv-2682, 2019 WL 7293584 (D. Kan. Dec. 30, 2019)...................16-17

*In re Packaged Seafood Prod. Antitrust Litig.*,
  No. 15-MD-2670, 2018 WL 5785284 (S.D. Cal. Nov. 5, 2018) ....................................*passim*

*Parker v. Olympus Health Care, Inc.*,
  264 F. Supp. 2d 998 (D. Utah 2003)....................................................................................21

*In re Plastics Additives Antitrust Litig.*,
  No. 2:03-cv-2038, 2004 WL 2743591 (E.D. Pa. Nov. 29, 2004) ..........................................24

*SEC v. Gordon*,
  No. 9-cv-61, 2009 WL 2252119 (N.D. Okla. July 28, 2009) .................................................24

*SEC v. Thomas*,
  116 F.R.D. 230 (D. Utah 1987) ...........................................................................................23

*United States v. Arnold*,
  No. 7-cv-753, 2008 WL 2037270 (W.D. Okla. May 8, 2008)...............................................14

*United States v. Hames*,
  No. 18-cv-1055, 2020 WL 10139368 (N.D. Ala. Nov. 20, 2020).........................................15

*In re Urethane Antitrust Litig.*,
  No. 4-md-1616, 2014 WL 359565 (D. Kan. Feb. 3, 2014) ...................................................21

*Windham for Marquis Props., LLC v. Snyder*,
  No. 18-cv-63, 2018 WL 4100512 (D. Utah Aug. 28, 2018)............................................23-24

**REDACTED PUBLIC VERSION**

**Constitution & Rules**

U.S. Const. amend. V ................................................................................................ *passim*

**REDACTED PUBLIC VERSION**

## I.      Introduction

Jayson Penn ("Penn") and William Lovette ("Lovette")—critical witnesses in this civil multi-district antitrust litigation (the "Action")—have moved the Court to stay their depositions until after the disposition of their criminal trial in a completely separate matter, which is scheduled to conclude on or about December 21, 2021. ECF Nos. 158 ("Penn Br."), 161 ("Lovette Br."). In support of their motions Penn and Lovette argue, among other things, that (1) the allegations in this Action overlap with the allegations in other cases that have named them criminally and civilly (in their view, exposing them to either self-incrimination or forfeiture of their civil defenses) and (2) that neither possess unique knowledge of Plaintiffs' claims. These two arguments are wrong. In fact, none of Penn's and Lovette's various assertions raised in support of their requests for a stay withstand modest scrutiny. Their motions should be denied.[1]

As explained below, the criminal conduct Penn and Lovette have been indicted for, and the securities class actions (predicated on that same criminal conduct) that name them as civil defendants, do not overlap with the allegations in this Action at all. Penn, Lovette, and others are being prosecuted by the Department of Justice ("DOJ") for rigging bids on the sales of broiler chickens to national restaurant chains, grocery stores, and other purchasers. The civil securities actions mirror those allegations. By contrast, Plaintiffs' claims here arise from different conduct (a compensation suppression cartel) targeted at different victims (growers) in a different market (the labor market for broiler growers' services), and causing different harm (suppressed grower pay). Penn and Lovette can safely testify without fear of self-incrimination because Plaintiffs' examination on grower-facing issues will be useless to the DOJ's bid-rigging case (unless Penn and Lovette lie under oath and it is admitted for purposes of perjury or impeachment). Penn and Lovette can safely invoke their Fifth Amendment rights (though they certainly need not) because the lack of overlap between the issues in this Action and those that have named them as civil defendants makes an adverse inference against them impossible to obtain. Their motions fail for this fundamental reason, as without substantial overlap, their so-called Hobson's Choice between self-incrimination and forfeiture of their civil defenses is illusory.

Penn and Lovette also played key roles in the grower-facing conduct Plaintiffs challenge in this Action. Penn and Lovette were among the highest-ranking executives at Pilgrim's Pride

---

[1] Because of the time between the close of briefing (October 8) and the beginning of Penn and Lovette's criminal trial (October 25), Plaintiffs respectfully request an expedited hearing.

REDACTED PUBLIC VERSION

Corporation ("Pilgrim's"), with each holding the Chief Executive Officer position for a time. Their collective custodial files returned over 88,000 documents responsive to Plaintiffs' document requests. The search terms used to identify these documents were negotiated heavily, and they were designed to return documents related specifically to Plaintiffs' grower-facing claims and exclude documents that related only to the sale of broilers. The number of responsive custodial documents alone demonstrates Penn's and Lovette's relevance to this Action, but the substance of those documents reveals that Penn and Lovette were the final decisionmakers on grower compensation at Pilgrim's and they each took overt steps to effectuate the compensation suppression cartel. The claim that neither of them possess a scintilla of unique knowledge that cannot be derived from other sources within Pilgrim's borders on frivolity.

Even if one credited the erroneous claim of substantial overlap between this Action and the actions that have named Penn and Lovette civilly and criminally, their motions still fail as (a) even with such overlap, stays are the exception not the rule, and (b) the Court has in its toolkit mechanisms to protect whatever legitimate interests they may have, without prejudicing Plaintiffs' needs in this Action. These tools include issuing protective orders precluding inquiry by Plaintiffs into the sales-facing bid-rigging allegations Penn and Lovette have been indicted on and limiting the use of the depositions by the DOJ as well as civil plaintiffs that named them. While the lack of overlap makes these measures unnecessary, the Court can moot Penn and Lovette's illusory Hobson's Choice by implementing them, and they are a far less drastic measure than staying the depositions of witnesses critical to Plaintiffs' claims in this Action.

As such, Penn's and Lovette's motions should be denied outright, or, in the alternative, their depositions should proceed under a protective order that limits their use by the DOJ to issues of perjury or impeachment and bars other civil plaintiffs from receiving them.

## II.    Factual Background

### A.    Penn and Lovette Are Key Players with Unique Knowledge of the Broiler Grower-Facing Conspiracy Alleged in this Action

Plaintiffs seek to depose Penn and Lovette because they were central figures in Defendants' scheme to suppress grower compensation. Penn and Lovette nevertheless assert that Plaintiffs seek their depositions "merely to get the criminal defendant's invoking [their Fifth Amendment rights] on the record," Penn Br. at 13 (citation omitted); Lovette Br. at 3, 5 ("Plaintiffs seek this deposition only to exploit Mr. Lovette's predicament"), and that neither witness possesses "unique knowledge related to Plaintiffs' claims in this litigation," Lovette Br. at 1; Penn Br. at 2 (similar). The discovery record

**REDACTED PUBLIC VERSION**

belies their assertions.

Penn and Lovette wore multiple hats at Pilgrim's, with both sales-facing and grower-facing responsibilities. Unlike their co-defendants in the DOJ's criminal case, they played key roles in the grower-facing conspiracy alleged in this Action. ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ This fact alone justifies these critical depositions.

This differentiates Penn and Lovette from their criminal co-defendants. Their eight criminal co-defendants are not document custodians in this Action because they had sales-facing, not grower-facing responsibilities.[2] By contrast, there have been over 48,000 documents produced from Lovette's custodial file and over 40,000 documents produced from Penn's custodial file—accounting for over 22% of *all* documents produced by Pilgrim's in this Action. Smith Decl. Ex ¶¶ 1-5. These documents were produced in response to requests for production and search terms specifically tailored towards the grower-related issues in this Action. Given the sheer volume of responsive documents in their files, it defies credulity to suggest that neither possesses unique knowledge of the issues in this Action. Indeed, an examination of just a handful of their custodial documents shows that they are each critical fact witnesses here.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[2] *See, e.g.*, ECF No. 159-1 Ex. 1 (the "Criminal Indictment") ¶ 14 (defendant Fries "was a sales manager"); *id.* ¶ 16 (defendant Mulrenin "was a sales executive"); *id.* ¶ 17 (defendant Kantola "was a sales executive"); *id.* ¶ 18 (defendant Little "was a sales director").

REDACTED PUBLIC VERSION



**REDACTED PUBLIC VERSION**



This is just a smattering of the documentary record, which spans over 88,000 documents from Penn and Lovette's files alone. Smith Decl. ¶¶ 1-5. But crucially, Penn and Lovette undoubtedly have information that is relevant to Plaintiffs' claims beyond that ascertainable from existing document discovery. Antitrust conspiracies are by their very nature secretive, and conspirators rarely document their agreements or acts in furtherance thereof in writing. ███████

███████ Penn and Lovette are thus virtually guaranteed to have additional unique information that can only be obtained through oral testimony.

### B. There is No Overlap Between the Allegations in the Criminal Indictments and Civil Securities Suits and the Allegations in this Action

Penn and Lovette are named defendants in three actions: (1) the DOJ's Criminal Indictment, (2) a federal securities class action (the "Shareholder Action") that asserts that the criminal antitrust conspiracy in the Criminal Indictment artificially inflated Pilgrim's stock prices, and (3) a state law derivative class action (the "Derivative Action") with analogous

claims. Penn and Lovette argue that there is a substantial similarity of issues in this Action, on the one hand, and the issues in the Criminal Indictment, the Shareholder Action, and the Derivative Action, on the other, Penn Br. at 4, 10-11; Lovette Br. at 8-9, with Lovette claiming such overlap "is the most important factor," Lovette Br. at 8, and Penn falsely asserting, *inter alia*, that the Derivative Action "incorporates the allegations in the action pending in this Court," Penn Br. at 4. If Lovette is right about the import of overlap (and Plaintiffs disagree this factor is dispositive), his motion necessarily fails. There is no substantive overlap in the upstream grower-facing conspiracy allegations in this Action and the downstream sales-facing conspiracy allegations in the actions that have named Penn and Lovette criminally or civilly—they allege different violations targeted at different victims, in different markets, causing different injuries.

### 1.   There is No Overlap Between This Action and the Criminal Indictment

As this Court held, this Action alleges "an overarching scheme, illegal per se, not to compete for grow-out services," Hr'g Tr. Jan. 6, 2020 at 26:17-18, which "had at least two complimentary and mutually reinforcing elements," *id.* at 28:11-12, including, "first, the agreement to share current, detailed, sensitive and confidential business information, including grower compensation," and "second, a complementary no-poach agreement not to solicit or hire growers from other conspiring integrators," *id.* at 28:12-21; *see also generally* Consol. Class Action Compl. ("CCAC"), ECF No. 59. Simply put, Plaintiffs allege a *grower-facing* conspiracy with the purpose and effect of suppressing grower compensation below competitive levels.

In contrast, the Criminal Indictment alleges a different antitrust conspiracy, to "rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products ***sold*** in the United States. ECF No. 159-1 Ex. 1 ¶ 2 (emphasis added); *see also, e.g.*, *id.* ¶ 47 (the "purpose" of the conspiracy "was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States"). The conspiracy was targeted not at broiler growers, but at "[r]estaurants, grocery retailers, and others who ***purchased*** large volumes of broiler chicken products" including "quick-service restaurants" or "QSRs." *Id.* ¶ 4 (emphasis added); *see also, e.g.*, *id.* ¶¶ 36-42 (listing as victims of the criminal conspiracy various "nationwide restaurant franchise[s]" and "nationwide grocery-store chain[s]").

The Criminal Indictment does not contain as much as a passing reference to Agri Stats, exchanges of grower compensation or other information (through Agri Stats or otherwise), or an

agreement not to poach one another's growers—not once does the Criminal Indictment even use the terms "grower," "farmer," "Agri Stats," or anything remotely analogous. *See generally* ECF No. 159-1 Ex. 1. Even the time periods are different, with this Action covering a conspiracy beginning as early as 2008 and continuing to the present, CCAC ¶ 1, and the DOJ challenging a narrower period of 2012 through 2019. As discussed in Sections III.A. & III.B., *infra*, criminal defendants are regularly compelled to sit for a civil deposition even when the criminal claims and the civil claims are ***identical***. But the civil claims in this Action involve a conspiracy to suppress labor (or input) costs whereas the Criminal Indictment involves a conspiracy to inflate sales (or output) prices, and the only "overlap" is that the individuals that orchestrated these two separate schemes all worked in the chicken industry.

Penn falsely represents that "[t]he government has repeatedly made clear that . . . the civil cases substantially overlap with the criminal case." Penn Br. at 2.[6] Not so. While the DOJ has made that representation in connection with *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.), where it intervened and (largely unsuccessfully) sought to stay Mr. Penn's deposition, it has ***never*** made that representation with respect to this Action nor has the government intervened or otherwise sought to stay any discovery in this Action. Smith Decl. ¶ 6.

In tacit recognition that there is no overlap between this Action and the Criminal Indictment, Penn and Lovette both make the claim that the government's "investigation is active," Penn Br. at 2-3, and "remains 'ongoing,'" Lovette Br. at 4. Ostensibly, the insinuation is that the DOJ could file a superseding criminal indictment against Penn and Lovette over new, grower-facing claims three months before Penn and Lovette's already two-month long jury trial is set to commence. Of course, there is no evidence that the government is investigating Penn and Lovette for any issues beyond the ones presently set for trial. And if Penn and Lovette believe they have engaged in grower-facing conduct that subjects them to further criminal prosecution, that is hardly a reason to postpone their depositions and frustrate discovery.

### 2.   There is No Overlap Between This Action and the Shareholder Action

Once more, in contrast to the allegations in this Action, the allegations in the Shareholder

---

[6] It is conceivable that this and other false statements were included in Penn's brief inadvertently (albeit, not all false statements) because, in large part, it mirrors arguments from a prior motion he filed in *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.), a motion that contrary to Penn's representations, remains pending in that court, *see* Section II.C., *infra*.

Action in which Penn and Lovette have been named as defendants mirror those in the Criminal Indictment. *See* ECF No. 159-1 Ex. 5 ¶ 41 ("Plaintiffs and other investors began to learn the truth about the source of the Company's purported competitive strengths and advantages on June 3, 2020, when the DOJ announced that a federal grand jury in the District of Colorado had returned the Indictment charging four executives in the chicken industry with criminal antitrust violations[.]"); *id.* ¶ 44 (the conspiracy involved "illegally and improperly coordinat[ing] on the **prices** . . . offered to chicken **purchasers**") (emphases added).

Like the Criminal Indictment, the Shareholder Action does not contain as much as a passing reference to Agri Stats, exchanges of grower compensation or other information (directly through Agri Stats or otherwise), or an agreement not to poach one another's growers—and like the Criminal Indictment, the Shareholder Action never even uses the terms "grower," "farmer," "Agri Stats," or anything analogous. *See generally* ECF No. 159-1 Ex. 5. It never mirrors or incorporates by reference any allegation from any complaint in any member case in this MDL or the CCAC. *Id.* It does not even track the allegations in the parallel civil litigation to the Criminal Indictment, *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.). It is entirely confined to the allegations in the Criminal Indictment. The Shareholder Action thus has no overlap with the grower-facing issues in this Action.

### 3.   There is No Overlap Between This Action and the Derivative Action

Similarly, the Derivative Action bears no resemblance to the substantive allegations in this Action, instead tracking the sales-facing conspiracy at issue in the Criminal Indictment and in the parallel civil litigation, *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.).

Penn represents to the Court that the Derivative Action "incorporates the allegations at issue in the action pending in this Court." Penn Br. at 4 (citing ECF No. 159-1 Ex. 6 ¶¶ 160-271, 377-78, 424-43). This is completely false. *See* note 6, *supra*. A cursory review of the allegations cited by Penn reveals that they actually mirror the allegations made by purchasers of broiler chicken about a conspiracy in the downstream sales market, and they do not at all relate to the grower-facing allegations in this Action. *See, e.g.*, ECF No. 159-1 Ex. 6 ¶ 160 ("According to the **Maplevale** [purchaser] Complaint") (emphasis added); *id.* ¶ 163 ("Pilgrim's was able to collude with other supplier companies and eventually achieved the goal of manipulating broiler chicken **prices**") (emphasis added); *id.* ¶¶ 160-271 (describing the output-reduction conspiracy alleged in *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.)); *id.* ¶ 377 (the "truth" about

Pilgrim's securities violations emerged when "Maplevale initiated the first antitrust class action against Pilgrim's and 13 other broiler producers **in U.S. District Court for the Northern District of Illinois**") (emphasis added); *see also id.* ¶¶ 424-43 (cited in Penn Br. at 4) (describing the Criminal Indictment allegations).

The Derivative Action does not incorporate by reference any allegation in the CCAC or from any complaint in any member case in this MDL. And while the 134-page complaint in the Derivative Acton uses the term "grower" in 3 of its *558 separate paragraphs* (unlike the Criminal Indictment and the Shareholder Action, which never use the term), the term's usage is always framed in terms of the output reduction conspiracy allegations in *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.). *See* ECF No. 159-1 Ex. 6 ¶ 147 (integrators could reduce output to increase prices by "increasing the time between collection and delivery of birds" to their growers); *id.* ¶ 224 ("Tyson announced a 4% production cut, through longer days between flocks for its contract growers[.]"); *id.* ¶ 225 (discussing growers in the context of a decision to idle capacity at Pilgrim's Chattanooga, Tennessee processing plant).

The Derivative Action, like the other proceedings, thus has no overlap with the grower-facing issues in this Action.

### C.     Penn Falsely Suggests that the *Broiler* Court Granted His Request to Stay His Deposition

At the end of Penn's brief, Penn Br. at 14-15, Penn represents that following his intervention in *In re Broiler Growers Antitrust Litig.*, No. 16-8637 (N.D. Ill.), the court entered an order purporting to grant Penn's motion and "ensuring Mr. Penn's deposition would take place after his criminal trial." Penn Br. at 14-15. That is false.[7]

In that case, the DOJ intervened and sought to stay Penn's civil deposition. In a sealed order, the DOJ lost that bid in large part, with the *Broiler* court authorizing a deposition of Mr. Penn prior to his criminal trial, allowing "the deposition of Mr. Penn to cover 'all topics other than [the] bid-rigging" allegations in the Criminal Indictment. Smith Decl. Ex. 13 at 2 (Penn's brief from *In re Broiler Growers Antitrust Litig.*, No. 16-8637 (N.D. Ill.)); *id.* at 1 ("this Court has entered a sealed order allowing Mr. Penn's deposition to proceed now on certain topics"). That is, the court only prohibited a narrow line of questioning pertaining to the bid-rigging

---

[7] Unlike the false representations above that were arguably inadvertently copied from prior briefing, there is no conceivable justification for this misrepresentation.

allegations in the Criminal Indictment but allowed questioning on all other aspects of the sales-facing conspiracy to go forward. Thereafter, Penn filed his own motion to intervene and stay, *see id.*, which is now fully briefed and remains pending, *id.* ¶ 22; *id.* Ex. 13.

The scheduling order that Penn points to as purported proof that the *Broiler* court stayed his deposition until after his criminal trial did no such thing. That scheduling order established the date for the "[e]xpiration of [the court's] [s]tay on [d]epositions of DOJ-[r]equested [w]itnesses and [t]opics" as January 3, 2022 and a corresponding deadline to complete the depositions of stayed witnesses and topics of May 11, 2022. Smith Decl. Ex. 14 at 4. While the *Broiler* court's stay does in fact expire after Penn's criminal trial, as Penn's own motion papers make clear, the *Broiler* court's order staying certain witnesses and topics at the DOJ's request **did not** cover Penn's deposition, except on the singular topic of bid rigging. And, importantly, the DOJ has **not** sought to stay Penn's or Lovette's depositions in this Action. *Id.* ¶ 6.

### D. Penn and Lovette Misstate the Chronology Concerning Plaintiffs' Requests to Take Their Depositions in This Action

Both Penn and Lovette take issue with the proximity of their potential deposition to their criminal trial. Penn Br. at 12 ("The criminal trial begins October 25, 2021, just two weeks after Mr. Penn's reply in support of this motion for a protective order is due."); Lovette Br. at 3 ("Plaintiffs seek to take the deposition of Mr. Lovette . . . less than two months before his related criminal trial."). But they misrepresent the chronology and their roles in creating the circumstances of which they now complain.

Plaintiffs first reached out to Penn's and Lovette's respective counsel separately on June 24, 2021. Smith Decl. Exs. 15-16. When they did not confirm a time to discuss, Plaintiffs followed up with each of them each again on June 30, 2021. *Id.* Exs. 17-18. Plaintiffs were unable to speak with Penn's counsel until July 2, 2021, and Lovette's counsel until July 9, 2021 (after following up by email again on July 9, 2021). *Id.* ¶¶ 8-9 & Ex. 19. On July 23, 2021, after the parties met and conferred, Plaintiffs emailed deposition notices to counsel for Penn and Lovette seeking to take their depositions on August 18, 2021 (for Lovette) and August 23, 2021 (for Penn) and asking that they accept service of the subpoenas to avoid the need to send a process server out during the COVID-19 pandemic. *Id.* Exs. 20-22.

Penn and Lovette refused to accept service of their deposition subpoenas until almost a month later, on August 19, 2021 (for Lovette) and August 10, 2021 (for Penn). And they used their refusal to accept service to extract the very briefing schedules they now complain about.

11

*See* Smith Decl. Ex. 21 (Penn complaining that beginning briefing on August 23 would be "too soon"—"I will accept service of the subpoena on Jayson Penn's behalf once we agree on a briefing schedule for a protective order"); *id.* Ex. 20 (Lovette initially refusing to accept service of any deposition subpoena that would trigger briefing before September 15). Plaintiffs objected to the delayed briefing, *id.* ("The timeline you lay out in your email below will delay the briefing too much."); *id.* Ex. 20 ("we cannot offer more [time for briefing] than that given the schedules in our case and Mr. Penn's case"), but acquiesced on the belief that Penn and Lovette would not complain about a timeline that they insisted on.

When, to Plaintiffs' surprise, Penn and Lovette **did** complain about the delay **they** insisted on, Penn Br. at 12, Lovette Br. at 3, Plaintiffs offered to cut their own briefing time by a week (without cutting Penn and Lovette's reply time at all) to alleviate their supposed concerns, Smith Decl. Ex. 23. But Penn and Lovette **refused** Plaintiffs' proposed accommodation, agreeing only to cut the total briefing time by 3 days (and all at Plaintiffs' expense), which Plaintiffs accepted to avoid a dispute over the briefing schedule. *Id.*

## III. Argument

### A. Legal Standard

It is well established that "[t]he Constitution does not generally require a stay of civil proceedings pending the outcome of criminal proceedings, absent substantial prejudice to a party's rights." *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1080 (10th Cir. 2009) (citing *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980)); *see also, e.g.*, *In re CFS-Related Sec. Fraud Litig.*, 256 F. Supp. 2d 1227, 1236 (N.D. Okla. 2003) ("The Constitution . . . does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.") (alteration in original, citation omitted) (collecting cases); *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670, 2018 WL 5785284, at *2 (S.D. Cal. Nov. 5, 2018) ("In the absence of substantial prejudice to the rights of the parties involved, simultaneous parallel civil and criminal proceedings are unobjectionable under our jurisprudence.") (collecting cases).

The Tenth Circuit has recognized that a "defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." *Creative Consumer*, 563 F.3d at 1080-81 (quoting *Keating*, 45 F.3d at 324). In determining whether substantial prejudice has been shown, courts in the Tenth Circuit and elsewhere consider

12

REDACTED PUBLIC VERSION

the following factors:

> (1) [t]he extent to which issues in the criminal case overlap with those presented in the civil case; (2) [t]he status of the case, including whether the defendant has been indicted; (3) [t]he private interests of the plaintiff in proceeding expeditiously versus the prejudice to plaintiff caused by the delay; (4) [t]he private interest of, and burden on, the defendant; (5) [t]he interests of the Court; and (6) [t]he public's interest.

*CFS*, 256 F. Supp. 2d at 1236-37. Even if substantial prejudice is shown, other remedies are available and usually implemented. For example, a district court can issue an order precluding deposition questions on "a specific subject matter," *id.* at 1236, such as an order precluding questions about the big-rigging allegations in the downstream market that Penn and Lovette have been indicted on (questions Plaintiffs have no intention of asking anyway), or the issuance of protective orders governing the use of the indicted deponents' deposition transcripts in other actions, *id.*; *see also, e.g.*, *id.* at 1242 (denying "drastic measures" of staying a criminal defendant's civil deposition, but ordering that the "deposition be sealed and not used for any purpose outside the [instant] civil proceeding"); *Packaged Seafood*, 2018 WL 5785284, at *8 (ordering that all civil depositions where the indicted witness was merely "a third-party may proceed"; staying indicted witness' deposition only in the one civil proceeding in which the indicted witness was named as a defendant, and ordering that civil litigants that named the witness as a defendant were prohibited "from participating in or receiving any discovery against" the indicted witness to alleviate any adverse inference concerns).[8]

**B.    There is No Overlap Between This Action and Those That Have Named Penn and Lovette Criminally or Civilly**

Lovette argues that overlap between pending cases is the most important factor in deciding whether a stay is appropriate. Lovette Br. at 8. While "***a large degree*** of factual overlap between the civil and criminal cases" is indeed "a significant factor, it is still only one 'consideration to be weighted against others.'" *Packaged Seafood*, 2018 WL 5785284, at *3 (citations omitted) (emphasis added). But the weight of authority holds that even with "a large degree of factual overlap," "[i]t is constitutionally permissible . . . for a defendant to have to

---

[8] Plaintiffs do not separately address Lovette's unsupported motion to quash. He cites no authority even remotely supporting that relief, let alone any authority on facts even close to those present here. Lovette Br. at 6-7. All of his (incorrect) arguments in support of his motion to quash are addressed and rebutted in the context of his motion to stay. Separately, Plaintiffs do not oppose Penn or Lovette's requests to intervene, just the relief they seek as intervenors.

REDACTED PUBLIC VERSION

make th[e] choice" between testifying in a civil matter and invoking their Fifth Amendment rights. *Id.* (citation omitted). This choice "is the same one faced by every defendant faced with criminal liability, and multiple courts have denied stays" under such circumstances. *Id.* (citation omitted). This is because there are "equitable means other than a stay" at the Court's disposal to "protect [Penn's and Lovette's] interests," such as a protective order limiting the use of their deposition testimony by the DOJ and the Shareholder and Derivative Action plaintiffs. *Id.*

As a threshold matter, this factor weighs in favor of denying Penn's and Lovette's motions because there is no substantive overlap (let alone a "large degree of factual overlap") between this Action, on the one hand, and the allegations in the Criminal Indictment, Shareholder Action, or the Derivative Action, on the other. *See* Sections II.B.1. (contrasting this Action with the Criminal Indictment), II.B.2. (Shareholder Action), and II.B.3. (Derivative Action), *supra*. Penn's authorities are in accord.[9] And because of the lack of substantive overlap, it is also virtually guaranteed that the Shareholder and Derivative Action plaintiffs will be unable to obtain an adverse inference against either Penn or Lovette. *See* Section III.E., *infra*.

Even assuming *arguendo* that this factor did weigh in Penn's and Lovette's favor (and it does not), this factor is not dispositive and there are options available to the Court other than a stay. In *Packaged Seafood*, a corporate executive was criminally indicted for taking "part in the price fixing conspiracy which is the subject of th[e instant] civil litigation." 2018 WL 5785284, at *1. The executive was named by one civil plaintiff group, but not the others. *Id.* There, unlike here, there was complete harmony between the allegations in the criminal and civil actions and even with such complete overlap, the Court nonetheless allowed "[d]iscovery . . . pertaining to [the executive] as a third-party [to] proceed," and only entered a protective order "prohibit[ing the civil plaintiffs that named the executive as a defendant] from participating in or receiving any discovery against" the executive taken in the executive's capacity "as a third-party." *Id.* at *8.

In *CFS*, a case relied upon repeatedly by Penn, Penn Br. at 6, 13-14, the Northern District

---

[9] *E.g.*, *Clark v. Colbert*, No. 16-cv-115, 2016 WL 11671910, at *2 (E.D. Okla. Dec. 7, 2016) (denying request for a protective order as "the civil and criminal actions do not involve the same subject matter" and there was only "a tangential relationship to the subject of the criminal action and the issues arising in the civil action") (Penn Br. at 6); *United States v. Arnold*, No. 7-cv-753, 2008 WL 2037270, at *1-2 (W.D. Okla. May 8, 2008) (denying stay given "absence of evidence that the civil and criminal actions are parallel"; the "highly conjectural burden on Defendant of participation in civil proceedings d[id] not outweigh the important considerations of judicial efficiency and economy and the public interest in resolution of this action") (Penn Br. at 6, 11).

of Oklahoma took a similar approach. There, again unlike here, the court found "essentially a complete overlap of issues present in the criminal" action and the civil case in which the indicted witness' deposition was sought. *CFS*, 256 F. Supp. 2d at 1237. There the indicted witness argued, similar to Penn and Lovette here, that "negative inferences could severely damage his defense to the civil charges and lessen his chance of success on cross-claims." *Id.* at 1240. The court observed that "[t]he detriment to [the indicted witness] from any negative inferences is speculative at this point," and that even if the detriment was not speculative, "it is not unconstitutional to force a defendant to make this decision" between testifying (and risking self-incrimination) and invoking the privilege (and risking an adverse inference). *Id.* at 1240-41. The court adopted a "[l]ess drastic" measure than a stay, and instead adopted the "sensible option" of sealing the deposition directing "that it not be used for any purpose outside the civil proceeding except for perjury or impeachment." *Id.* at 1240-41.

With such an order, the depositions would not prejudice Penn's and Lovette's civil defenses and the only utility to the DOJ would be if Penn or Lovette lie under oath, and surely they are not entitled to any special protections if they provide false testimony. *See also, e.g.*, *Garcia v. City of Leavenworth, Kansas*, No. 19-cv-2049, 2019 WL 3302306, at *3-4 (D. Kan. July 23, 2019) (denying motion to stay despite the defendant's "dilemma regarding his Fifth Amendment rights" and instead suggesting "alternative methods" to "avoid [any] prejudice" such as "sealed depositions"); *id.* at *2 (citing *CFS*, 256 F. Supp. 2d at 1237); *Bd. of Cnty. Comm'rs of Cnty. of Adams v. Asay*, No. 11-cv-02238, 2012 WL 6107949, at *2 (D. Colo. Dec. 10, 2012) (denying motion to stay; "the Court notes that a variety of procedures exist to lessen any detriment to Defendant [] by having to defend himself in this civil matter" such as 'sealing answers to depositions, . . . or limiting disclosure only to counsel.'") (quoting *CFS*, 256 F. Supp. 2d at 1240); *U.S. ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 571 F. Supp. 2d 758, 764 (W.D. Tex. 2008) (denying motion to stay; "the Court could enter a protective order prohibiting the use of [the witness'] deposition answers, interrogatory responses, and answers to requests for admissions in any criminal proceedings brought against him").[10]

---

[10] The rule from *CFS* is widely followed outside this Circuit as well. *See, e.g.*, *United States v. Hames*, No. 18-cv-1055, 2020 WL 10139368, at *2-3 (N.D. Ala. Nov. 20, 2020) (ordering deposition to proceed but "providing for the sealing and confidentiality of the future civil deposition" of the criminal defendant) (citing *CFS,* 256 F. Supp. 2d at 1240-41) (collecting cases); *Lizarraga v. City of Nogales Arizona*, No. 06-cv-474, 2007 WL 215616, at *4 (D. Ariz.

Accordingly, this factor weighs against granting Penn's and Lovette's motions as there is no substantive overlap between this Action and the Criminal Indictment, the Shareholder Action, or the Derivative Action. *See Creative Consumer*, 563 F.3d at 1080-81 (upholding district court's decision denying stay where "there was limited overlap between the issues and evidence" in the instant civil litigation and the criminal proceedings).[11] At most, an order: (1) barring the

---

Jan. 24, 2007) (sealing deposition in lieu of stay); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04-cv-698, 2005 WL 8179401, at *7 (N.D. Ill. July 15, 2005) ("The Court finds that Defendants' Fifth Amendment concerns can instead be addressed by a less drastic remedy, the entry of a protective order sealing those portions of Defendants' deposition testimony that overlap with the anticipated criminal investigation[.]") (citing *CFS*, 256 F. Supp. 2d at 1241); *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979) ("a witness should be entitled to rely upon the enforceability of a protective order against any third parties, including the Government").

[11] The lack of overlap alone distinguishes this Action from all of the authorities cited by Penn and Lovette granting deposition stays; moreover, in each of the following cases the defendant in the criminal action was a defendant in the civil action in which the stay was sought—not so here. *Berreth v. Frazee*, No. 19-cv-27, 2019 WL 10250759, at *1-2 (D. Colo. Apr. 1 2019) (plaintiffs did not oppose the motion for a stay and did "not dispute that the facts of this case overlap with the criminal case") (Lovette Br. at 8); *Chagolla v. City of Chicago*, 529 F. Supp. 2d 941, 945-47 (N.D. Ill. 2008) (case in which stay was sought and parallel criminal action "involve[d] *identical* subject matter" and "the *exact same* incidents") (emphases added) (Lovette Br. at 6 n.3); *Chapman v. Hedderman*, No. 20-cv-825, 2021 WL 3686687, at *2 (W.D. Okla. July 30, 2021) ("The criminal charges against [defendant] Hedderman arise from the *exact same event* at issue in this case—the use of force against Plaintiff at the OCDC.") (emphasis added) (Lovette Br. at 8); *Cruz v. Cnty. of Dupage*, No. 96-cv-7170, 1997 WL 370194, at *2 (N.D. Ill. June 27, 1997) ("the court find that the civil and criminal proceedings do in fact involve *the same subject matter* . . . the [same] abduction, molestation, and murder" of the same victim) (emphasis added) (Lovette Br. at 5); *Fine v. Tumpkin*, No. 17-cv-2140, 2018 WL 317466, at *5 (D. Colo. Jan. 8, 2018) ("the allegations in the criminal proceedings *are essentially the same* as those raised here") (emphasis added) (Lovette Br. at 8); *Glover v. Upmann*, No. 19-cv-3738, 2020 WL 1433801, at *2 (N.D. Ill. Mar. 24, 2020) ("there is *certainly an overlap of issues* in the criminal and civil matters" which both "concern whether [defendants] caused [the victim's] death") (emphasis added) (Penn Br. at 14); *Graham v. Garfield Cnty. Det. Ctr.*, No. 17-cv-634, 2018 WL 4035971, at *3 (W.D. Okla. Aug. 23, 2018) ("the issues raised in the instant action substantially overlap with, and *are nearly identical to*, the issues raised in the criminal prosecutions") (emphasis added) (Penn Br. at 8, 10-11, 13-14) (Lovette Br. at 7, 9, 11); *Leland v. Short*, No. 16-cv-142, 2016 U.S. Dist. LEXIS 140544, at *3-4 (N.D. Okla. Oct. 11, 2016) (both cases "stem from the *same underlying facts*: [defendant's] alleged abusive conduct against [plaintiff]" and "plaintiffs d[id] not object" to the stay request) (emphasis added) (Lovette Br. at 9, 11-12); *McGarvey v. Special*, No. 6-cv-576, 2007 WL 222018, at *1 (N.D. Okla. Jan. 25, 2007) (there was "*complete identity of issues* between the case at bar and the criminal trial") (emphasis added) (Penn Br. at 10, 12); *Myers v. Brewer*, No. 17-cv-2682, 2019 WL 7293584, at *2-3 (D. Kan. Dec. 30, 2019) ("defendant has been criminally indicted in relation to *the same shooting*

Shareholder and Derivative Action plaintiffs from "participating in or receiving any discovery against" Penn and Lovette in this Action; (2) precluding Plaintiffs from asking questions about the "bid-rigging" claims in the Criminal Indictment; and (3) sealing the deposition and directing it cannot be used in connection with Criminal Indictment "except for perjury or impeachment" would protect any legitimate interests that Penn and Lovette might have.

### C.    The Status of the Criminal Case Does Not Favor A Stay

Courts in the Tenth Circuit have observed that on a "closer review of the cases granting [deposition] stays [] that 'most' courts do not necessarily grant a stay" even when the witness has been formally indicted. *CFS*, 256 F. Supp. 2d at 1238. Of those cases granting stays, the "request for the stay was made or joined by the United States Attorney or the District Attorney, or was unopposed by the plaintiff." *Id.* Of course, here, despite having notice of the pending depositions, Smith Decl. ¶ 6, the DOJ has not sought to intervene and stay the depositions. And the motion for a stay is opposed by Plaintiffs.

Penn and Lovette point to their October 25, 2021 trial date as cause to grant a stay, Penn Br. at 12; Lovette Br. at 9-10, while Penn repeats his (mistaken) claim that there is substantial overlap between the questions he will be asked in this Action and the allegations at issue in the Criminal Indictment, Shareholder Action, and the Derivative Action. Penn Br. at 11. Plaintiffs have already explained that there is no overlap and that, even when faced with "complete overlap of issues" courts still deny stays in favor of other remedies. *CFS*, 256 F. Supp. 2d at 1237, 1240-41. And to the extent that Penn and Lovette might have to spend a single day sitting for a deposition before, or during a break in, their criminal trial, that dilemma is of their own construction. Penn and Lovette were nonresponsive, ducked service, and insisted on motion practice (with extended briefing schedules that they requested and then complained of), all of which served to compress the time available for their depositions—which could have easily occurred over the summer. *See* Section II.D., *supra*. They cannot complain about the results of their own strategic moves.[12] This factor counsels against the relief sought by Penn and Lovette.

---

*incident* at issue in the civil matter" and so would "effectively forfeit[] this civil case") (emphasis added) (Lovette Br. at 7-8, 11).

[12] Lovette makes the irrelevant claim that he is among the earlier depositions to be noticed in this Action. Lovette Br. at 3. That much is true, because (a) Penn and Lovette are critical witnesses and (2) Plaintiffs wanted to secure their depositions before their criminal trial commenced, to alleviate any burdens on Penn and Lovette as much as possible but without the depositions

**D.** **Plaintiffs Will Be Prejudiced If They Are Forced to Take These Critical Depositions at the Eleventh Hour**

"Civil Plaintiffs have a strong interest in the speedy resolution of their claims, which weighs against a stay." *Packaged Seafood*, 2018 WL 5785284, at *4 (denying stay where indicted executive "played a central role in the alleged conspiracy and [plaintiffs'] factual case would be incomplete without" the deposition); *CFS*, 256 F. Supp. 2d at 1238 ("The third consideration involves the private interests of the Plaintiffs in proceeding expeditiously."); *see also Glover*, 2020 WL 1433801, at *3 (plaintiffs' interests weigh against a stay as "evidence disappears and memories fade; plaintiffs' cases rarely grower stronger with delays").

Penn and Lovette try to counter these interests by claiming that neither possesses unique knowledge that cannot be obtained from other sources, Penn Br. at 2, 8; Lovette Br. at 10-11, and there is "likely" plenty of time between the end of their criminal trial and the close of fact discovery in this Action for Plaintiffs to take their depositions without suffering any prejudice, Penn Br. at 11-12; Lovette Br. at 11. They are wrong on both counts.

As to their claimed lack of unique knowledge, Plaintiffs have shown above that there are questions that only Penn and Lovette could answer not just about specific instances of misconduct, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Section II.A., *supra*. This is just a small glimpse of the documentary record, which spans over 88,000 documents from Penn's and Lovette's files alone. Smith Decl. ¶¶ 1-5. Further, conspiracies are, by their nature, secretive— ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████ and conspirators rarely document their agreement or acts in furtherance thereof in detail. Penn and Lovette are thus virtually guaranteed to possess knowledge concerning Plaintiffs' claims beyond that reflected in the documentary record and that can only be obtained through oral testimony.

As to their claims about Plaintiffs' lack of prejudice from a delay, Penn and Lovette fail

---

occurring so late as to prejudice Plaintiffs. But Penn and Lovette are hardly alone, as Plaintiffs have already scheduled or requested the depositions of thirty-three percipient witnesses under Rule 30(b)(1) and seventeen separate 30(b)(6) depositions. Smith Decl. ¶ 9.

to appreciate that Plaintiffs have scheduled or requested dates for fifty different depositions in the opening waves of deposition discovery alone. Smith Decl. ¶ 9. If Penn and Lovette were deposed in January 2022, Plaintiffs will be prejudiced in myriad ways.

First, Plaintiffs would potentially have to reopen closed depositions to account for new testimony from Penn and Lovette concerning those previously deposed fact witnesses.

Second, Plaintiffs would likely need to notice additional depositions to account for testimony from Penn and Lovette. Unless Plaintiffs depose every current and former employee of Defendants and their co-conspirators—something that the deposition limits in this case would not permit—the likelihood that Plaintiffs will have deposed ███████████████

████████████████████████████████████████████████████████████

███ See Section II.A., supra.[13] Not to mention the need for depositions of individuals or entities that may be identified in Penn's and Lovette's testimony, but whose import to the case was not obvious on the face of the document discovery record.

Third, Penn's and Lovette's testimony would undoubtedly inform the questions Plaintiffs would ask of other deponents, the staging of certain depositions, and the allotment of Plaintiffs' available deposition hours. Plaintiffs will be making determinations on these issues without the benefit of Penn's and Lovette's important testimony.

Deposing Penn and Lovette just a few weeks before discovery is set to conclude and Plaintiffs' expert reports on both class and merits issues are due would implicate all of these concerns. This prejudice would persist even if Plaintiffs had months left to depose Penn and Lovette. Even if Plaintiffs are allowed to take Penn's and Lovette's depositions in October, Plaintiffs will have *already* been prejudiced, which is why Plaintiffs attempted to depose Penn and Lovette in August. Every day, and every deposition that passes without testimony from Penn and Lovette inures to Defendants' benefit and Plaintiffs' detriment.



19

Another concern is the likely possibility that Penn and Lovette would invoke the Fifth Amendment whether their depositions occur now or in January 2022 and irrespective of whatever procedural safeguards the Court puts in place. Nowhere is there a suggestion, let alone a commitment, that Penn and Lovette would testify substantively in January 2022 after their criminal trial, or even a commitment that they would actually sit for a deposition in January 2022. They may well continue to resist civil discovery even at that late date.[14] Penn and Lovette have suggested (if not committed) that they would invoke the Fifth Amendment now irrespective of available procedural safeguards. If that is true now, it is likely to be their posture in January 2022 as well, whether they are exonerated (out of fear of future criminal prosecutions) or incarcerated (to preserve the privilege during their appeals). They have said nothing to the contrary. Their motions may well invite prejudice to Plaintiffs only to delay the inevitable.

And courts in the Tenth Circuit have recognized that such invocations from critical witnesses in complex civil litigation are themselves a form of prejudice to plaintiffs, such that Plaintiffs are entitled at an early stage of the case to "require [the indicted witness] to assert his Fifth Amendment privilege so that Plaintiffs can preserve any right to a negative inference in the civil proceeding." *CFS*, 256 F. Supp. 2d at 1239.

> Plaintiffs are entitled to preserve the fact that they were deprived of information from the most central figure in the civil proceedings by a Fifth Amendment assertion at the beginning of six months of over two hundred (200) depositions. If [the indicted witness] deposition is delayed until the conclusion of discovery, any negative inferences received at that time would be of less impact.

*Id.*; *see also, e.g.*, *Hollinger*, 2005 WL 8179401, at *7 (denying stay request: "Plaintiff will be prejudiced if the depositions of the most important witnesses in the case are postponed until shortly before the . . . close of fact discovery."); *De v. United States*, No. 16-cv-2162, 2016 WL 4919468, at *3 (D. Kan. Sept. 15, 2016) (denying stay, noting that if the witness "does refuse to testify in this action" civil "plaintiffs are 'entitled to preserve the fact that they were deprived of information'" due to the Fifth Amendment invocation) (quoting *CFS*, 256 F. Supp. 2d at 1239).

*CFS* is directly on point. Although Plaintiffs, unlike those in *CFS*, are not seeking adverse inferences against Penn and Lovette, if Plaintiffs are deprived of critical testimony by

---

[14] Tellingly on this point, Lovette's primary relief sought, which cannot seriously be entertained, is that he should not have to sit for a deposition in this Action *ever*. Lovette Br. at 4-5.

their invocation of their privilege Plaintiffs reserve the right under Tenth Circuit law to seek adverse inferences against the non-settling Defendants.[15]

In short, Plaintiffs have already suffered prejudice from the delay in obtaining these depositions and will continue to suffer prejudice until they have occurred. This favors Plaintiffs.

### E.  Penn's and Lovette's "Hobson's Choice" is Illusory

Penn and Lovette claim they will be prejudiced by a deposition in this Action, with Penn claiming that they face a "Hobson's Choice," and each suggesting they may face adverse inferences in the Shareholder and Derivative Actions that have named them as civil defendants. Penn Br. at 12-13; Lovette Br. at 11-12. These contentions ignore the procedural safeguards that the Court can employ to protect their interests and fail to honestly assess the likelihood of adverse consequences that Penn and Lovette would face in the Criminal Indictment or Shareholder and Derivative Actions if they sat for a deposition in this Action.

"[A]t the outset," it is important to note that even if Penn and Lovette faced a real Hobson's Choice (they don't), and even if there weren't procedural safeguards the Court could employ to protect their interests (there are), "it is not unconstitutional to force a defendant to make th[e] decision" between testifying or invoking the privilege against self-incrimination. *CFS*, 256 F. Supp. 2d at 1240. For instance, in *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637 (N.D. Ill.), which had substantial overlap with the Criminal Indictment, the court denied in large part the DOJ's motion to stay Penn's deposition. Smith Decl. Ex. 22 at 1-2; *see also, e.g.*, *Estate of Morad v. City of Long Beach*, No. 16-cv-6785, 2017 WL 5187826, at *9 (C.D. Cal. Apr. 28, 2017) ("Simply being forced to invoke the Fifth Amendment, and accordingly incurring an adverse inference, is not by itself the sort of prejudice that categorically favors a stay.").

But Penn and Lovette do not seriously face this quandary because Plaintiffs will not be examining them over the separate issues raised in the Criminal Indictment, and in turn, the related securities cases. *See* Sections II.B.1.-3., *supra*. Penn and Lovette can safely testify in this Action because Plaintiffs' examination will focus on grower-facing issues distinct from those

---

[15] *E.g.*, *In re Urethane Antitrust Litig.*, No. 4-md-1616, 2014 WL 359565, at *2 (D. Kan. Feb. 3, 2014) ("an executive's invocation[s] may be imputed to a corporate party with whom he has a close relationship, for purposes of allowing an adverse inference at trial against the corporation"); *Parker v. Olympus Health Care, Inc.*, 264 F. Supp. 2d 998, 1001 (D. Utah 2003) ("an adverse inference against the [employer] defendants was proper" based on invocation of the fifth amendment by employee that had "control over key facts involved in th[e] litigation").

raised in the Criminal Indictment. And in any event, the Court can limit the use of the deposition in the Criminal Indictment to issues of "perjury or impeachment," *CFS*, 256 F. Supp. 2d at 1240-41, which means the depositions' only utility to the DOJ at trial would be if Penn or Lovette lie under oath—a potential outcome unworthy of procedural safeguards from this Court.

Penn and Lovette also seriously overstate the risk of an adverse inference if they refuse to testify substantively when deposed in this Action. There is virtually none, as "the fact to be established by the adverse inference must be tethered to some other probative evidence admitted against the person invoking the Fifth Amendment." *Farrah v. Chacon*, No. 18-cv-895, 2018 WL 7141329, at *5 (D. Colo. Dec. 6, 2018) (collecting cases). "In other words, there must be some factual basis for the adverse inference—some independent evidence of the fact sought to be established by the inference." *Id.* Plaintiffs will examine Penn and Lovette with lines of inquiry and using exhibits concerning a grower-facing conspiracy. While those exhibits are "other probative evidence" providing "some factual basis for" an adverse inference in a case involving a grower-facing conspiracy, the Shareholder and Derivative Actions allege a sales-facing conspiracy. *See* Sections II.B.2.-3., *supra*. Since there would be nothing to tether their testimony in this Action to the issues in those cases, allowing an adverse inference would be improper.

Regardless, as discussed above, the Court can bar the Shareholder and Derivative Action plaintiffs from "participating in or receiving any discovery against" Penn and Lovette, mooting their concerns entirely. *See* Sections II.A.-B., *supra*,

Finally, Penn makes the (irrelevant) point that he is "one of only two defendants in the criminal action whose depositions plaintiffs seek to take in this matter," Penn Br. at 13, but that point undercuts Penn's and Lovette's assertions that Plaintiffs have merely noticed these depositions up to elicit Fifth Amendment invocations from irrelevant witnesses. *E.g.*, Penn Br. at 6 (discussing Penn's "Hobson's Choice"); Lovette Br. at 5 ("It is apparent that the purpose of the deposition is to force Mr. Lovette to assert his Fifth Amendment rights on the record."). If Plaintiffs were mindlessly hunting for Fifth Amendment testimony irrespective of the deponent's connection to the case, they surely would have subpoenaed *all* of Penn and Lovette's criminal co-defendants—but Plaintiffs did not. None of Penn and Lovette's criminal co-defendants were even document custodians in this case, as Defendants and various non-parties represented that they had only *sales*-facing, not *grower*-facing responsibilities. *See, e.g.*, Smith Decl. Ex. 24 (June 10, 2020 email thread between counsel for Plaintiffs' and counsel for Pilgrim's agreeing that

**REDACTED PUBLIC VERSION**

given his sales-facing role, Pilgrim's Roger Austin—a named defendant in the Criminal Indictment—was not a proper custodian in this Action). Not so for Penn and Lovette, whose custodial files collectively contain over 88,000 documents responsive to Plaintiffs' requests for production in this Action. *Id.* ¶¶ 1-5.

The Court should thus allow these depositions to go forward. Penn and Lovette are critical witnesses. They face no serious consequences by testifying in this Action as the lack of overlap between this Action and the Criminal Indictment makes their testimony useless to the DOJ. And if the Court enters an order barring (a) Plaintiffs from inquiring on the bid-rigging claims and issues raised in the Criminal Indictment (something that Plaintiffs would stipulate to) and (b) the use of the transcripts in connection with the Criminal Indictment except for perjury and impeachment, then there would be no consequence to Penn and Lovette unless they lie under oath. If Penn and Lovette still refuse to testify despite the Court's implementation of those safeguards, the lack of overlap between this action and the Shareholder and Derivative Actions dooms any bid by those plaintiffs to seek an adverse inference. (And again, the Court can issue a protective order barring those plaintiffs from accessing the discovery to resolve any doubts.)

If, despite the procedural safeguards the Court can put in place, Penn and Lovette still decline to provide substantive testimony, that is their right—but it is no Hobson's Choice.[16]

In light of these considerations, this factor, too, weighs against a stay.

**F.      The Court Has an Interest in The Expedient Resolution of This Action**

"The Court has a strong interest in keeping litigation moving to conclusion without unnecessary delay," which is "enhanced in complex litigation." *CFS*, 256 F. Supp. 2d at 1241-42 ("Any delay or disruption of the schedule would severely hamper the progress made to this date."). Thus, "[t]his factor generally weighs against a stay because the Court has an interest in clearing its docket." *Packaged Seafood*, 2018 WL 5785284, at *6. Here, the Court has already expressed its goal to "ensure that we move expeditiously and efficiently." Hr'g Tr. 15:9-24 (Feb. 21, 2021). This factor thus weighs against a stay.[17]

---

[16] *See also SEC v. Thomas*, 116 F.R.D. 230, 234 (D. Utah 1987) (a witness is not permitted to invoke the privilege against self-incrimination "with impunity and without adverse consequence [for] refus[ing] to disclose facts tending to establish civil liability").

[17] On the interests of the Court, Penn cites in passing to *Windham for Marquis Props., LLC v. Snyder*, No. 18-cv-63, 2018 WL 4100512, at *5 (D. Utah Aug. 28, 2018) (Penn Br. at 13). While Magistrate Furse did grant a partial stay there, *Windham* is inapposite, as unlike here, (1) the

23

**REDACTED PUBLIC VERSION**

**G.      The Public Has an Interest in the Expedient Resolution of This Action**

"The public has an interest in both the prompt resolution of civil cases as well as the prosecution" of criminal cases, and so "the public's interest . . . is normally a question of what interest the United States Attorney has in the request for the stay." *CFS*, 256 F. Supp. 2d at 1242. Here, "neither the Plaintiffs in the civil case nor the United States Attorney have joined in the request to stay discovery," *id.*, weighing against a stay here. *See also SEC v. Gordon*, No. 9-cv-61, 2009 WL 2252119, at *3 (N.D. Okla. July 28, 2009) (noting that courts sometimes depart from the ordinary rule against civil discovery stays where "the prosecution[] request[s]" a stay until "pending . . . completion of a parallel criminal case") (Penn Br. at 11).[18]

**IV.    Conclusion**

For the foregoing reasons, Penn's and Lovette's motions should be denied, or, in the alternative, the Court should enter an order allowing the depositions now but (1) barring the Shareholder and Derivative Action plaintiffs from participating in or receiving any discovery against Penn and Lovette in this Action; (2) precluding Plaintiffs from asking questions about the "bid-rigging" claims in the Criminal Indictment; and (3) sealing the deposition and directing it cannot be used in connection with the Criminal Indictment except for perjury or impeachment.

Dated: September 24, 2021          Respectfully submitted,

                                   */s/ Gary I. Smith, Jr.*
                                   Gary I. Smith, Jr.*
                                   **HAUSFELD LLP**
                                   325 Chestnut Street, Suite 900
                                   Philadelphia, PA 19106
                                   Telephone: (215) 985-3270
                                   Facsimile: (215) 985-3271
                                   Email: gsmith@hausfeld.com

---

*Windham* criminal and civil cases "significantly overlap[ped]," (2) the *Windham* civil case had just recently been filed at the time of the stay request (while this case is approaching its fifth birthday), and (3) the *Windham* civil case named the criminal defendants, which meant that the civil defendants would "effectively forfeit th[e] case" absent a stay. *Id.* at *3-4. Not true here, where, *inter alia*, this Action is advanced in age, it does not name Penn and Lovette, and there are safeguards the Court can employ to protect their interests in the actions that name them.

[18] *See also, e.g.*, *In re Plastics Additives Antitrust Litig.*, No. 2:03-cv-2038, 2004 WL 2743591, at *8 (E.D. Pa. Nov. 29, 2004) ("The public's interest in vigorously enforcing national anti-trust laws through the expeditious resolution of a private antitrust litigation is particularly great.") (collecting cases).

24

**REDACTED PUBLIC VERSION**

Michael D. Hausfeld*
James J. Pizzirusso*
Melinda R. Coolidge*
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com

Kimberly A. Fetsick*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322
Email: kfetsick@hausfeld.com

Samantha S. Derksen*
**HAUSFELD & CO. LLP**
12 Gough Square
London, EC4A 3DW
Telephone: +44 (0)20 7665-5000
Email: sderksen@hausfeld.com

Kyle G. Bates*
**HAUSFELD LLP**
600 Montgomery St, Ste 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 633-4980
Email: kbates@hausfeld.com

Eric L. Cramer*
Patrick F. Madden*
David A. Langer*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: dlanger@bm.net

**REDACTED PUBLIC VERSION**

Daniel J. Walker*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bm.net

***Co-Lead Counsel for Plaintiffs and the Proposed
Class***

M. David Riggs
Donald M. Bingham
Kristopher Koepsel
**RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS**
502 West Sixth Street
Tulsa, OK 74119
Telephone: (918) 699-8914
Facsimile: (918) 587-9708
Email: driggs@riggsabney.com
Email: don_bingham@riggsabney.com
Email: kkoepsel@riggsabney.com

William A. Edmondson (OBA No. 2628)
**RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS**
528 N.W. 12th Street
Oklahoma City, OK 73103
Telephone: (405) 843-9909
Facsimile: (405) 842-2913
Email: dedmondson@riggsabney.com

***Liaison Counsel for Plaintiffs and the
Proposed Class***

Larry D. Lahman (OBA No. 5166)
Roger L. Ediger (OBA 19449)
**MITCHELL DECLERK, PLLC**
202 West Broadway Avenue
Enid, OK 73701
Telephone: (580) 234-5144
Facsimile: (580) 234-8890
Email: ldl@mdpllc.com
Email: rle@mdpllc.com

Vincent J. Esades*
**HEINS MILLS & OLSON, PLC**

26

310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns*
**BURNS CHAREST, LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
Email: wburns@burnscharest.com

Gregory L. Davis*
**DAVIS & TALIAFERRO, LLC**
7031 Halcyon Park Drive
Montgomery, AL 36117
Telephone: (334) 832-9080
Facsimile: (334) 409-7001
Email: gldavis@knology.net

Charles D. Gabriel*
**CHALMERS & ADAMS LLC**
North Fulton Satellite Office
5755 North Point Parkway, Suite 251
Alpharetta, GA 30022
Telephone: (678) 735-5903
Facsimile: (678) 735-5905
Email: cdgabriel@cpblawgroup.com

Larry S. McDevitt*
David M. Wilkerson*
**VAN WINKLE LAW FIRM**
11 North Market Street
Asheville, NC 28801
Telephone: (828) 258-2991
Facsimile: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

Harlan Hentges (OBA No. 17911)
**HENTGES & ASSOCIATES, PLLC**
102 East Thatcher Street
Edmond, OK 73034
Telephone: (405) 340-6554

**REDACTED PUBLIC VERSION**

Facsimile: (405) 340-6562
Email: harlan@organiclawyers.com

John C. Whitfield*
Caroline R. Taylor*
**WHITFIELD COLEMAN BULLOCK, PPLC**
19 North Main Street
Madisonville, KY 42431
Telephone: (270) 821-0656
Facsimile: (270) 825-1163
Email: jwhitfield@wcbfirm.com
Email: caroline@wbmllp.com

J. Dudley Butler*
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Drive
Benton, MS 39039
Telephone: (662) 673-0091
Facsimile: (662) 673-0091
Email: jdb@farmandranchlaw.com

Daniel M. Cohen*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
Facsimile: (202)789-1813
Email: danielc@cuneolaw.com

David S. Muraskin*
**PUBLIC JUSTICE, PC**
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 861-5245
Facsimile: (202) 232-7203
Email: dmuraskin@publicjustice.net

Kellie Lerner*
Matthew J. Geyer*
Meegan F. Hollywood*
**ROBINS KAPLAN, LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
Email: KLerner@RobinsKaplan.com

28

REDACTED PUBLIC VERSION

Email: MGeyer@RobinsKaplan.com
Email: MHollywood@RobinsKaplan.com

Aaron Sheanin*
**ROBINS KAPLAN, LLP**
2440 West El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
Email: ASheanin@RobinsKaplan.com

M. Stephen Dampier*
**DAMPIER LAW FIRM**
55 North Section Street
P.O. Box 161
Fairhope, AL 36532
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
Email: stevedampier@dampierlaw.com

Michael L. Silverman*
**ROACH LANGSTON BRUNO, LLP**
205 North Michigan Avenue, Suite 810
Chicago, IL 60601
Telephone: (773) 969-6160
Email: msilverman@rlbfirm.com

Grant L. Davis*
Thomas C. Jones*
Timothy C. Gaarder*
Thomas E. Ruzicka, Jr.*
**DAVIS BETHUNE & JONES, LLC**
1100 Main St, Ste 2930
Kansas City, MO 64105
Telephone: (816) 421-1600
Email: gdavis@dbjlaw.net
Email: tjones@dbjlaw.net
Email: tgaarder@dbjlaw.net
Email: truzicka@dbjlaw.net

Robert J. Bonsignore*
**BONSIGNORE TRIAL LAWYERS, PLLC**
23 Forest St.
Medford, MA 02155
Telephone: (781) 350-0000
Email: rbonsignore@classactions.us

REDACTED PUBLIC VERSION

*Additional Class Counsel for Plaintiffs and the Proposed Class*

\* admitted *pro hac vice*

**REDACTED PUBLIC VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2021, I electronically transmitted a true and correct copy of the this opposition and all related papers with the Clerk of Court for filing using the CM/ECF system, which will send notification of such filing to all counsel of record, and that I emailed counsel of record with unredacted versions of all filings made under seal.

*/s/ Gary I. Smith, Jr.*
Gary I. Smith, Jr.