```
 1               IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF OKLAHOMA

 3       _____

 4   IN RE:  BROILER CHICKEN GROWER
     ANTITRUST LITIGATION (NO. II)
 5       _____

 6
     HAFF POULTRY, INC., et al.,      )
 7                                     )
                        Plaintiffs,   )
 8                                     )
     vs.                               ) Case No.  20-MD-2977-RJS-CMR
 9                                     )
     TYSON FOODS, INC., et al.,        )
10                                     )
                        Defendants.   )
11

12                 TRANSCRIPT OF PROCEEDINGS

13                      JULY 13, 2023

14          BEFORE THE HONORABLE ROBERT J. SHELBY

15               UNITED STATES DISTRICT JUDGE

16               MOTION HEARING - VOLUME I

17
     APPEARANCES:
18

19   FOR THE PLAINTIFFS:       DANIEL J. WALKER
                               Berger Montague PC
20                             2001 Pennsylvania Avenue, NW
                               Suite 300
21                             Washington, DC  20006

22                             PATRICK F. MADDEN
                               Berger Montague PC
23                             1818 Market Street, Suite 3600
                               Philadelphia, Pennsylvania  19103
24
     REPORTED BY:              JOANNA SMITH, CSR, RPR
25                             United States Court Reporter
```

**United States District Court**
**Eastern District of Oklahoma**

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFFS:          GARY I. SMITH, JR.
                                  Hausfeld, LLP
 3                                600 Montgomery Street, Suite 3200
                                  San Francisco, California  94111
 4
                                  MELINDA R. COOLIDGE
 5                                SAMANTHA R. DERKSEN
                                  Hausfeld, LLP
 6                                888 16th Street, NW, Suite 300
                                  Washington, DC  20006
 7
                                  M. DAVID RIGGS
 8                                Riggs Abney Neal Turpen
                                  Orbison & Lewis
 9                                502 West Sixth Street
                                  Tulsa, Oklahoma 74119
10
                                  LARRY D. LAHMAN
11                                ROGER L. EDIGER
                                  Mitchell & DeClerck, PLLC
12                                202 West Broadway Avenue
                                  Enid, Oklahoma  73701
13
                                  J. DUDLEY BUTLER
14                                Butler Farm & Ranch Law Group, PLLC
                                  499-A Breakwater Drive
15                                Benton Mississippi  39039

16   ON BEHALF OF THE DEFENDANT
     PILGRIM'S PRIDE:             MARC E. KASOWITZ
17                                HECTOR TORRES
                                  DAVID E. ROSS
18                                KEVIN A. CYRULNIK
                                  HENRY BROWNSTEIN
19                                MICHAEL PECORINI
                                  Kasowitz Benson Torres LLP
20                                1633 Broadway
                                  New York, New York  10019
21
                                  LARRY D. OTTAWAY
22                                Foliart Huff Ottaway & Bottom
                                  201 Robert S. Kerr Ave.
23                                12th Floor
                                  Oklahoma City, Oklahoma  73102
24

25
```

**United States District Court**
**Eastern District of Oklahoma**

```
 1    APPEARANCES CONTINUED:

 2    ON BEHALF OF THE DEFENDANT
      SANDERSON FARMS:                ADAM C. DOVERSPIKE
 3                                    GableGotwals
                                      110 North Elgin, Suite 200
 4                                    Tulsa, Oklahoma  74120

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

                                                            <u>PAGE</u>
2   Argument on behalf of Defendant Pilgrim's Pride
       by Mr. Torres                                            10
3
    Argument on behalf of Plaintiffs
4      by Mr. Walker                                            92

5   Argument on behalf of Plaintiffs
       by Mr. Smith                                            132
6
    Further Argument on behalf of Defendant Pilgrim's Pride
7      by Mr. Torres                                           167

8   Further Argument on behalf of Plaintiffs
       by Mr. Smith                                            180
9
    Further Argument on behalf of Plaintiffs
10     by Mr. Walker                                           182

11  Further Argument on behalf of Defendant Pilgrim's Pride
       by Mr. Torres                                           187
12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2  JULY 13, 2023:

3          THE COURT:  Morning, everyone.

4          We'll go on the record and call Case Number

5  20-MD-2977.  It's our In Re: Broiler Chicken Antitrust

6  Litigation case.

7          I see we have a few lawyers here with us today and

8  some guests.  Why don't we take a moment and make our

9  appearances, please, for the plaintiffs.

10         Just one moment.  Let me get unpacked here.  As a

11  visiting judge, got everything in my bag.

12         For the plaintiffs.

13         MR. WALKER:  Good morning, Your Honor.  Dan Walker

14  from Berger Montague.

15         MR. SMITH:  Good morning, Your Honor.  Gary Smith

16  with Hausfeld.

17         MR. MADDEN:  Good morning, Your Honor.  Patrick

18  Madden with Berger Montague.

19         MS. COOLIDGE:  Good morning.  Melinda Coolidge

20  from Hausfeld.

21         MS. DERKSEN:  Good morning.  Samantha Derksen with

22  Hausfeld.

23         MR. BUTLER:  Dudley Butler from Butler Farm &

24  Ranch Law Group.

25         THE COURT:  Butler is the last name?

```
1              MR. BUTLER:  Butler.  For the plaintiff.
2              THE COURT:  All right.  Thank you.
3              All right.  And for Pilgrim's.
4              MR. OTTAWAY:  Larry Ottaway for the defendant.
5              MR. KASOWITZ:  Marc Kasowitz from Kasowitz,
6   Benson, Torres, Your Honor, for Defendant Pilgrim's.
7              MR. TORRES:  Morning, Your Honor.  Hector Torres
8   from Kasowitz, Benson, & Torres on behalf of Pilgrim's.
9              MR. BROWNSTEIN:  Good morning, Your Honor.  Henry
10  Brownstein from Kasowitz, Benson, Torres, on behalf of
11  Pilgrim's.
12             MR. CYRULNIK:  Good morning, Your Honor.  Kevin
13  Cyrulnik, Kasowitz, Benson, Torres, on behalf of Defendant
14  Pilgrim's.
15             MR. ROSS:  Good morning, Your Honor.  David Ross
16  from Kasowitz, Benson, Torres, for Defendant Pilgrim's.
17             THE COURT:  Oh, go ahead.
18             MR. PECORINI:  Good morning, Your Honor.
19  Michael Pecorini from Kasowitz also on behalf of Pilgrim's.
20             THE COURT:  All right.  Thank you.
21             I don't think we have anyone who's planning to
22  make any appearances for any of the other parties in the
23  case.  Am I wrong about that?
24             All right.  And we have a number -- hi.
25             MR. DOVERSPIKE:  Your Honor, Adam Doverspike for
```

```
1   Defendant Sanderson Farms.  I don't intend to participate,
2   but wanted to let you know I was here, Your Honor.
3              THE COURT:  It's good to see you.  Thank you.
4              Anyone else who cares to make an appearance?
5              All right.  A couple of housekeeping matters as
6   we're beginning.  Of course, we have two matters set on the
7   calendar for today and tomorrow.  We'll take up tomorrow the
8   plaintiffs' motion seeking class certification or ECF Number
9   454 in the main case.  I didn't separately call our
10  individual cases, but, of course, this is a joint hearing in
11  the main MDL and the sub-matters.  And I think today will be
12  largely focused on Pilgrim's motion to exclude the
13  plaintiffs' expert, Hal Singer, under Rule 702.  It's our
14  ECF Number 456.
15             The plaintiffs, of course, have their own *Daubert*
16  motion pending, and I understand from your submissions that
17  the plaintiffs don't believe that it's necessary for us to
18  resolve that issue to reach the class certification issues.
19  We appreciate the briefing that you-all submitted, I think
20  drawing into sharp focus the interrelationship between
21  Dr. Singer's opinions and the plaintiffs' class
22  certification motion.
23             I can tell you that in advance of our hearing, as
24  is always the case, we have spent a lot of time with your
25  papers.  We've read all of them, most of them more than
```

1   once.  They're dense.  You've given us a lot to think about.

2   I've never been more grateful for that economics PhD I got

3   from Stanford.  I kid.  So I'm really eager to hear from all

4   of you today.  I think you'll see a sponge on the bench.

5   I'm interested in trying to soak up as much of your

6   knowledge and expertise as I can, especially today.

7            We've received just about -- just briefly, to get

8   this out of the way before we begin.  I think we've now

9   received four letters from individuals in Oklahoma claiming

10   some interest in these proceedings and asking for guidance

11   from the Court about how to present claims.  We've lodged

12   those on the docket.  They're Docket Numbers 518 to 521.

13            I think the best thing to do is to ask the

14   plaintiffs to have the claims administrator send a claims

15   form for at least the one -- I think most of the deadlines

16   have passed.

17            But, Mr. Smith, do you have a suggestion?

18            MR. SMITH:  We've already done so, Your Honor, for

19   the Sanderson settlement.  So for the one claims period that

20   is still open, those growers are being sent claim forms

21   right now.

22            THE COURT:  Terrific.  Oh, we may have received

23   one more.  We'll just keep putting them -- placing them on

24   the docket, and we'll just understand that the plaintiffs

25   will be notifying the claims administrator.  Great.  Thank

 1    you.  Even untimely claims, I suppose, we should at least

 2    process, then we can take them up in turn if there are any

 3    untimely claims.

 4            MR. SMITH:  For Koch, we can do that.  For Tyson

 5    and Perdue, because of the distribution already, we won't be

 6    able to, Your Honor.

 7            THE COURT:  Fair.  All right.  Thank you.

 8            With respect to the *Daubert* motion and Dr. Singer,

 9    and I think even our class issues tomorrow, most of your --

10    maybe all of your papers, I think, are sealed under file

11    entirely, not just partially, and I think I understand why.

12            I think most of the discovery in this case, both

13    party discovery and third-party discovery, was undoubtedly

14    provided under protective orders.  This is a presumptively

15    open proceeding.  I mean, we're litigating in federal court

16    now, just as we will be at trial.  I've read those papers.

17    I don't see any trade secret information.  There may be some

18    competitively sensitive information perhaps, and I'm

19    especially mindful about potentially sensitive information

20    that third parties might have produced, but this is an open

21    hearing, and I don't have in mind closing the court.  I

22    don't have in mind sealing the transcript.  And if there's

23    something that you're about to discuss and you think it

24    needs to be in a sealed portion of the transcript, you

25    should let me know, and we can work through that if and/or

```
 1   when we get there.
 2            I think that's probably all you need to hear from
 3   me, and now I'm eager to hear from you, unless there's
 4   anything more we should take up by way of housekeeping.
 5            Mr. Walker and Mr. Smith?
 6            MR. SMITH:  No, Your Honor.
 7            MR. WALKER:  No, Your Honor.
 8            THE COURT:  For the defendants?  And tell me, to
 9   whom should I generally be directing questions at this
10   table?
11            MR. KASOWITZ:  Your Honor, you can direct them to
12   me and -- but, for today, it will be Mr. Torres that you'll
13   be directing, I think, your questions and attention to.  It
14   will be me tomorrow.
15            THE COURT:  All right.  Thank you.
16            MR. KASOWITZ:  Thanks, Your Honor.
17            THE COURT:  Mr. Torres, let me invite you to take
18   the podium.
19            I'm notorious for taking control of these
20   proceedings and dragging the lawyers around everywhere, and
21   I think the most helpful thing today will be for me to
22   listen to you.  So I won't be bashful about questions and
23   eager to hear what you have to share.
24            MR. TORRES:  Good morning, Your Honor.  Hector
25   Torres for Pilgrim's Pride.
```

United States District Court
Eastern District of Oklahoma

 1              Your Honor, on this Rule 702 motion, we're seeking
 2     to exclude the opinions of the plaintiffs' expert, Hal
 3     Singer, on the grounds that they are based on unreliable
 4     methodologies and in certain material respects, also are not
 5     relevant to the issues in this case.
 6              And one of the things, we're seeking an order
 7     excluding Dr. Singer from providing any opinions concerning
 8     the plaintiffs' claim and core theory in this case.  And to
 9     be clear, Your Honor, plaintiffs' claim and core theory is
10     that five defendant integrator companies and 16 alleged
11     co-conspirators engaged in a nationwide, 11-year agreement,
12     the purpose and effect of which was to suppress the pay of
13     more than 24,000 growers.
14              Plaintiffs also claim that this overarching
15     agreement consisted of two separate mutually reinforcing
16     agreements, a nationwide no-poach agreement and a nationwide
17     information sharing agreement.
18              And I plan to first briefly address the governing
19     standard on the motion and then to address Dr. Singer's
20     opinion concerning the overarching agreement.  I will then
21     turn to his regressions.  And before discussing the
22     regressions, I plan to provide an overview of some basic
23     economic and other facts concerning the market for grower
24     services, particularly as they relate to Dr. Singer's
25     opinions, based on the evidence in this case.

1          Briefly, on the standard, Your Honor.  As Your
2     Honor knows, the Courts have essentially distilled the 702
3     *Daubert* standard to two overarching requirements, the
4     expert's opinion must be both reliable and relevant.  The
5     Court has broad latitude in determining not only whether the
6     expert's testimony is reliable, but also in deciding how to
7     determine its reliability.
8          And particularly relevant to this case,
9     Your Honor, an expert's regression in antitrust in other
10    cases are not immune from *Daubert* scrutiny.  Any expert
11    testimony that relies on regressions that are either
12    unreliable or not relevant to the issues in the case should
13    be excluded.
14         And courts have not hesitated to exclude
15    unreliable expert opinions at the class certification stage.
16    As I will discuss, courts have excluded Dr. Singer's
17    opinions in other antitrust class action cases, including at
18    the class certification stage.  His opinions have been
19    excluded as unreliable because they were based on flawed
20    regressions.
21         Indeed, Your Honor, as we will demonstrate, many
22    of the fatal flaws that were found by the courts in those
23    cases also infect Dr. Singer's regressions in this case.
24         Now, let me turn to the overarching agreement
25    component of our claim.

1              THE COURT:  Before you leave the standard, the

2      parties all briefed this question under the current Rule

3      702.  That rule has been amended, effective December 1st.

4      There's a different standard that courts will be applying.

5      You briefed it under the current rule, I plan to decide it

6      under the current rule, but I wanted to ask if anybody

7      wanted to be heard about that.

8              I'll ask the plaintiffs later.

9              You presume the current rule should govern?

10             MR. TORRES:  Correct, Your Honor.

11             THE COURT:  All right.

12             MR. TORRES:  Okay.  Now, Your Honor, on the

13     overarching agreement, the first opinion we'd like to

14     discuss relates to his opinion concerning the overarching

15     conspiracy alleged by the plaintiffs.  And just to be clear

16     here, we seek an order excluding any testimony from

17     Dr. Singer concerning the overarching agreement as they have

18     defined it.  And we seek this exclusion for a very simple

19     reason.  Dr. Singer has not provided any reliable basis for

20     offering any such opinion, and his theory -- his theory as

21     to how the two separate agreements are mutually reinforcing

22     is not relevant to this case.

23             THE COURT:  How can that be?  At the class

24     certification stage, among other rules that I'm required to

25     apply, I presume the truth of the well-pled factual

 1    allegations in the complaint.  Of course, we go beyond the
 2    complaint, but this is the plaintiffs' theory of the case.
 3    The expert -- the jury will decide whether there's a
 4    conspiracy.  If there is, who was a member, what the
 5    duration was, and what the scope was.  But Dr. Singer can't
 6    ignore the plaintiffs' theory when he's providing testimony
 7    about his other opinions in the case.
 8            Now, he -- he's not a Magic 8 Ball.  He's not
 9    looking into people's brains, and he's not going to
10    articulate views about the intent of the actors, but isn't
11    it relevant under the plaintiffs' theory?
12            MR. TORRES:  Well, Your Honor, the problem is that
13    the theory that they have articulated is an overarching
14    conspiracy with two separate components.  We're fine so far.
15    But it also has a mutually reinforcing element to it, and
16    that's the core issue.  And if you recall at the motion to
17    dismiss stage, there was an issue in terms of which --
18    whether the -- they were whether the claims would be treated
19    separately or whether they would be treated as an
20    overarching.  And obviously that's significant because if
21    they're treated separately, there's a different standard
22    that governs with respect to the application of the rule.
23            Under the no-poaching agreement, it's a per se
24    standard, and under the information sharing, it's the rule
25    of reason.  And the reason this issue is important, Your

1    Honor, is because, in this case.  He definitely has done

2    extensive work with respect to the no-poach regression, the

3    no-poach opinion.  He's run his regressions and they all

4    relate -- you know, those regressions relate to the no-poach

5    opinion, and then he has a separate part of his report and

6    separate sections of his report which relate to the

7    information sharing.  That's fine.  He can testify about

8    that.

9         But what he can't testify about is the notion that

10   he has reliable evidence to support the overarching

11   conspiracy theory because one element of that theory is that

12   it be mutually reinforcing.  And he's done no evidence.

13   He's done no tests, no analyses, no economic studies to

14   capture what that means.  And we still are unclear.  I mean,

15   he has an obligation to testify as to the work that he has

16   done, but if he goes beyond it, then we have to look at,

17   well, what's the basis for his opinion to go beyond it.  And

18   the basis is very limited.  He doesn't express it.

19        THE COURT:  I just don't understand it to be that

20   complicated.  I mean, other parts of his analysis are for

21   sure, but as a matter of basic economic theory, to say it

22   doesn't make sense among competitors for you to share

23   contemporaneous information about your growers, unless

24   you've agreed you're not going to take each other's growers.

25   Now, that may be right and it may be wrong and there may be

1  other components to it, but this isn't -- this isn't

2  susceptible to a formulaic expression, it's just an economic

3  theory and principle, isn't it?  And he's articulated it,

4  not in great detail in report, perhaps, but that's what he's

5  -- that's all he' said about this so far; right?

6          MR. TORRES:  He basically has said very little.

7  On the overarching component of it, there's maybe one or two

8  sentences in the report that deal with it.  I mean, that's

9  it.  That's the sum total.  So on a Rule 702, the Court has

10  to make an assessment.  Has he -- has he proposed -- this is

11  for purpose of the jury, to assist a jury in making this

12  determination.  What methodology or principles has he

13  brought to the table that will enable the jury to decide

14  that issue?  None.

15          THE COURT:  Won't it matter in this instance?  It

16  seems to me that your first subject and seventh, relating to

17  Dr. Singer's opinions, strike me as the kind of issues that

18  we have to resolve at trial when we hear what he's asked and

19  what he says.  And you may object it goes beyond the scope

20  of what he said in his report, you may object -- who knows

21  what your objections might be.  But don't we need to hear

22  what that opinion is before we can assess whether it's

23  reliable and relevant?

24          MR. TORRES:  Well, Your Honor, the problem is that

25  you have to get past -- the Court has the gatekeeper role to

 1   keep out opinions that could be misleading or that are not

 2   supported by reliable evidence.  I mean, that are reliable

 3   based on expert standards, based on principles.

 4         The standards are you have to rely on -- you know,

 5   on the facts and the data in the case, you have to rely on

 6   principles that are -- that are reliable, and they have to

 7   be reliably applied.  You take all those criteria there, and

 8   with respect to the overarching conspiracy theory, there's

 9   one sentence.

10         And so we're not -- we're not saying that he

11   should be precluded from testifying about the no-poach

12   agreement, about his regressions.  He can testify all he

13   wants about that.  We're not saying he can't testify to the

14   information sharing, all you want.  But in connection with

15   the overarching theory, this overarching claim, with this

16   mutually reinforcing, that is a problem.  And the reason

17   it's a problem is because, ultimately, it comes down to an

18   issue concerning the standard that governs the case.

19         And if he is able to bring in through the back

20   door information concerning, you know, the information

21   sharing, in order to avoid and not have to deal with the

22   requirements that otherwise would apply at the rule of

23   reason stage, then he's able to circumvent those

24   requirements, which include greater specificity with respect

25   to having to set forth the basis of a rule of reason claim.

```
 1           THE COURT:  I think the reason -- the reason I'm
 2  getting high-centered is I don't know what this opinion is
 3  that you're objecting to, that Dr. Singer is going to offer
 4  at trial.
 5           You've just now talked about -- as I've understood
 6  what you just said, you're concerned that an expert might be
 7  now talking about standards that apply or the law that the
 8  jury is supposed to consider or the elements of the
 9  evaluation, which is all stuff that I'll be charging the
10  jury on.  The experts won't be talking about this at trial.
11           But I don't -- I truly don't -- I am high-centered
12  on this question that we have these two theories, the
13  information sharing and the no-poach, and that the objection
14  is an economist says those are two things you wouldn't
15  expect to see in isolation, I'm not surprised to see them
16  together.
17           The jury is going to have to decide whether either
18  or both exist and whether there is an overarching
19  conspiracy.  No expert is going to say there is an
20  overarching conspiracy.  The jury will have to decide it.
21           So what is the opinion exactly that you're trying
22  to strike?
23           MR. TORRES:  Well, the opinion is -- the opinion
24  we're trying to strike is essentially the opinion that --
25  the sole support that he provides for this part of his
```

1    testimony, for this notion that is mutually reinforcing.

2            And just to be precise, Your Honor, this appears

3    -- and this is -- this is his sole basis in the hundreds of

4    pages of reports that he submitted, this is his basis for

5    opining on this mutually reinforcing component of his

6    theory.  This is it.  And I quote:  "It is not rational in

7    the absence of a no-poach agreement for an integrator to

8    share with another integrator information about which

9    growers are performing the best because such information

10   would allow the second integrator to identify targets for

11   poaching, making poaching more effective and profitable."

12   That's it.  That's the sum total of the decision.

13           And in connection with this, the plaintiffs have

14   taken the position in this case that any information with

15   respect to efficiencies are not part of the equation.

16   Any -- any -- in other words, when we look at the impact of

17   the conduct -- there are two things you have to evaluate

18   when you're dealing with the rule of reason.  One of the

19   things you have to evaluate is whether there are

20   procompetitive effects as a result of the information

21   sharing.  Perfectly fine.

22           In this case, we never pursued and didn't have --

23   didn't have any obligation to pursue that particular line of

24   discovery, that particular line of analysis, because we're

25   operating under the per se standard.  And under the per se

1  standard, there's no obligation to -- on behalf of the

2  defendant, there's no obligation to assemble and put

3  together and present a case concerning the procompetitive

4  effects.

5       So here, he's actually making -- he's avoiding the

6  issue and he's able to -- trying to, through the back door,

7  bring in this -- this argument without -- and really

8  depriving Pilgrim's of the opportunity to present the

9  evidence that we otherwise would have had if we were

10 operating under the rule of reason.

11      So that's the reason it's important, Your Honor.

12 In terms of -- it's important.  And I understand what you're

13 saying in terms of a jury, and you can just pretend they can

14 decide, but it's really a more fundamental and a core issue

15 that really goes to the requirement, particularly under

16 *Comcast,* that there be a nexus between the damages and the

17 damage models that have been presented by the expert and the

18 theory that the plaintiff has presented.

19      And here, what we're arguing, is that based on the

20 report that he submitted, there's a complete disconnect

21 between the report, those opinions, and the analyses that

22 he's done in his report.

23      THE COURT:  Why?

24      MR. TORRES:  Because there's -- there is --

25 there's no -- this opinion that he expressed here, which I

1   read to you, Your Honor, concerning the absence that you
2   identify, he's basically saying that you can assume that the
3   reason they're sharing information -- and this is the
4   implication of this -- because there was a no-poach --
5   because there was a no-poach agreement.  Well, that is --
6   what's his basis for that?  I mean, other than -- is he --
7   if you look at the actual data in connection with -- that
8   he's referencing here, for sharing the data -- there's two
9   types of data.  There's the grower pay data and then there's
10   a performance metrics data, things like feed conversion, the
11   livability; okay?  So those are two separate components.
12        The plaintiffs' theory from the outset has been
13   that the only thing that they're focusing on here is the
14   exchange of data concerning pay.  And they've taken the
15   position, very clearly, that anything unrelated to pay,
16   related to efficiencies, is not in the case.  So he's
17   basically confusing that.  He's bringing it into the case,
18   and he's using it affirmatively, depriving Pilgrim's of the
19   opportunity to develop the record to oppose it.
20        THE COURT:  So I've heard you say different things
21   now.  That sounds like a 403 argument, not a 702 argument.
22   And with respect to 702, I don't understand what -- he's not
23   going to do a regression on a basic economic theory that --
24   what -- what the plaintiffs have proposed and alleged here
25   makes sense economically.  You wouldn't expect to see one

```
 1    without the other, if that's his opinion.  You read it.
 2              Or maybe you're arguing that we're really
 3    disputing whether it's performance or pay, and maybe he's
 4    using a different word than the plaintiffs used in their
 5    complaint.  But -- so which is it?  Or is it all of those
 6    things?
 7              And I still don't -- what analysis do you think an
 8    economist is supposed to do to prove a general theory about
 9    why it would make sense that these agreements would be
10    mutually reinforcing at a high level --
11              MR. TORRES:  Well, Your Honor, but that's the
12    point.  If there is no analysis, then we don't need -- then
13    we don't need -- then we don't need this expert.  I mean,
14    his role is to come in and bring some expertise.  Then this
15    is ipse dixit; okay?  So he thinks that's the case, but
16    there's no economic analysis.  He has to have some reasoned,
17    principle basis that our experts are able to explore and to
18    analyze.  And in the context of doing that, that's when we'd
19    have an opportunity to develop the record with respect to
20    the difference on -- on the procompetitive effects of
21    information sharing.
22              THE COURT:  -- do your experts have views about
23    whether or not these agreements like this would be mutually
24    reinforcing in economic theory?
25              MR. TORRES:  Well, Your Honor, I'm sure they do,
```

1   but that's not -- but they're not in the case.  I mean, if

2   -- I'm sure they do, and if they were in the case, if that

3   was really a core element of this case, then there will be

4   another expert report, a separate expert report, probably

5   200 pages long, dealing with the procompetitive effects.

6   But we don't have that because we're operating under the

7   rubric of this overarching conspiracy that kind of lets

8   them, you know, avoid all those issues, make these kind of

9   statements just based on his ipse dixit.  That's all it is.

10          Of course, he can express the opinion, but the

11   question is, is there a reliable foundation for an expert to

12   infect a jury with that kind of information, where that's

13   one of the core issues in the case, whether there's an

14   overarching agreement.

15          THE COURT:  It's -- I'm really trying to

16   understand.  It strikes me as just an entirely different

17   subject matter, for example, than a model to calculate

18   damages or to decide whether everyone's been -- all the

19   members of the class have been harmed, a regression

20   analysis.  This sounds like economic -- basic economic

21   principles and theories that would be helpful to a sixth

22   grade teacher who's on our jury, who may not have facility

23   with economic theory.  So it seems relevant and helpful.

24          I don't see what analysis is missing.  If there's

25   an issue here about the relationship between the per se

1   standard and the rule of reason -- this is something I was

2   hoping we would be discussing today.  I wonder if we're a

3   little bit ahead of ourselves, but maybe we're not.  I can

4   see that it's relevant, but it hasn't been clearly discussed

5   in the papers.  You both take different positions.

6           Your statement today, Mr. Torres, that the rule of

7   reason -- that the per se standard applies to the no-poach

8   is the first time I've heard the defendant say that.  I

9   think you said otherwise in your papers.  I think you

10  dispute that.  I think you argue that the rule of reason

11  applies.

12          And the reason I've been thinking that this may be

13  relevant is because I think it will come into our discussion

14  about Dr. Singer's discussion about the relevant market.

15  But one step at a time, I suppose.

16          I'll go back to my first part.  Isn't it basic

17  economic theory?

18          Wouldn't it be helpful to a jury?

19          And isn't Dr. Singer in a position to have an

20  opinion about that?

21          And hasn't he basically told you what it is?

22          MR. TORRES:  But, Your Honor, I mean, the issue is

23  that this -- they were setting up what the nexus is going to

24  be with the -- between the opinion and the analyses that

25  he's done.  And *Comcast* is a good example of this, where the

 1   expert -- the expert essentially had four theories of the
 2   case and prepared a damages analysis and a report.  And then
 3   the case went forward, and it turned out that the judge
 4   threw out three of the theories.  So now the expert is left
 5   with -- you know, with this report based on the three
 6   theories.
 7          So right now, we're setting -- we're in precisely
 8   that situation because if it -- the model now has been
 9   structured and the damages have been structured in a way
10   that essentially combines -- you know, it has a separate
11   damage number for the no-poach, and then it has a separate
12   damage number for the information sharing, but the
13   information sharing, so-called, is really two constituent
14   elements.  There's actually an information sharing and a
15   no-poach.  So it has both.
16          So if -- if the case goes forward and there's --
17   an analysis is done with respect to the issue of the
18   no-poach, and they don't prevail on that part of the case,
19   that means that the per se standard is out, and you have the
20   information sharing, which is under the rule of reason.
21          And then the rule of reason, obviously -- because
22   right now, we've, you know, been operating under the per se
23   standard that applies to both of them.  So that's the issue.
24          THE COURT:  So then are we procedurally out of
25   step?

1          I think Pilgrim's is going to invite me to decide

2     that issue in the next round of briefing for summary

3     judgment.  But I'm not -- I haven't decided that issue

4     today.

5          And we don't have the *Comcast* problem today

6     because both of those claims, both of those theories, are

7     still alive in the case today.

8          MR. TORRES:  Well, we're making the record, Your

9     Honor, that we see this -- this nexus, and we're making the

10    record now that if something happens in the future in

11    connection with a disaggregation of the claim that has

12    implications under standard review, that -- that they

13    weren't expecting it, we're making the record now and

14    putting them on notice.

15         THE COURT:  That, I understand.  Okay.

16         MR. TORRES:  Thank you, Your Honor.

17         Now, Your Honor, before turning to Dr. Singer's

18    regressions and setting the context for the analysis of

19    those regressions, a useful starting place is some of the

20    basic economics and the facts concerning the market for

21    grower services.

22         These are facts there are either undisputed or

23    indisputable.  Plaintiffs purport to represent, as I

24    mentioned before, a putative class of more than 24,000

25    individual farmers, who, at some point between 2008 and

1    2019, raised chicks for one -- of 21 different integrator

2    companies that collectively own 147 processing plants

3    disbursed throughout the country.

4         The market for grower services is local.  93

5    percent of all growers -- that's more than 22,000 of the

6    24,000 potential class members at issue here -- are located

7    within 50 miles of the plant.  This geographic limitation is

8    driven by the need to reduce transportation costs and

9    protect the health of the birds.  The greater the distance

10   the birds have to travel obviously, the greater the risk of

11   mortality.

12        Local factors materially impact grower pay because

13   growers are hired from within a limited geographic range.

14   Decisions about grower pay, necessarily, are impacted by

15   local and regional factors.  Among the local competitive

16   factors impacting grower pay is, number one, the number of

17   integrator companies throughout the many different regions

18   of the country.  Local plant managers, with some limited

19   exceptions, make decisions about grower pay.

20        And as I mentioned before, this case involves 147

21   separate plants, which means that you have at least 147

22   separate local managers at those plants, at least, because

23   some of them have multiple local managers.  And different

24   companies have different approaches to pay.

25        Also at the local level, grower pay varies

1  depending on the specific grower, the type of broiler house,

2  such as, among others, conventional housing,

3  tunnel-ventilated houses, and premium houses; the size of

4  the birds that are delivered by the local plant, the number

5  of chicks that are delivered to the grower's farm, and a

6  host of other factors.

7          Now, the importance of the local factors on grower

8  pay was explained by the director of live operations at

9  Mountaire, David Patey, at his deposition.  And I'll just

10  give you a little question and answer in terms of what his

11  testimony was.

12          "QUESTION:  Now, are the payment terms in all

13          these contracts with the growers in North Carolina

14          the same as the payment terms for its growers in

15          the Delmarva Peninsula?

16          "ANSWER:  No.

17          "QUESTION:  Why is that?  Why are they different?

18          "ANSWER:  Well, different reasons geographically.

19          Costs were different for many items.  The overall

20          costs of living I think was higher on Delmarva

21          than it was in North Carolina.  I don't think the

22          labor rate was as high in North Carolina, but

23          specifically to the chicken business, for

24          instance, where North Carolina was located,

25          there's a lot of lumber industry."

 1              That's his testimony at pages 197 and 198.  And he
 2      also testified that fuel costs were different in different
 3      locations.
 4              Now, that's important, Your Honor, because that
 5      wide pay variance, based on integrator-specific,
 6      plant-specific grower-specific, house-specific, and a host
 7      of other factors is not genuinely in dispute in the case.
 8      And -- in fact, it's conceded at page -- on page 6 of
 9      plaintiffs' option brief.
10              Now, all of that pay variance at both the company,
11      the plant, and the grower level is clearly shown in graphs
12      of the actual grower pay data over an 11-year period.
13              Exhibit 31, from McCrary's report, shows the
14      grower pay from all 147 plants from 2008 to 2019.
15              Do we have that?
16              Okay.  As you can see from this graph, Your Honor,
17      the grower pay -- and these lines represent the different
18      integrators across that time span.  As you can see,
19      tremendous variance in all directions, which is just
20      reflective of the reality and the nature of the market.
21              Now, with that, let me now turn to more
22      specifically address a number of Dr. Singer's regressions.
23              THE COURT:  Before we get to the regressions, is
24      it not the case that it can both be true that grower
25      compensation is driven by local and regional factors,

1    including those you've described and others, I think, that

2    Dr. Singer takes into account, including the tax structure,

3    local tax structures, and other things.  Can't it also be

4    true that nationwide grower compensation can be suppressed

5    because of an overarching conspiracy among the integrators?

6              Those things are not mutually exclusive, are they?

7              MR. TORRES:  Well, no.  You know, theoretically,

8    Your Honor -- and we're not disputing that you can't have an

9    overarching conspiracy where all the -- all the companies go

10   into a room and agree, let's -- okay.  Let's agree that

11   we're going to uniformly reduce pay by 5 percent.  Of

12   course, that can happen, and it has happened in certain

13   cases.  It actually has happened and cases have been

14   litigated based on that, but that's not this case.

15             So yes -- the answer is yes.  It's theoretically

16   possible.  Well, then it gets to the issue of, you know,

17   what the evidence is in this case.  And, more importantly,

18   Your Honor, what is the nexus between the regressions that

19   he's done, because in order to understand the reliability of

20   those regressions, it is also important to understand the

21   local competitive dynamics that is informing the data that's

22   being inputted into the regression models.

23             THE COURT:  Fair enough.  And we're going to get

24   into -- I think this is what we're going to spend most of

25   today probably talking about.  But didn't you just reframe

1    the plaintiffs' theory in the case?

2          The plaintiffs have not alleged -- this isn't one

3    of those cases where the CEOs of five companies got together

4    and agreed they wanted to reduce their cost by 10 percent or

5    5 percent.  They're not -- the plaintiffs' evidence, I don't

6    think, and the theory isn't that the integrators targeted a

7    specific decrease.  It was that they wanted to control their

8    costs, and they wanted -- through reducing grower

9    compensation generally, and that these were the vehicles for

10   which they wanted to accomplish that feat, and that -- and

11   that they did, nationwide.  That's the plaintiffs' theory.

12         That theory is not in conflict with the defendants'

13   position that grower pay is a product of localized factors as

14   well.

15         MR. TORRES:  Right.  Well, Your Honor, I was

16   responding to your question, where you asked me whether

17   theoretically that was possible, and I gave you the

18   affirmative response.

19         THE COURT:  Okay.

20         MR. TORRES:  In connection with the next step,

21   which is really what the evidence is in this case -- and

22   you're right.  I mean, their theory is this kind of generic,

23   overarching agreement theory -- and that's why this kind of

24   tails back to the point about Dr. Singer because it's the

25   theory -- I mean, something has to hold that theory

 1    together; right?  So, yes, theoretically, it's possible that
 2    there could be tacit collusion.  Every one just, you know,
 3    somehow signals to one another that we're going to uniformly
 4    suppress pay by a particular percentage.  Zero evidence of
 5    that here, but that -- that is really the divide where we're
 6    at.  And that's why Dr. Singer's regressions -- which really
 7    go to the heart of that issue -- in terms of the competitive
 8    dynamic in this market, it's important to understand the way
 9    he's run them and the fundamental flaws that -- as I
10    mentioned before, flaws that have been identified by other
11    cases in locking out his opinions.

12         Now, let me just turn to Dr. Singer's no-poach,
13    you know, regression, Your Honor.  He claims that -- and
14    this is the one based on his -- the natural experiment.  He
15    claims that there was a two-and-a-half year breakdown of the
16    nationwide no-poach agreement between March 1st, 2013, and
17    July 31, 2015, in the Delmarva region.  This is what he
18    calls the "war on the shore."

19         Now, Dr. Singer describes Delmarva as providing a
20    natural -- a "natural experiment."  A natural experiment
21    that allows him to estimate the degree to which grower pay
22    was suppressed because of the alleged no-poach agreement.

23         Now, the Delmarva region includes certain parts of
24    only three states -- and this is a peninsula -- Delaware,
25    Maryland, and Virginia.  And this region includes only five

1    out of the 21 integrators, Allen Harim, Amick, Mountaire,

2    Perdue, and Tyson, and only ten out of 147 plants at issue

3    in this case.  Pilgrim's is not one of the integrators in

4    Delmarva.

5           Now, the evidence of the alleged no-poach

6    agreement in effect in Delmarva before 2013 -- this is the

7    before period -- consists of email exchanges between the

8    employees of the five integrators.  That's their evidence

9    that there was an agreement.  Now -- and this evidence

10   relates to decisions concerning the ten plants in Delmarva.

11          Now, what Singer does, his regression compares the

12   pay per pound and pay per square foot of the Delmarva

13   growers in the period before and after the alleged breakdown

14   of the no-poach agreement, the "war on the shore."  And he

15   estimates that plants in the Delmarva region paid their

16   growers approximately 4 percent more per pound than they did

17   before March 1st, 2013.

18          And Dr. Singer's opinion is that this increase in

19   grower pay in the Delmarva region essentially was caused by

20   the breakdown of the alleged no-poach agreement.  That's the

21   basis for the opinion that the alleged 4 percent suppression

22   in Delmarva "flowed exclusively from the NPA."  That's at

23   *Daubert* opposition 8 and Singer's report, paragraph 9.

24          Now, let me turn to the issue of the problems and

25   the flaws, the fundamental flaws with his work.  His

1  no-poach regression suffers from a fundamental

2  methodological flaw that renders it unreliable.

3         First, Dr. Singer never compares the increase in

4  actual grower pay in Delmarva to actual grower pay in the

5  rest of the country where he alleges the no-poach agreement

6  did not break down, but, under his theory, continued to be

7  maintained.  Had he done that analysis, he would have seen

8  that grower pay and the rate of grower pay outside of

9  Delmarva increased as much or more on average than the

10 grower pay and the rate of pay in Delmarva during the same

11 period.

12        The grower pay in Delmarva increased on average

13 12.4 percent, but increased 14.7 percent at the plant for

14 some -- for the same integrators outside of Delmarva, where,

15 again, Dr. Singer claims that the no-poach agreement did not

16 break down.

17        In other words, the actual pay data refute

18 Dr. Singer's opinion that a breakdown in the no-poach

19 agreement in Delmarva caused the pay increase during the

20 "war on the shore," and he does not show that the alleged

21 agreement, the no-poach agreement, caused the grower pay to

22 be suppressed in Delmarva before the "war on the shore."

23        Now, this is demonstrated -- and this fundamental

24 flaw is really vividly demonstrated by Dr. McCrary's work,

25 his difference-in-difference model, which is a

 1   widely-accepted methodology in antitrust cases.  And a
 2   difference-in-difference model basically and as applied
 3   here, it compares two things.  It compares to changes in
 4   grower pay at Delmarva plants before and after the "war on
 5   the shore."  So that's one point for the comparison.  It
 6   compares that to changes in grower pay in the non-Delmarva
 7   plants during the same period.  And by the non-Delmarva
 8   plants, of course, we're talking about 90 percent -- the
 9   other 90 percent of the growers.
10          Now, if a breakdown in the no-poach agreement had
11   an effect on grower pay, then the grower pay in Delmarva
12   would have increased at a greater rate than the grower pay
13   in the rest of the country, but the results show precisely
14   the opposite.
15          In other words, contrary to Dr. Singer's opinion,
16   there was nothing exceptional about the rate of pay growth
17   in Delmarva during the "war on the shore" when compared to
18   the pay growth rates of the other integrators.  And under
19   Dr. Singer's theory that the no-poach agreement was
20   suppressing pay, the Delmarva pay should have increased more
21   than the non-Delmarva pay, but that is not supported by the
22   actual grower pay data.
23          THE COURT:  So with respect to this criticism,
24   isn't this really just an argument that -- not that
25   Dr. Singer's calculations were incorrect, not that he

 1    misapplied his model.  It's that there are additional

 2    comparisons that he should have made.  Your expert says you

 3    should also compare -- if you're trying to test this,

 4    compare this data point with this data point.  Compare that

 5    data point with that data point.

 6            This sort of disagreement arises between experts

 7    all the time.  This is a classic -- let me rephrase.  Why is

 8    that not a classic battle of the experts?  What are the

 9    right data points to compare?

10            MR. TORRES:  Right.  Well, Your Honor, I think

11    it's -- it's really this opinion in conjunction with the

12    others that I'm going to be expressing, because I think that

13    is the combination of them that really rises to the

14    threshold of just rendering them unreliable and really

15    taking it outside the realm of the battle of experts.

16            THE COURT:  That's how -- that's how I think I've

17    understood generally.  That's not what you've said in your

18    papers, but that's my takeaway from it; right?  It's the

19    collective flaws that you see in this analysis that in your

20    judgment --

21            Is my microphone not on for you?  Am I not

22    speaking loudly enough?

23            THE REPORTER:  No, it's fine.

24            THE COURT:  It's not a commanding voice?

25            MR. TORRES:  We could hear you.

1           THE COURT:  I'm all ears.  Go ahead.

2           MR. TORRES:  Okay.  Thank you.

3           In any event, just to sum it up, I mean, the

4    results of this particular aspect of the work with the

5    difference in difference contradict his opinion.

6           Now, if this aspect of the before and after model

7    were reliable and he was -- and this is the key; okay?  If

8    it were reliable, it means that he has been successful at

9    isolating the effect of "war on the shore" on growers' pay.

10   Then the model, as I indicated before, should have shown a

11   higher rate of increase of pay in Delmarva relative to the

12   rest of the country.

13          Now, at least according to the Singer's theory, he

14   essentially -- let me fast-forward to what Dr. McCrary has

15   demonstrated.  Dr. Singer's own regression -- and to

16   rephrase a point -- when applied to the data from outside of

17   Delmarva -- finds that the grower pay outside of Delmarva

18   increases much or more than the increase in pay at the

19   Delmarva plant.

20          Now, this shows that the regression -- and this is

21   a key phrase, Your Honor -- it's not capable of isolating

22   the effect of the alleged collusion, because it provides no

23   support for the claim that the breakdown caused the pay to

24   increase in Delmarva during the "war on the shore."  And it

25   also means that the regression does not support his opinion

 1    that the alleged no-poach agreement caused the grower pay to
 2    be suppressed in Delmarva or outside Delmarva before the
 3    "war on the shore."
 4            Now, Dr. Singer criticizes the
 5    difference-in-difference test because McCrary uses only pay
 6    data for the integrators that also have plants in Delmarva.
 7    But that is precisely what is required under basic economic
 8    theory to have an untreated comparison group that is very
 9    similar to the treatment group.  Here, integrators with
10    plants in Delmarva and plants outside Delmarva.
11            THE COURT:  Wasn't there -- wasn't there also a
12    time break that Dr. McCrary employed here?  Or am I
13    confusing the tests now?
14            MR. TORRES:  Well, Your Honor, there is a time
15    break in one of the models, and it essentially deals -- what
16    he calls a -- I think it's an arbitrary structural break.
17    There's nothing arbitrary about it and there was no break.
18    I mean, that was just premised on the model that he -- that
19    he specified for conducting his regression, which is that
20    there's a before and after period.  So all he did was
21    basically follow the same structure of the model that had
22    been constructed by Dr. Singer.
23            Another criticism is that Dr. Singer -- or that
24    Dr. Singer claims that Dr. McCrary failed to include state
25    and regional fixed effects, but that's not relevant here.

 1   Dr. Singer's own regression results in Appendix Tables 12
 2   and 13 show that the inclusion of a state and regional fixed
 3   effects makes no material change to the grower pay.
 4           Now, let me turn to the second fundamental flaw in
 5   Singer's regressions.  And as we note and discussed before,
 6   Your Honor, they have to be considered together.  It's his
 7   falsification test.  And there's a standard falsification
 8   test that was run by Dr. McCrary.  And a falsification test
 9   is a standard tool that's used by economists to test the
10   reliability of regression by applying the regression to data
11   where you know no impact should be found.
12           For example, if -- suppose you want to put a new
13   COVID test on the market, but you first want to assess how
14   good the test is at detecting COVID.  One way to do that is
15   to give the test to a room full of people that you know do
16   not have COVID.  If your test shows that everyone has COVID,
17   then you know you have a bad test.  It couldn't be clearer.
18   And this is the kind of -- conceptually, the kind of
19   falsification test that McCrary has performed.
20           THE COURT:  How do courts on this subject matter
21   -- on this issue about falsification tests, haven't courts
22   recognized you find a good expert economist, they can run a
23   test using any model that will show that the results are --
24   will yield absurd results.  That this isn't a way to
25   disprove the reliability of a model.  It's a way to

1   illustrate weaknesses in it, perhaps.  But the fact that you

2   can plug in specific data in a specific way and get an

3   absurd result doesn't -- doesn't itself establish that the

4   test is unreliable?

5           MR. TORRES:  Yeah.  Your Honor, I do not disagree

6   with that at all, but the point is, this is another piece of

7   the equation here that is speaking toward this fundamental

8   failure to isolate the effect of the alleged conspiracy

9   here.  But if that's all it was, just the falsification

10  test, agreed.

11          Now -- so let's go back to just finish up on the

12  falsification test.  What he does is he uses Dr. Singer's

13  before and after model, using grower pay for plants not

14  associated with the "war on the shore," same model, but just

15  a set of data where you have plants that are not associated

16  with the "war on the shore."  If the model was reliably

17  isolating and measuring the effect of the "war on the shore"

18  -- which is exactly what he's saying -- after the breakdown

19  of the no-poach agreement, his methodology should find no

20  effect to grower pay outside Delmarva.  Common sense.

21  But the model fails this test, and it finds material

22  differences even among these plants.

23          And this is shown in Exhibit 28 of McCrary's

24  report, at paragraph 16, where he does a comparison of Dr.

25  -- of Singer's before and after results to a version of the

1  same regression using all plants, including those outside of
2  Delmarva.
3          THE COURT:  I know this is in the papers, but will
4  you say that again?  It's exhibit what?
5          MR. TORRES:  Exhibit 28, Your Honor.
6          THE COURT:  28.
7          MR. TORRES:  This is Dr. McCrary, paragraph 116,
8  page 91.
9          THE COURT:  Thank you.
10         MR. TORRES:  Now, the falsification test finds the
11 same patterns for grower pay at plants in Delmarva as well
12 as plants outside of Delmarva.  Those results show that the
13 increase in pay could not have been the result of the "war
14 on the shore" purportedly breaking down.  This, again, shows
15 that Dr. Singer's model is unreliable because he fails to
16 isolate the effect of the alleged no-poach agreement.
17         Now, Dr. Singer criticizes the falsification test
18 because it supposedly claims -- and this is what you were
19 alluding to before, Your Honor -- an arbitrary structural
20 break in the data for non-Delmarva integrators at the
21 beginning of the "war on the shore."
22         But I mentioned before, that's not correct.
23 Dr. McCrary's falsification test was properly based on
24 replicating Dr. Singer's before and after model, which
25 includes the structural break at the beginning of the "war

1   on the shore," and there's nothing arbitrary with this
2   inclusion in the non-Delmarva data used in the falsification
3   test.
4        The third fundamental flaw in Dr. Singer's
5   no-poach regression is that he assumes the results of his
6   regression -- and the results is that there's -- there was a
7   4 percent wage suppression across the board for all, more
8   than 24,000 growers.  He assumes that can be extrapolated to
9   all plants located throughout the country.  And that's the
10  basis for his assumption.  It's based on an extrapolation.
11  And it has to be based on an extrapolation, Your Honor,
12  naturally, because the actual analytical work and the
13  economic work is based just on data from Delmarva.
14       Now, Dr. Singer assumes that you can extrapolate
15  the results to growers in areas of the country where there
16  was only one company operating, and the grower could not
17  have been subjected to a no-poach agreement, or where the
18  grower never had any interest in switching companies.
19       In fact, Your Honor, five of the eight named
20  plaintiffs in this case were located in an area with only
21  one integrator, and the other three explicitly testified
22  that they never had any interest in switching integrators.
23  None of these speculative and unsupported assumptions are
24  supported -- of Dr. Singer's -- are supported by any
25  reliable methodology or other economic analysis.

1          His speculative assumptions are unsupportable

2     because his no-poach model is limited, as I said, to the

3     grower pay data of the five companies in Delmarva.  And the

4     data relates only to the ten Delmarva plants and does not

5     include the data from the other 137 plants outside --

6     outside Delmarva.

7          Now, even assuming that Dr. Singer's model had not

8     been flawed, that the most that he might be able to say is

9     that any impact from the alleged no-poach agreement may

10    possibly be limited to some growers in Delmarva.  That's the

11    confines of that particular model.  But, nevertheless, what

12    he does, he makes the quantum leap and assumes that the 4

13    percent pay suppression that he estimates for those Delmarva

14    growers would apply to all the growers in the country, more

15    than 24,000.

16         And for this, he's basically concluded -- and this

17    is another -- I'll got back to the Latin phrase, this is

18    based on his that based upon ipse dixit -- that the pay of

19    every other grower -- that's 90 percent of growers, in every

20    other part of the country, irrespective of the competitive

21    dynamic, irrespective of whether you only had one integrator

22    and there was no -- not even a possibility for switching,

23    they had their pay also uniformly suppressed.

24         Now, let's turn to the basis for this

25    extraordinary extrapolation.  The entire basis for

1   Dr. Singer's extrapolation assumption is set forth in a

2   single paragraph of his report at paragraph 231.  And it

3   consists of nothing more than certain superficial,

4   high-level comparison of averages of certain grower-related

5   metrics such as pay per pound, number of chicks placed per

6   flock, feed conversion averages, and other grower-related

7   statistics.

8         He simply looks at the Delmarva averages and the

9   nationwide averages, looks at both, compares them, including

10  Delmarva, and then he concludes that the similarity in those

11  high-level averages, that comparison, that alone, is a

12  sufficient basis to justify his sweeping conclusion that the

13  exact same 4 percent pay suppression in Delmarva would have

14  been transmitted to exactly the same degree to all growers

15  in the rest of the country, irrespective of the

16  circumstances.  That's it.  That's the basis for the

17  extrapolation.  And the rest of the country, as I mentioned,

18  we're talking about for 90 percent of the growers.

19         THE COURT:  Is that a -- is that a criticism that

20  goes to Dr. Singer's conclusion that all of the growers felt

21  some injury or is it a criticism drawn to his calculation of

22  the amount of the injury for each grower?

23         MR. TORRES:  Well, Your Honor, the --

24         THE COURT:  Is it the fact of damages or the

25  amount of damages?

1           MR. TORRES:  It's -- we're talking about impact.

2      We're talking about impact here, Your Honor.  That's -- this

3      is one of the threshold and critical issues, as you know, in

4      a Sherman Act case, is impact.  That's what we're talking

5      about.  And he's -- this is being used affirmatively for

6      impact purposes.  Of course, it also has consequences down

7      the line in damages, but at this threshold issue, that's

8      what we're talking about, impact.  This is what sweeps in

9      the more than 24,000 growers.

10          THE COURT:  I think the defendant -- I think

11     Pilgrim's argues in its papers -- do I have this right? --

12     that about 15 percent of growers in the class are in a

13     geographic area where there's only one integrator.

14          MR. TORRES:  Correct, Your Honor.

15          THE COURT:  Doesn't that mean that 85 percent of

16     the growers are in areas where there is more than one

17     integrator?

18          MR. TORRES:  Well, what it means, Your Honor, is

19     that there are areas of the country where there are

20     variances even with respect to the level of concentration of

21     companies in different regions of the country.  So, of

22     course, there's some where it's more than one, there's some

23     where it's two, there's some -- and Dr. McCrary has a chart

24     in his -- in his report that lays out, you know, with some

25     specificity, the different levels of concentrations in the

 1  different parts of the country.

 2          THE COURT:  And on impact, I understand Pilgrim's

 3  to take the position in its papers that there's a broad and

 4  firm rule that if more than 5 or 6 percent of the class is

 5  uninjured, that you don't certify a class.  I don't see that

 6  in the Tenth Circuit or from the Supreme Court.  I don't see

 7  any binding authority for that proposition.  And, in fact,

 8  didn't the *Black* case out of the Tenth Circuit -- I'm trying

 9  to remember now.  I think it was *Black,* in the Tenth

10  Circuit, Judge McHugh's decision -- acknowledge there were a

11  significant number of members of the class who likely

12  weren't harmed, but that didn't prevent certification.

13          MR. TORRES:  Your Honor, there have been different

14  decisions, and there is no uniformity on this and, we agree,

15  but there is authority for -- and there's no Tenth Circuit

16  case, but there is authority for the proposition that when

17  you have that, that that's more than de minimis.  Here is 15

18  percent and that's more than de minimis.  And courts have

19  found that that is sufficient for purposes of determining

20  that that just is too -- that percentage is just too high to

21  justify certification.

22          THE COURT:  What do I do with -- I believe I'm

23  required to assume the truth of the plaintiffs' well-pled

24  allegations in their complaint, and there's factual support,

25  at least in -- we'll get to summary judgment.  It looks to

 1    me on this incomplete record that we have at this stage,

 2    that there is sufficient evidence from which a jury could

 3    conclude that there is a conspiracy, a nationwide conspiracy

 4    among the integrators.

 5              And if that's true, as a matter of economic

 6    principle, why would the integrators engage in a nationwide

 7    conspiracy if all of these considerations of grower pay were

 8    only as isolated and localized as you're suggesting?

 9              Have I articulated that question well enough to

10    convey my concern?  I feel like that got confusing.

11              MR. TORRES:  Well, Your Honor --

12              THE COURT:  Why would you have this conspiracy --

13    if the plaintiffs can prove up this conspiracy, why does it

14    exist, if integrators don't need to have some agreement

15    among themselves nationwide, if they can really control

16    grower compensation on a plant-by-plant, local-by-local

17    area?

18              MR. TORRES:  Well, it's not that they can control

19    the compensation, Your Honor.  It's that in order to

20    determine grower pay, that you have to look at the different

21    regions to see what the level of competition is among the

22    companies.

23              And in connection with the point that I was making

24    before about the different concentrations across the country

25    of companies, that speaks directly to the issue of what the

 1    degree of competition there is in different markets.

 2           If you have two -- Delmarva happens to be an

 3    example of a case where you have five integrators, which is

 4    on the higher end of the concentration among the

 5    integrators.  But that really goes to the issue of whether

 6    the underlying claim here is even -- and this goes to the

 7    relevant market issue -- whether you have to appreciate the

 8    fact that these are local markets.  And you have to -- local

 9    decisions and the grow pay determinations are based on the

10    local dynamics within each of those markets.

11           And in connection with the -- you know, with

12    whether there's enough here for purposes of showing that

13    there is a -- kind of overarching agreement -- we obviously

14    disagree, you know, strongly with that, Your Honor, because

15    we think that the record obviously does not show that.  And

16    we think, in fact, that the record -- that once you start --

17    and Mr. Kasowitz is going to address some of this tomorrow

18    -- once you start seeing some of this evidence that -- that

19    they claim shows evidence of the overarching conspiracy,

20    it's a house of cards.

21           I mean, it's basically -- what they have, at best,

22    are some episodic, handshake deals in regions between two --

23    one or two plant managers, that we'll stay from each other's

24    growers, handshake deals, gentlemen's agreements -- that's

25    the way they're referred.  It's a leap to jump from those --

```
 1   those handful of agreements, it's a leap to argue that that
 2   constitutes evidence of a nationwide conspiracy,
 3   particularly when one of the vehicles that they're using is
 4   the information sharing through Agri Stats.
 5            So, Your Honor, we just -- you know, respectfully,
 6   on that issue -- and you'll hear about it more tomorrow -- I
 7   don't even think they get to that -- you know, I don't even
 8   think they pass that threshold.
 9            THE COURT:  What --
10            MR. TORRES:  And, Your Honor, if I may --
11            THE COURT:  You've cited --
12            MR. TORRES:  I'm sorry.
13            THE COURT:  You've cited, collectively, dozens of
14   cases in your papers.  I've read lots of cases.  I can't
15   tell you I read all of the cases you've all cited.  What
16   cases do you point to, Mr. Torres, that you think best
17   support this question about the reliability of applying an
18   isolated study to a broad national impact?
19            MR. TORRES:  Well, Your Honor, if I may, just for
20   one moment, on that question, just to tie the loop on the
21   last question.
22            THE COURT:  Sure.
23            MR. TORRES:  The *Black* decision out of the Tenth
24   Circuit essentially held that a significant -- this is a
25   quote -- "a significant portion of members who for some
```

1  reason could not have been harmed by the defendant's

2  allegedly unlawful conduct is defined too broadly to permit

3  certification."

4          So, actually -- I misspoke earlier.  The Tenth

5  Circuit has adopted what had been -- and it was until very

6  recently, it had not been expressed, but they adopted what

7  had been and still is the Seventh Circuit reasoning in

8  connection with that issue.

9          THE COURT:  I'm not sure that's right.  The Tenth

10  Circuit in that case affirmed Judge Freudenthal's decision

11  to certify a liability-only class, acknowledging that there

12  were some unknown number of people in the class who likely

13  were going to be unable to establish damages, preserve the

14  damages issue, and that was not an impediment to class

15  certification in the Tenth Circuit's view, as I remember

16  that case.

17          MR. TORRES:  Well, Your Honor, as I recall, it was

18  that if there's a significant number, that that was -- you

19  know, and maybe in that case, did it hit the threshold?  But

20  at least as standard, it was expressed that -- and it gets

21  -- you know, the devil is in the details of what's a

22  significant number that precludes certification.

23          THE COURT:  Fair enough.  Do you have my last

24  question in mind because, now, I don't?  I guess --

25          MR. TORRES:  Okay.  Your Honor -- yeah, on your

 1   other question, look -- I mean, it's obviously an issue that
 2   has to be decided at the class cert -- and this is --
 3   obviously, Mr. Kasowitz is going to address this.  But
 4   unlike at this hearing on the 702, under Rule 23, in the
 5   class cert hearing, there's a more rigorous standard that's
 6   applied.  And that more rigorous standard, you know,
 7   empowers you to actually dig into the merits to the extent
 8   necessary to resolve the class certification issue.  And
 9   Mr. Kasowitz will address this tomorrow in connection with
10   that precise issue that you just raised.
11          THE COURT:  Well, then let me -- let me refine my
12   question and be more precise.  It seems to me that the only
13   way I can proceed through the analysis you've given me is to
14   evaluate the extent to which each of these criticisms,
15   taking into account Dr. Singer's rebuttal to the criticisms,
16   collectively, if it crosses some threshold of reliability
17   where it has to be excluded.  And so this specific instance,
18   this criticism about extrapolating nationwide from a
19   regional study, this has been done before.  In my mind, it
20   goes to -- my first question is does that go to the strength
21   of the opinion or its core reliability?
22          And so I'm asking where a case is that says, no,
23   you can't do that.  Not that -- not that it's unreliable
24   because you didn't take into account certain factors, but
25   that's a -- that's a hard stop.

1          MR. TORRES:  Well, Your Honor, first of all, of

2     course, plaintiffs bear the burden of justifying the

3     extrapolation through some reliability methodology.  And in

4     terms of a case that says that, that's the Northern District

5     of Illinois decision in *Farmer v. Directsat*.

6          And here, as I've indicated, there is no economic

7     analysis to justify that extrapolation.  And that failure is

8     particularly egregious in light of the plaintiffs'

9     concession, on pages 6, 10, and 16 of their reply brief,

10    that local, state, and regional factors affect pay.

11         The other decision out of California, Your Honor,

12    *Kamakahi*, also stands for the proposition that an expert

13    that proposes a regression model that applies -- and I can

14    discuss -- I was going to discuss the specifics of it, but I

15    can do it now and give you some of the facts of that case.

16    And this is a California case, 2015.  It's a horizontal

17    price-fixing case in the Northern District of California.

18         And in this case, Your Honor, the plaintiffs

19    relied on Dr. Singer's regression, and they relied on

20    Dr. Singer's opinion and evidence of class-wide impact and

21    damages.  And just to give you some of the details, because

22    I think they're relevant in terms of drawing this point out,

23    the plaintiffs in that case were human egg donors.  And

24    their claim essentially was that they received artificially

25    suppressed compensation because of an alleged unlawful,

1    horizontal price-fixing agreement.

2            And the agreement there -- just so that the

3    context and the comparison is clear -- in that case, there

4    was no dispute about what the agreement was.  I mean, here,

5    of course, that's hotly disputed.  But in that case, the

6    agreement -- there was an industry association -- and the

7    industry at this time consisted of like 390 clinics and

8    agencies that participated in this human egg donor program.

9    And they -- trade association meeting, they came up with,

10   quote/unquote, guidelines limiting the pay that would pay to

11   human egg donors to 5- to $10,000.  So they had a clear

12   agreement, a clear restriction, in terms of a restraint.

13           Now, plaintiffs brought in Dr. Singer.  He

14   conducted his magic with the regression, and he offered an

15   opinion that they used in terms of trying to show both

16   class-wide impact and damages.

17           And another similarity that is kind of

18   interesting, Dr. Singer's regression was based on what he

19   considered a natural experiment.  Another natural

20   experiment.  This one was that three of the 390 clinics and

21   agencies had followed the guidelines for a certain period of

22   time, but then they changed course.  They disavowed the

23   guidelines and did not continue to follow them.  The classic

24   before and after period, the same construct the doctor used

25   -- Dr. Singer uses in this case.

1              In that case, he did exactly what he did here, a
2      before and after model, and he prepared his regression.  And
3      what did it find?  It found uniform suppression of pay to
4      these -- to the plaintiff, to the entire class.
5              So, basically, he extrapolated from the model
6      based on three -- in this case, there was three.  That was
7      the natural experiment.  In our case -- and in *Kamakahi,* it
8      was three.  In our case, it's five.  That's the difference.
9      And so he said he could extrapolate to all the agencies.
10             But just like Dr. Singer, if you look at his
11     report, there's no -- I mean, there is no economic analysis
12     or principal basis for him to predicate his assumption
13     concerning extrapolation.  He doesn't do anything.  He had
14     no basis at all.
15             And the defendants in that case, as we're arguing
16     here, they said, well, look, you cannot use Dr. Singer's
17     analysis to show that all these class members were injured
18     because he couldn't reasonably or reliably -- you know,
19     those results with the three couldn't be reliably applied to
20     the clinics and agencies in light of the absence of the
21     information that he had done to justify that extrapolation.
22     And the Northern District of California agreed.  It excluded
23     and struck Dr. Singer's opinion and regression because it
24     was based on data from only three agencies and because of
25     the absence of any legitimate basis for extrapolation.

```
 1              The same outcome, Your Honor, is appropriate here.
 2              Now, Your Honor, unless you have any other
 3   questions, I was planning on moving to the pay structure
 4   regression.
 5              THE COURT:  Just one moment, please.
 6              You and I are both moving at a decent clip in our
 7   discussion, which I know is taxing for a court reporter, and
 8   we've been going to about an hour and a half.  This seems
 9   like a natural place for us to break.  Let's try to keep it
10   short, maybe ten minutes, and come back, and let's pick up
11   where we're leaving off.
12              Thank you.  We'll be in recess.
13              MR. TORRES:  Thank you, Your Honor.
14        (Recess taken.)
15              THE COURT:  Mr. Torres, you were just about to
16   transition our discussion.
17              MR. TORRES:  Thank you, Your Honor.
18              I want to turn now to the pay structure
19   regression.  And the pay structure regression, according to
20   Dr. Singer, shows that grower compensation moved together,
21   in lockstep, across all complexes, all integrators, all
22   regions, and the entire industry.  And that a change in one
23   location is transmitted to growers in all other geographic
24   locations.  That's at paragraphs 255 through 263 of
25   Dr. Singer's main report.
```

1              Now, the existence of a rigid compensation
2    structure across the industry, according to Dr. Singer,
3    would -- and this is quoting precisely from his language --
4    "would transmit the artificially reduced compensation," and
5    then -- he's obviously referring to from the regressions --
6    "broadly across the class."  That specific language is at
7    paragraph 255 of Dr. Singer's report.
8              Now, in an antitrust case alleging a nationwide
9    agreement or scheme among companies to suppress pay, the
10   standard that must be satisfied to show common impact is a
11   pay structure across the entire grower industry nationwide.
12             The standard was summarized in the *Railway*
13   *No-Poach Antitrust* case.  There, the court, in the Western
14   District of Pennsylvania, held that the plaintiff must
15   present evidence that the "compensation structures" of the
16   defendants in the pertinent industry were so rigid that the
17   compensation of all class members were impacted.
18             THE COURT:  Yeah, I read that case.  I know that
19   that's what the Court said in that passage after evaluating
20   some other cases.  I'm not -- that case is not very
21   persuasive to me.  None of it's binding authority on this
22   Court in the Tenth Circuit, none of it's from the Supreme
23   Court.  I'm not sure that that's a misreading, but it seems
24   like an overstatement of a standard drawn from some other
25   districts.

```
1              I don't think you're going to convince me that the
2    required proof on this point is that kind of rigidity.
3              MR. TORRES:  Yeah.
4              THE COURT:  The plaintiff has to show something.
5    I'm convinced -- I don't think that I'm going to follow that
6    standard.
7              MR. TORRES:  Fair enough, Your Honor.  This is a
8    standard that's been articulated -- and you're absolutely
9    correct, it's not -- you know, the Tenth Circuit obviously
10   hasn't articulated, but the underlying principle that's
11   animating that standard is the one that we're subscribing
12   to.
13             THE COURT:  Well -- and I think it's going to be
14   incumbent on the plaintiff here to establish through expert
15   testimony some correlation or there won't -- you won't -- or
16   the impact won't follow throughout the class in the way that
17   the plaintiff is arguing, I think.
18             MR. TORRES:  Correct.  Correct, Your Honor.  There
19   has to be some -- this is -- whether the Court is persuaded
20   by the precise language of the *Railway No-Poach* decision or
21   not, you understand that this is really their burden to come
22   up with some quantitative methodology for purposes of
23   supporting the conclusion that this pay gets transmitted to
24   the entire class.  They have to come up with something.  It
25   can't be based on ipse dixit.
```

1          THE COURT:  I think you and I are saying the same

2     thing, that the proof has to be that the alleged antitrust

3     conspiracy impacted all the members of the class nationwide.

4          MR. TORRES:  Exactly, Your Honor.

5          THE COURT:  And the problem here -- I think what

6     you're focusing on is Dr. Singer's analysis trying to

7     extrapolate Delmarva nationwide.  Is that right?

8          MR. TORRES:  That's exactly correct, Your Honor.

9          THE COURT:  I'm listening.

10          MR. TORRES:  Great.

11          Now, Dr. Singer's pay structure regression is

12     fundamentally flawed and unreliable for several reasons and

13     -- that I will go through right now.

14          Number one:  A simple inspection of the actual

15     grower pay data -- and this is just the first point.  But a

16     simple inspection of the actual grower pay data from the

17     relevant period demonstrates that changes in grower pay do

18     not move in lockstep across companies throughout the entire

19     industry.

20          That is demonstrated in Exhibit 31 of

21     Dr. McCrary's main report.  And that shows that both grower

22     pay level and grower pay changes in rates varied widely

23     throughout the industry.  Now, this is the actual data.

24     This is not data that has been modified.  But these and

25     other charts in our class certification brief, at pages 7 to

9, show that grower pay and pay changes varied by region,
they varied by company, they varied by grower, and they
varied by housing class.  And, in fact, grower pay even
varied across growers of the same company, in the same
state, at the same time.

That data clearly provides no support for the
conclusion that grower pay moves in lockstep across all 147
plants in the country.

Now, it's a fairly axiomatic point, Your Honor,
but when the basic facts and the data in a case contradict
an expert's regression results, the regression is very
likely flawed.

And as the courts have held, pay structure
regressions can be used as an aid to interpret the data, but
not as a substitute for the actual data.

In the *Plastic Additives* case, Your Honor, the
Eastern District of Pennsylvania rejected the expert's
opinion that a pay structure exists in that market because
the graphs show that the actual prices did not behave
similarly for all products and all customers.

Third, Dr. Singer's pay structure regression, as
demonstrated in the report that we submitted from
Dr. Saravia, fails a standard falsification test.  This is
in conjunction with the prior flaws.  And as I mentioned
earlier, under this test, the regression is applied to data

1  where no impact should be found.  If the regression still

2  finds an impact, it means that the regression is not

3  reliable.  Here, Dr. Singer's regression finds a pay

4  structure, even when applied to data without a pay

5  structure.

6          So Dr. Singer ran -- Dr. Saravia -- I'm sorry --

7  ran Dr. Singer's pay structure regression over two sets of

8  data.  The first consists of two subsets of actual grower

9  data where a pay structure does not exist.

10          And between -- and I picked out some examples for

11  you.  Between 2008 and 2019, pay at Tyson's Temperanceville,

12  Virginia, plant increased by 50.7 percent, but increased by

13  only 9.2 percent during the same time period at Pilgrim's

14  Russellville, Alabama, plant.  And this is referenced and

15  presented in Exhibit 26.

16          And yet applying to that data, Dr. Singer's

17  regression generates a coefficient of .99, which, according

18  to him, signifies a rigid pay structure under his

19  definition.

20          Another example.  Under the same time period, the

21  total pay per square foot at Tyson's Hope, Arkansas, plant

22  increased by 65.2 percent, but decreased at Pilgrim's

23  Chattanooga, Tennessee, plant by 15.8 percent.  That clearly

24  cannot consider to be a lockstep pay structure.  Yet

25  Dr. Singer's regression here generates a coefficient of .98,

1    which, again, indicates a rigid pay structure.  And that
2    analysis is set forth in paragraph 67 and Exhibit 37 of
3    Dr. Saravia's report.
4          Now, Dr. Singer cannot meaningfully respond to
5    these results other than to continue to repeat, without any
6    legitimate support, that there is a pay structure.  Further
7    proof that Dr. Singer's pay structure regression is rigged.
8    It's rigged to always find a pay structure is -- when his
9    model is used with hypothetical data that, by design, lacks
10   any pay structure.
11         And there are a number of models that are run by
12   Dr. Saravia, but the one that I think is most significant is
13   one that has a set of data that simulates completely
14   randomized grower pay.  In other words, the data structure
15   is structured to not reflect that there has been -- you
16   know, it has been completely randomized, so there's no
17   structure.
18         When applying his model to that data, what he
19   finds is -- also finds that there's a pay structure, also
20   finds that there's a coefficient that's close to one.
21         Now, turning back to *Kamakahi,* also relevant here,
22   Your Honor.  In *Kamakahi,* Dr. Singer again opined that there
23   was a rigid pricing structure.  This is the human egg donor
24   case that I mentioned.  And there is the -- a rigid pricing
25   structure, here's a rigid pay structure.  But based on that

1  purported rigid pricing structure, the plaintiffs in

2  *Kamakahi* relied on Singer's opinion to argue that the

3  damages could be proven through common proof.

4          The court rejected Dr. Singer's opinion and

5  testimony concerning a rigid pay structure, and it did so in

6  reasoning that is applicable here.  Dr. Singer simply failed

7  to explain how this mechanism works across different clinics

8  and agencies that are not part of the same pricing

9  structure.  Here, also, Dr. Singer fails to articulate any

10  of the transmission mechanisms of his flawed pay structure

11  regression.

12          THE COURT:  Before you leave that point, what are

13  Dr. Singer's criticisms of Dr. Saravia's calculations?

14          MR. TORRES:  Your Honor, those criticisms do not

15  address -- do not go to the heart of the model that she

16  generated because they do not explain how the -- how he was

17  able to generate these results to that type of data.  They

18  simply don't respond directly, other than indicating that

19  there's always some possibility that there's going to be a

20  -- you know, that they're going to be results and not

21  consistent with his opinion.  But none of those criticisms

22  go to the heart of -- the core of her analysis, which is

23  that all she's doing is applying his regression to this data

24  that is randomizing and, by definition, should not reflect

25  the pay structure.

1          Now, Your Honor, I would like to turn to the

2    information sharing regressions.  And I would like to

3    address the fundamental flaws that render Dr. Singer's

4    information sharing regressions unreliable.

5          Those regressions are the sole quantitative

6    support for the plaintiffs' argument that grower pay was

7    suppressed, because all 21 companies entered into this

8    nationwide information sharing agreement with the purpose

9    and effect of suppressing the pay of more than 24,000

10   growers in the country.

11         Now, here, Dr. Singer identified and obtained

12   grower pay data from four third-party integrators whom

13   Dr. Singer claims did not participate in Agri Stats, but

14   otherwise are comparable to the 21 companies.

15         THE COURT:  Well, he assumed that fact.  He didn't

16   -- he's not testifying.

17         MR. TORRES:  Well, Your Honor, in the information

18   sharing, when you're setting it up and you're trying to --

19   you're trying to justify -- when you're trying to justify a

20   basis for a benchmark, you have to make a judgment in terms

21   of whether they're comparable.

22         THE COURT:  Well --

23         MR. TORRES:  I mean, that's what --

24         THE COURT:  No, he doesn't.  He can assume the

25   plaintiffs' theory in the case for purposes of his analysis,

1    and if you persuade the jury that the plaintiffs' theory is

2    incorrect, then the analysis falls apart; right?  Every

3    expert will say that on the stand.  I assumed the truth of

4    the allegation for purposes of my analysis.

5              Cross-examination.  And if you -- if the jury

6    disagrees with the plaintiffs' theory, then you agree your

7    analysis doesn't apply?  Answer:  Yes.  Right?

8              MR. TORRES:  Well, but, Your Honor, this is --

9    this is more fundamental, because, by definition -- a

10   benchmark analysis, by definition, is supposed to be

11   premised on two comparable comparisons; otherwise, it's

12   completely unreliable.  I mean, if you're comparing apples

13   and oranges, it's not going to have any meaningful -- you

14   can testify about it, but it doesn't pass the threshold of

15   reliability.

16             THE COURT:  So is it Pilgrim's position that the

17   other four integrators are part of the conspiracy, and the

18   plaintiffs are wrong, and Singer's analysis is incorrect

19   because they were part of the conspiracy that's alleged?

20             MR. TORRES:  Well, let me -- let me, if I may, go

21   through, I think this will respond to your question, Your

22   Honor.  And let's talk about the four other conspiracies --

23   the four other integrators.

24             Those four other integrators are Holmes, Freebird,

25   Gerber's, and Murray's.  Now, he opines that the pay of

1   these four integrator companies supposedly represents a

2   competitive benchmark.  That's the whole predicate of the

3   benchmark.  In other words, this represents -- this

4   represents the outcomes that you would have in the absence

5   of an information sharing agreement.

6           Dr. Singer's regression finds that after

7   accounting for other factors that could effect pay, the four

8   companies paid approximately 5 to 7 percent more than the 21

9   companies.

10          Now, let me explain why this regression is

11  fundamentally flawed.  Number one, the four so-called

12  benchmark companies are not comparable to the 21 companies

13  at issue here.  The four companies are small, specialty,

14  niche broiler production companies that differ operationally

15  in many material ways from the 21 companies in this case.

16  And they differ in connection with aspects of their

17  operations that directly impact grower pay.

18          Gerber uses Amish, or Amish, and nonelectrical

19  grower housing.  The 150 to 200 chicken houses that grow

20  Gerber chickens are Amish, or Amish, or "old-style growing

21  houses" that are not even connected to modern electrical or

22  energy grids.  Gerber also is certified by multiple animal

23  welfare organizations that have stringent requirements that

24  impose additional labor and expenses.

25          Freebird and Murray's are also certified by an

1    organization, the Global Animal Partnership, that has low --

2    special low-density and slow-growth requirements.

3            Freebird -- or Holmes -- moving on to Holmes --

4    uses growers who are members of the family that owns the

5    company, the Lester family, that owns Holmes.  Only 5

6    percent of the growers at Holmes are not members of the

7    Lester family.  This means that since 2008, Holmes has not

8    needed to recruit or contract any new growers.

9            The four companies also were much smaller in terms

10   of the number of growers.  They had an average of 100

11   growers.  The 21 companies here, in contrast, had an average

12   of 1,000 growers.  The so-called benchmark companies produce

13   fewer pounds of chickens per square feet, which means that

14   the companies need to be paid more on a per-pound basis to

15   ensure that they receive competitive pay.

16           Ignoring these material differences, Dr. Singer

17   focuses on pay per pound, which necessarily leads to

18   misleading results, because he failed to control for the key

19   variable of housing density.  Dr. Singer fails to control

20   for density, which is a critical flaw because of the

21   material differences between the four benchmark companies

22   and the 21 companies.  And density, so we're clear, refers

23   to the number of birds of growers in the house and is

24   measured in square footage per bird.  Singer simply ignores

25   all of the facts and reasons that the four companies are not

1    comparable to the 21 companies.

2          In short, the effect of running Dr. Singer's

3    regression, using total pay per square foot, is that the

4    regression finds the opposite of what he claims.  Provides

5    no evidence that the 21 companies in the case paid their

6    growers less than Singer's so-called competitive benchmark.

7          On the contrary, their total pay per square foot

8    is approximately 24 to 32 percent higher than the

9    compensation of third-party integrators, Gerber and

10   Murray's.  Nor can Dr. Singer reasonably claim that he

11   cannot use the pay-per-square-foot data in his analysis.

12         In his Delmarva and pricing structure regression,

13   he also uses the total pay-per-square-foot data.  It was

14   only in this regression, however, which contradicts his wage

15   suppression opinion, that he elected not to include the

16   total pay-per-square-foot data.

17         Once this fatal flaw was pointed out to

18   Dr. Saravia -- was pointed out by Dr. Saravia, the only

19   excuse that Dr. Singer could present was that he did not use

20   the pay-per-square-foot data for this regression because it

21   was not provided by Holmes and Murray's.  But that's not a

22   legitimate excuse because he could have used the data from

23   the companies that did provide the data.

24         In other words, even under Dr. Singer's flawed

25   logic, all four firms are competitive benchmarks, which

1   means that his model should be robust to the inclusion or

2   combination of the four.

3          So after receiving Dr. McCrary's report, what did

4   Dr. Singer do?  He ran a different regression that does

5   control for housing density, which he claims still shows pay

6   suppression.  But that new regression does not help

7   Dr. Singer because it provides no support for his opinion in

8   this case that the information sharing agreement suppressed

9   grower pay by 5 to 7 percent.  If anything, the results have

10  a dramatic effect on the results presented in Dr. Singer's

11  model, reducing the coefficient by 70 percent.

12         And even Dr. Singer admitted at his deposition, on

13  pages 51 and 52, that any variable in a regression that has

14  such an effect on the results of the regression is a key

15  variable.  And the exclusion of such a variable renders a

16  model unreliable.

17         Third, the lack of reliability of Dr. Singer's

18  information sharing regression is also demonstrated through

19  another falsification test that was run, this time by

20  Dr. McCrary.  This is a test of Dr. Singer's assumption that

21  all four third-party integrators provide a reliable estimate

22  of the but-for pay per pound.

23         Now, if all four provide a benchmark for a

24  competitive rate -- if all four provide a benchmark for a

25  competitive rate of pay, and Dr. Singer has all the

1  appropriate controls, the regression should not find that

2  any of the third-party companies paid significantly less or

3  more than any -- than any of the other third-party

4  companies.

5      Again, the falsification test is a common vehicle

6  used for purposes of testing the reliability of a

7  regression.  And for this test, what Dr. McCrary did was he

8  treated Freebird and Murray -- and Murray's as benchmarks,

9  and the other two, Gerber and Holmes, as presumed members of

10 the alleged conspiracy, using the same regression model that

11 Dr. Singer uses to analyze the impact of the information

12 sharing agreement.

13     If the regression was reliable in detecting the

14 effect of the information sharing, it should not have shown

15 any suppression of the grower's pay, because Dr. Singer's

16 criteria for selection of the benchmark integrators were

17 that they were not sharing information through Agri Stats.

18 But the regression finds that both Gerber and Holmes

19 suppressed pay by over 32 percent.

20     Again, this test makes clear that the purported

21 benchmarks are not reliable, and if they were reliable,

22 there would be no difference in pay from each other.

23     THE COURT:  And you'll tell me again that

24 Dr. Singer's criticisms of Dr. McCrary's analysis don't go

25 to the heart of the problem with Dr. Singer's analysis, but,

1    among other things, he says, McCrary, your analysis

2    discarded 98 percent of the data.

3              MR. TORRES:  But, Your Honor --

4              THE COURT:  They're going to have wide variance.

5    And you didn't explain why you picked the two integrators

6    you did to be the conspirators and the two that didn't.  And

7    did you -- did you test other combinations of the four --

8              MR. TORRES:  Because it doesn't matter,

9    Your Honor.  I mean, the entire premise of Dr. Singer's

10   opinion is that all four were competitive benchmarks.  So

11   whether he selected two or three, it really -- it doesn't

12   matter.  It's irrelevant.

13             THE COURT:  And it doesn't matter that 98 percent

14   of the data is, by definition, excluded.

15             MR. TORRES:  Well, that's -- that's a function of

16   the nature of the data that was available with respect to

17   this test.  It wasn't excluded because, you know, he thought

18   it would skew his test.  It was just excluded based on the

19   principal basis that these are the integrators that

20   supposedly were competitive benchmarks.

21             THE COURT:  You don't think that's a fair

22   criticism.  If Dr. Singer had discarded 98 percent of the

23   data in part of his regression, that it's not relevant.  I

24   mean, the point is this.  It seems like this -- these

25   arguments in some ways are circular.  There's a criticism of

1   Dr. Singer's regression or his analysis based on another

2   expert's analysis, and there's criticisms of that expert,

3   but it's irrelevant because it doesn't address the main

4   problem with Singer's analysis, and we go around.

5           MR. TORRES:  Well, except, Your Honor, that the

6   issues and the problems that are being identified are just

7   core to the structure of the model, and it's -- so it's not

8   just a battle of the experts where you could have, you know,

9   a dispute over whether the inclusion of certain variables.

10  This is a core precept of these models, and it's a

11  fundamental requirement for setting up one of these

12  benchmarks.

13          And if all he had was the comparison to the four,

14  I could see that that would probably be insufficient.  But

15  it's that in conjunction with all the other information that

16  cumulatively has a very powerful impact.

17          THE COURT:  And I think what Pilgrim's would say

18  is you can't build a model that can show nationwide impact.

19  That's probably the short answer.  You don't have to prove

20  that.  But if you think about the two examples that

21  Dr. Singer set up from 10,000 feet, they both, intuitively,

22  are appealing.  They make sense.  Oh, there's an area of the

23  country where the no-poach allegedly broke down for a period

24  of time.  Well, let's examine that and see what happened.

25  Well, that's evidence of something.

1          Oh, and information sharing.  There are
2     integrators who do this work who were not alleged to be part
3     of the conspiracy.  Well, we could look at their data.
4     That's interesting.  That tells us something.
5          Those are both -- like at 10,000 feet --
6     attractive ways to begin to test nationwide impact.
7          MR. TORRES:  Yeah.  Except, Your Honor --
8          THE COURT:  And you can -- go ahead.  You haven't
9     said there's a better or different way to do it, just that
10    -- and maybe this was okay and maybe it wasn't, but the way
11    you designed it's unreliable.
12         MR. TORRES:  Well, Your Honor, two responses to
13    that.  Number one, in connection with where we are, it's
14    important to understand the context of where these
15    regressions come into play.  And Mr. Kasowitz will be
16    addressing some of this tomorrow, but these regressions
17    really constitute their evidence on -- on this transmission
18    of these -- A, on the existence, and B -- A, on the
19    existence of impact and the transmission of that impact
20    throughout the entire class.  So that's just -- that's the
21    context in which we're entering this analysis.  And then
22    these regressions are just deeply, structurally flawed, and
23    in the -- this is all they have.  This is the best and the
24    strongest evidence.
25         You evaluate that, Your Honor, and I think in

1  terms of reliability, the question -- they just do not stand

2  scrutiny, particularly in the light of other decisions that

3  clearly have said that you can have your regressions.

4        And like you suggest today, they may be suggestive

5  or indicative of conduct in a certain direction, but you

6  also need to have some foundational evidence that relates to

7  the evidentiary basis for making the conclusion that there

8  was that collusion.  And that first element is something

9  that's completely missing in this case.  And it will be

10  developed, Your Honor, but that is one of the fundamental

11  core.  So the weight that these regressions are carrying is

12  enormous in this case.  It's enormous.  And the quality and

13  reliability of these models, as other courts have

14  identified, doesn't cut it.

15        Now, Your Honor, I would like to just quickly turn

16  to the in-sample regression.

17        In *Kamakahi,* Your Honor also excluded -- I forgot

18  to close the loop on the *Kamakahi* case.  The *Kamakahi* court

19  also excluded his pricing structure regression.

20        Turning to Dr. Singer's in-sample regression.

21  This regression also is rigged to find that all or nearly

22  all growers were harmed regardless of the underlying data.

23  His in-sample prediction method again fails a standard

24  falsification test because it finds harm, regardless of the

25  data to which his methodology is applied.  He ran the

1    regression over data chosen to reflect hypothetical

2    information sharing and no-poach agreements that did not

3    have an impact on grower pay.

4              This is at paragraph 153 of Dr. Saravia's report.

5              Again, if the singular regressions were reliable,

6    they would show no impact.  Yet his regressions still finds

7    that over 90 percent of growers would be harmed, even if a

8    hypothetical information sharing agreement had no impact on

9    the growers.  And over 83 percent of the growers in Delmarva

10   would be harmed, even if a hypothetical no-poach agreement

11   had no impact on grower pay.

12             In fact, even where the data is constructed to

13   reflect that the hypothetical information sharing agreement

14   increased grower pay by 6.6 percent, Dr. Singer's regression

15   would somehow still find that approximately 75 percent of

16   the proposed class was harmed.  And that is set forth at

17   paragraphs 154 and 158 of Dr. Saravia's main report,

18   Your Honor.

19             Dr. Singer's in-sample regression may be

20   mathematically accurate, but it is simply a house of cards

21   and should be excluded because it is unreliable.  His

22   principal response in attempting to defend Dr. Singer's --

23   or plaintiffs' principal response in attempting to defend

24   Dr. Singer's flawed in-sample regression is to rely on the

25   fact that certain properly constructed in-sample regressions

1   have been accepted in other cases.  But nothing in those

2   cases sanctions the flawed methodology that's baked into

3   Dr. Singer's model.

4          Under Rule 702, the critical issue is whether

5   Dr. Singer's methodology is reliable and whether he has

6   reliably applied it to the facts and data of this case.  The

7   fact that some other experts may have properly used this

8   model is irrelevant.  And none of those cases involved the

9   same model that Dr. Singer has constructed here, and none

10  discuss, much less bless, the fatal flaw in the model that

11  has been identified by Dr. Saravia.

12         The *Urethane* case, Tenth Circuit, 2014 case, was a

13  classic price-fixing case involving robust evidence -- and

14  this is connected to the point I made earlier -- involving

15  robust evidence of coordinated price increase announcements

16  from the defendants of polyurethane products in a national

17  market and a standardized pricing structure.  Nothing at all

18  comparable to those pricing-related facts has been presented

19  here, not even remotely comparable.  And this is not a

20  price-fixing case and does not involve a national labor

21  market.

22         *High-Tech*, another case that they rely on heavily,

23  involved a labor market completely different from the local

24  grower services or the local grower market at issue here.

25  It involved a national market for highly-skilled engineers,

1    developers, programmers, and animators.  These were

2    highly-skilled or highly-paid positions for which candidates

3    would be willing to relocate from one city to another.  And

4    there was extensive evidence that all defendants used formal

5    administrative compensation structures and divided the jobs

6    into bands, zones, grades, and ranges by which they

7    evaluated and paid employees in groups in relationship to

8    one another.  Informal job structure systems.  This meant

9    that any individual's compensation was necessarily

10   intertwined with that of her peers.  This is the language

11   that was used by the court.

12          In addition, the expert in *High-Tech* -- unlike

13   Dr. Singer here -- presented a graph demonstrating the

14   actual pay data which showed that the compensation for

15   different positions tended to move together over time.  The

16   expert's regressions corroborated the factual and economic

17   evidence of a rigid price structure.

18          In contrast here, the pay data shows the opposite.

19   It shows that among the 21 integrators, it did not tend to

20   move together over time at all.  And the labor market here

21   does not involve highly-skilled, mobile workers in a

22   national market, but relatively unskilled workers, whose

23   farms are within 50 miles of the integrators' plants and

24   work in a local market.  And by "unskilled," I mean

25   unskilled in order to enter the market.  Obviously, once

1   they enter the market, they acquire skills related to

2   growing.  So that -- I'm using the term in that respect, but

3   it's not one where there is this high threshold that you had

4   in the *High-Tech* decision.

5           And Dr. Singer's regressions, apart from being

6   fundamentally flawed, generate results that contradict the

7   basic pay data in patrons, contradict the local nature of

8   the labor market, and contradict the absence of any common

9   grower pay approach among integrators.

10          Moreover, plaintiffs' own cases, *Capacitors*,

11  *Drywall*, and *Olean* hold that an in-sample regression cannot

12  be used on its own to show common impact.  The plaintiff

13  also must provide factual evidence supporting a finding that

14  all or substantially all class members were injured because

15  of the alleged anticompetitive conduct.  Plaintiffs here

16  have failed to supply any such evidence.

17          Now, plaintiffs argue that Dr. Singer would not

18  use the in-sample regression if the results from step one of

19  his analysis -- that was impact regressions -- did not show

20  injury in the first place.  But this purported explanation

21  just avoids responding to Dr. Saravia's showing that the

22  model itself is invalid.  Plaintiffs do not dispute that the

23  falsification test was properly constructed and that

24  Dr. Singer's regression fails each of them.  His sweeping

25  opinion that the pay of all growers nationwide was

1    suppressed because of the overarching agreement is without
2    any reliable foundation.
3            In his opinion here, it's not unlike that in
4    *Conrad v.* the *Jimmy John's* case, where this was also
5    presented.  And in that case, also, Dr. Singer's opinion was
6    excluded.
7            In *Conrad*, a putative class action, the plaintiff
8    alleged a contractual no-poach provision -- the plaintiff
9    alleged that a contractual no-poach provision violated
10   Section 1 of the Sherman Act.  The Southern District of
11   Illinois completely rejected Dr. Singer's regressions and
12   related opinion in 2021.
13           Now, plaintiffs relied heavily on Dr. Singer's
14   opinions, which were based on -- again, on his regressions
15   in support of their class certification motion.  Those
16   regressions, according to Dr. Singer, demonstrated that the
17   wages of all employees, at nearly 3,000 Jimmy John's stores,
18   across 40 states, were suppressed as a result of the
19   no-poach provision.
20           Based on Dr. Singer's regressions and opinions,
21   the plaintiffs argued they had provided common evidence of
22   antitrust impact, under Rule 23(b)(3).  The Court did not
23   accept it.  Finding Dr. Singer's regressions and methodology
24   fundamentally unflawed -- fundamentally flawed, the Court
25   rejected the regressions and excluded Dr. Singer's estimates

1    of impact in that case.

2           The same outcome is appropriate here, Your Honor.

3    Dr. Singer's common impact regressions are fundamentally

4    flawed, they're unreliable, and they should be excluded.

5           The last point I would like to turn to,

6    Your Honor --

7           THE COURT:  Just a moment.

8           MR. TORRES:  Yeah.

9           THE COURT:  Go ahead.

10          MR. TORRES:  Thank you, Your Honor.

11          If I may now, Your Honor, I'd like to talk a

12   little bit about market definition.  And I would like to

13   discuss Dr. Singer's opinion that there is a nationwide

14   geographic market for broiler growing services.

15          THE COURT:  But before you do, let me just ask.

16   Is this -- are we ahead of ourselves, taking up the

17   admissibility of this opinion?  Is this -- are you asking

18   for an advisory opinion about this testimony that may not

19   ever be elicited at trial?

20          If we find, for example, that this is -- their per

21   se standard applies, the plaintiffs won't be offering expert

22   testimony about the scope of the market, will they?

23          MR. TORRES:  Well, Your Honor, unlike other

24   violations in the antitrust base, like your classic price

25   fixing, bid rigging, and the like, with respect to no-poach

1    -- the no-poach issue, there's no clear-cut standard that

2    the per se rule applies.  That's number one.

3           Number 2, this goes really to the issue of impact.

4    It's the issue in terms of -- under the Sherman Act, they

5    still have an obligation to demonstrate that there was

6    impact as a result of this alleged nationwide conspiracy.

7           THE COURT:  But isn't -- isn't impact among a

8    nationwide class a different consideration than defining a

9    nationwide market for purposes of the rule of reason?

10          MR. TORRES:  Just a second, Your Honor.

11          Your Honor, look, I think that the -- that this

12   really goes to the issue of when you're looking at whether a

13   plaintiff has met their burden of establishing that there

14   has been antitrust harm, you look at what the market power

15   -- what the market -- you're defining the market where

16   they're alleging that harm occurred.  So if they're alleging

17   that the harm occurred nationwide, then they have a burden

18   to show, through reliable evidence, that the conduct, the

19   alleged unlawful conduct, impacted adversely, for

20   anticompetitive reasons, the entire class.

21          And in this case, their fundamental problem is

22   that the evidence simply does not support the notion that

23   there's a nationwide class.  And if it doesn't support a

24   nationwide class, that's important because it indicates that

25   the issue of impact and harm has to be determined at the

1  local level.  It has to be determined grower by grower,

2  plant by plant, to determine whether there was impact.

3          THE COURT:  I don't understand what you're saying.

4  I don't mean to be rude.  I just don't understand how that

5  relates to the question about whether we're in the right

6  time in the proceeding to take up opinions about whether

7  this is a national market or a regional market or local

8  market.  It may be, but -- for example, what you just said

9  about power and monopsony power, monopoly power, or what --

10 it's not in the papers.  I mean, the papers touch on this,

11 but you-all haven't briefed that issue, you haven't provided

12 me the case law.  I think we're going to be arguing about

13 that at summary judgment, which suggests to me that there's

14 a decision still to be made, which suggests to me that his

15 opinion may or may not relevant in the case, and it may

16 never be solicited.

17         My question is what's the harm in deferring

18 resolution with respect to that opinion until we've decided

19 what standard we're going to apply for trial?

20         MR. TORRES:  Well, the harm, Your Honor, or the

21 reason why we should apply it now, because we're operating

22 in Rule 702, we're trying to assess the reliability of

23 Dr. Singer's opinion on this point.  That opinion relates to

24 impact across the entire country.  So it's important to

25 understand, for purposes of evaluating those regressions,

1   what the market is in reality to show, again, a complete

2   separation, and to show that there's a complete detachment

3   between the facts of this case, between the facts of this

4   grower market, and what Dr. Singer's regressions are

5   purporting to establish.

6           THE COURT:  But if he shows nationwide impact --

7   if I accept his regression analysis showing nationwide

8   impact, what more is there to consider at this stage with

9   respect to what the -- how the plaintiffs might define the

10  market?

11          MR. TORRES:  Well, Your Honor, the reason is

12  because experts can't escape the requirement to have a

13  rigorous analysis.

14          THE COURT:  Sure.

15          MR. TORRES:  And part of that rigorous analysis

16  involves delving into an issue that is integrally connected

17  between the claims that have to be proven by the plaintiff

18  and the expert testimony that they're proposing enables them

19  to meet that burden.  And the burden we're referring to here

20  is the burden of presenting reliable evidence that presents

21  impact.  And then the question is impact where.  And it's

22  important to understand what the market is in order to

23  answer the question of impact where.

24          THE COURT:  Why?  Why is it, and what's the case

25  law that tells me that that's the case?

 1          If this is a per se violation, what law tells me

 2    you have to define a market and then show the impact

 3    throughout the market?  This is a nationwide class, as

 4    proposed.

 5          MR. TORRES:  Well, Your Honor, first of all,

 6    whether it's a per se violation -- I mean, that's an issue

 7    that has not been definitively decided among the courts.  In

 8    the context of no-poach provisions, some courts have found

 9    that the rule of reason applies.

10          So, obviously, if the rule of reason applies, then

11    the issues with respect to the relevant -- the relevant

12    product or services market, the relevant geographic market,

13    market power, the exercise of market power is all relevant.

14          THE COURT:  I'm not sure I disagree with anything

15    you said.  And the first word, I think, in that sentence was

16    "if."  And isn't that the -- I think that's my point.  Until

17    we decide what standard we're going to apply, is the

18    question about Dr. Singer's market opinion relevant?

19          MR. TORRES:  Right.

20          THE COURT:  It sounds like you think it is, and I

21    think I've understood that you think it's tied in some way

22    to showing impact throughout the nationwide class.  Are they

23    the same?  You think it's -- it's not the same analysis

24    because we would be applying different considerations under

25    the rule of reason.  No?

 1           MR. TORRES:  Your Honor, the response to that was

 2  really presented by -- in the *Funeral Consumers* case out of

 3  the Fifth Circuit in 2012, where the court rejected the

 4  argument that the plaintiffs made in that case.  That

 5  plaintiffs do not need to prove a geographic market at the

 6  class certification stage because the Sherman Act claim

 7  requires proof of antitrust impact, which, in turn, requires

 8  proof of relevant market.  I mean, this is just restating

 9  what I mentioned earlier.

10           And *Black* also holds that at the class

11  certification stage, it necessarily begins with defining a

12  relevant market.  By definition, that's the purpose of it,

13  in terms of assessing the issues as to whether impact could

14  be possible as a result of certain conduct.  So *Black,* the

15  Tenth Circuit held that at the class certification stage,

16  necessarily begin -- the issue necessarily begins with

17  defining a market -- the market.

18           THE COURT:  I don't think *Black* said that, but

19  give me just a moment.

20           And, of course, it may depend on the arguments

21  presented by the parties and the potential relevance of the

22  opinions at issue.  I agree they have to be scrutinized.

23           You're telling me that you just start -- it's an

24  additional factor, I guess, in addition to Rule 23.  But

25  before you decide whether the rule of reason applies, what

1    you do at class certification is define the market.  That's

2    part of the certifying process in every antitrust case?

3    Every Section 1 case?

4            MR. TORRES:  Well, Your Honor, I mean, if --

5    obviously, in making the -- in doing the analysis under

6    Section 23, the analysis has to be cognizant of what the

7    standard is and what the burden is that the plaintiff has to

8    meet.

9            THE COURT:  Sure.

10           MR. TORRES:  And so to that extent, it is

11   relevant.

12           THE COURT:  What standard applies in this case,

13   Mr. Torres?

14           MR. TORRES:  Well, Your Honor, we would submit

15   that under a straight information sharing agreement, it's

16   the rule of reason.

17           THE COURT:  Should I decide that today, without

18   briefing from the parties on this question?

19           MR. TORRES:  Your Honor, this goes back to where I

20   started in terms of the overarching theory; right?  Because

21   the reason we're here and, really, are in -- let's just say

22   uncertain as to which standard applies because you have the

23   different standards.  In information sharing, you have the

24   rule of reason.  In no-poach, it may be the rule of reason,

25   it may be the per se.  We don't know.

1        But because we're operating under this theory, the

2   core theory about this overarching theory that they're

3   working together and they're mutually reinforcing, there's

4   really no clarity, at least at this point, in connection

5   with, you know, what that standard is.  But for purposes of

6   certification, purpose of certification, they have to begin

7   with an analysis of the -- of the nationwide class because

8   they're seeking certification of a nationwide class, and

9   they're asserting claims under the Sherman Act, on behalf

10   and in connection with alleged impact to the nationwide

11   class.

12        So, of course, you necessarily have to begin with

13   that kind of an analysis.  That's the issue in class cert.

14   Whether that's -- and it's not just Rule 23(b)(3) and -- you

15   know, in a vacuum.  It has to be considered in the context

16   with the allegations that are being alleged and the claim

17   that's being alleged here.

18        And I agree with you in terms of like the

19   standard, that has not been definitively resolved, but we're

20   working with what we have.  We're working with this -- we're

21   working with three theories.  Got the overarching agreement,

22   got the no-poach, and we got the information sharing.  So

23   those three theories.  And now they're seeking to certify a

24   class on behalf of all 24,300 growers in the country, on a

25   nationwide basis, in order to try to inject these

 1    regressions to argue that that was impacted.

 2              Given the critical nature of that analysis, it's

 3    imperative that the Court take a look at the relevant

 4    market.

 5              And the *In Re Cox* case out of the Western District

 6    of Oklahoma also says that you look at the market at the

 7    class certification stage.

 8              THE COURT:  And so that's a consideration under

 9    what, 23(b)(3)?

10              MR. TORRES:  Yes, Your Honor.

11              THE COURT:  Is that where it fits in the class

12    analysis?

13              MR. TORRES:  Yes, Your Honor.

14              THE COURT:  All right.  Okay.

15              MR. TORRES:  All right.  Now, turning to the issue

16    of market definition, Your Honor, I would like to discuss

17    Dr. Singer's opinion that there is a nationwide geographic

18    market for broiler growing services.

19              Dr. Singer claims that the market is national

20    because new growers are not -- Dr. Singer claims that the

21    market is national because new growers are "not bound by

22    geographic region."  He also claims that the market for

23    grower services is national because over an 11-year period,

24    an infinitesimally small number of growers, .01 percent of

25    all growers in the country, moved across state lines.  Those

1    are the two bases for Dr. Singer's opinion there's a
2    national market.
3              But his opinion not only ignores the facts and the
4    data concerning the market for growers, it's contradicted by
5    the facts and the data, some of which I summarized earlier
6    at the beginning of my argument and will not repeat here.
7    But it also defies logic, and it's contradicted by basic
8    principles, basic economic principles, and case law.
9              Most simply put, a plant in Nacogdoches, Texas,
10   does not compete with growers with a plant in Delmarva,
11   which is more than 1,000 miles away from Nacogdoches.
12             And as a matter of basic principles of labor
13   economics, the opportunities for growers to switch,
14   integrator companies are limited to the surrounding plants
15   in their local area.
16             The United States Department of Agriculture also
17   has stated that the market for grower services is local, not
18   national, and the reason for this as the USA -- USDA has
19   stated is "because transportation costs for feed, chicks,
20   and birds are significant, total grow-out costs can be
21   reduced by contracting with farms that are near hatcheries,
22   slaughter, and feed facilities."
23             And all of this is, of course, confirmed by the
24   extensive variance reflected in the graphs on grower pay and
25   grower pay trends that we -- we saw earlier, variance by

1    year, by region, by company, by grower, by housing class.

2          And as Dr. McCrary explained in paragraph 130 of

3    his report, if the broiler grow-out service market was

4    national, economic principles would dictate that those

5    graphs would show grower pay convergence because of

6    arbitrage activity.  No such convergence ever occurred here

7    throughout the entire relevant period.

8          In addition, no evidence has been presented that

9    any of the named plaintiffs, much less any of the putative

10   class members, ever attempted to leverage and offer at one

11   plant to negotiate higher pay at a different plant in a

12   different region.  That's not how grower pay works.

13         And both Dr. Singer and even plaintiffs have been

14   compelled to admit, on page 5 of their class certification

15   brief, that grower pay is set at the plant level, and

16   growers do not individually negotiate pay.  And even

17   Dr. Singer admits in paragraph -- paragraphs 265 and 266 of

18   his report that the integrators set pay, quote, within a

19   complex, with all growers at a complex signing the same

20   contract.  In addition, the case law categorically rejects

21   the notion that the market for growers is national.

22         Judge Folsom's opinion in *Wheeler,* squarely on

23   point and cannot be clearer on the issue concerning the

24   local nature of the market for growers.  There, the putative

25   class of growers -- it was not even a national class, but,

1   instead, a class limited to Arkansas and Northeast Texas.

2   The alleged conspiracy was not among 21 companies, but two.

3   And the alleged conspiracy did not involve 147 plants, but

4   only nine.

5           THE COURT:  But wasn't the failure in *Wheeler* a

6   failure of proof from a lack of discovery in the case?

7           MR. TORRES:  Well, Your Honor, in that case the

8   court rejected the plaintiffs' argument -- he rejected the

9   argument that the growers in the putative class were harmed

10  because of their inability to switch complexes.  In doing

11  so, the court pointed out that some growers were unable to

12  switch due to geographic limitations, while others were able

13  to do so.  And underscoring the local nature of the market

14  and the individual variance among plants and growers, Judge

15  Folsom stated, and I quote:  "The resulting conclusion is

16  that plaintiffs are unable to demonstrate this fact of

17  damages without delving into the individualized traits of

18  each complex of growers' locale."  And this precisely ties

19  in with what we were discussing earlier concerning the fact

20  of damages or impact.  And this is an issue that

21  Mr. Kasowitz was going -- well, you'll be hearing from

22  Mr. Kasowitz tomorrow on.

23          Now, *McDonald's* is an antitrust case that involved

24  -- this is a separate case also relevant here, Your Honor --

25  that involved a no-hire provision, where the plaintiffs'

 1    expert -- similar to what Dr. Singer has done here, but it

 2    was a different expert -- he opined that the market for

 3    restaurant workers was national.

 4            Regarding that opinion, the court stated that --

 5    and just let me backtrack.  First of all, we're dealing with

 6    restaurant workers, and the court mentioned that the court

 7    -- or held that the -- explained that the reasons that most

 8    labor markets are graphically quite small is because of

 9    issues concerning movement from the workplace to the home

10    and other local-related issues.  And in connection with that

11    opinion, the court found that it "defies logic."  That the

12    market for low-skilled restaurant employees was national.

13            And the evidence here, as I mentioned before, is

14    undisputed that no special skills are required to enter the

15    market for growers.  In fact, the principles -- this

16    principle from *McDonald's* applies here with even greater

17    force, and the reason is that unlike the McDonald's

18    restaurant employees, the growers here made capital

19    investments in the purchase of land and obviously that

20    reduces the mobility.

21        In short, Your Honor, Dr. Singer's national market

22    opinion should be excluded.  It is contradicted by the facts

23    and the data on the market for growers, and he's failed to

24    present any reliable principles or methodology in support of

25    his opinion.

 1              Your Honor, for all of these reasons and those set
 2     forth in our the *Daubert* motion -- *Daubert* motions, the
 3     Court should enter an order excluding the opinions of
 4     Dr. Singer.
 5              Thank you, Your Honor.
 6              THE COURT:  Thank you, Mr. Torres.
 7              I think -- I think what we should plan to do
 8     probably is -- so our court reporter can rest her fingers
 9     after about an hour and a half, let's go until about a
10     quarter after 12,  and then we'll take about a 45-minute
11     lunch break and get back at it.
12              You have the floor.
13              MR. WALKER:  Thank you, Your Honor.  I can still
14     say good morning, so I'll say good morning.
15              So no one has really questioned Dr. Singer's
16     expertise.  He has a PhD in economics, he's an economics
17     professor at the University of Utah, he taught at Georgetown
18     before, he's published many books and articles.  Nine
19     federal courts have followed his opinions in certifying
20     classes in antitrust cases.
21              THE COURT:  I'm going to interrupt right now
22     because you reminded me of something.  I learned -- I just
23     want to make a disclosure.  I learned a few weeks ago that
24     Dr. Singer and I both were participants in an antitrust --
25     I'm going to call it a symposium -- at the University of

 1 │ Utah sometime in the last year.  We didn't meet.  We weren't
 2 │ on the same panel.  I didn't know him.  I still don't know
 3 │ him.  To my knowledge, I've never met him or spoken with
 4 │ him.  I was on a panel with two other individuals.  It was
 5 │ entirely unrelated.  But it came to my attention after the
 6 │ fact, in preparation of this hearing, that he participated
 7 │ the same day.  I was there for my presentation and I left.
 8 │ I just wanted to make a disclosure to everyone.
 9 │         But go ahead, Mr. Walker.
10 │         MR. WALKER:  Okay.  Thank you, Your Honor.
11 │         So nine federal courts have relied on his opinions
12 │ in certifying classes, including in labor monopsony cases,
13 │ including in agricultural antitrust class actions.  And
14 │ including, most recently, in the *In re Pork* case, that --
15 │ the 23(f) petition on class was denied, where Dr. Singer
16 │ used an in-sample model identical in substance to what he's
17 │ done here.
18 │         So what Pilgrim's Pride contests generally are
19 │ certain methodologies that are just, by their nature,
20 │ flawed.  I would put in that category the in-sample
21 │ regression and the pay structure regression.  They say it's
22 │ as applied to this case, but the sort of generalized proofs,
23 │ quote/unquote, that Dr. Saravia does go to the heart of the
24 │ model itself regardless of how it's applied.
25 │         Those types of analyses are done in many antitrust

 1    class actions, have been relied on in many courts in

 2    certifying classes.  They're well-accepted methodologies.

 3           The second bucket is what we've heard a lot about

 4    today, which is the application of certain methodologies to

 5    the facts in the case, where Pilgrim's disputes whether it

 6    was done appropriately.  Dr. Singer rebuts those.

 7           We think Dr. Singer will prevail on the merits

 8    when this gets to the trial, but, to be clear, *Daubert* is

 9    not a merits inquiry.  *Daubert* is about whether Dr. Singer's

10    analyses are junk science, whether either the methodologies

11    are so unreliable by their nature that they can't be applied

12    at all in a case, or whether they're so unmoored from the

13    facts of this case as to be unreliable.

14           Dr. Singer here has implemented well-accepted

15    methodologies, he's applied an enormous amount of economic

16    and econometric expertise to the facts of this case.  The

17    hundreds of pages of his report, I think, go to this idea

18    that it's very well grounded in the case.

19           He had data from every integrator essentially

20    operating in this country, almost a hundred percent.  He

21    looked at an enormous amount of facts and depositions.  He

22    had an enormous amount of economic theory.  And each of his

23    opinions goes directly to a core issue in the case, was

24    there a conspiracy; did it harm the plaintiffs; and what are

25    the aggregate damages to the class.

1              Just as a housekeeping matter, my colleague, Dr.

2    -- my colleague, Gary Smith -- not Dr. Smith yet,

3    unfortunately for him -- is going to handle the relevant

4    market and conspiracy-related *Daubert* issues.  I'm going to

5    handle the impact and damages.  We sort of broke it up that

6    way because -- and I think Your Honor was getting at this --

7    we don't really see the relevant market and conspiracy

8    *Daubert* issues as going to class, and you'll hear more about

9    this tomorrow.  And I think the *Black* opinion makes clear,

10   those are class-wide issues regardless of how they're

11   resolved.

12             If Dr. Singer's -- if the proof fails on the

13   relevant market and we, for some reason, have to prove a

14   relevant market, that's a class-wide issue.  So that's why

15   we broke it up this way.

16             I'm going to dive into the impact and damages

17   issues, if that's okay with you.  But if you would rather

18   hear from Mr. Smith first, that's fine.

19             THE COURT:  No, it's great, Mr. Walker.  Thank

20   you.

21             MR. WALKER:  Okay.

22             So the basic *Daubert* framework is -- you know, I

23   don't dispute too much of what Pilgrim's counsel said about

24   that, except Rule 702 mandates a liberal standard of

25   admissibility.  The *Daubert* -- or *Daubert,* I guess -- case

1 says that.

2         And the *In re Urethane* said the rejection of expert

3 testimony is the exception rather than the rule.  So in order

4 to be admissible, the testimony must be reliable.  That does

5 not mean indisputably correct.  It doesn't mean that we have

6 to prove on the merits, or ever, that we have to prove with

7 100 percent certainty.

8         As the Supreme Court said in *Bazemore,* the standard

9 is not scientific certainty.  The standard is whether the

10 economic evidence or the econometric analysis, together with

11 all the facts in the case, would allow a jury to find in

12 favor of the proponent of the evidence by a more likely than

13 not standard.

14         And as the Supreme Court said, challenges to the

15 implementation of reliable methodologies should be done

16 through cross-examination, showing contrary proof, careful

17 instruction about burdens of proof and the standards of proof

18 at trial.  It is not -- the way to deal with disputes among

19 the experts is not to throw out the evidence altogether.

20         So let's look at what Dr. Singer does for his

21 impact analysis.  His analysis includes record evidence from

22 this case, information from the public record.  A large

23 amount went into the regressions as control variables, for

24 example; extensive citations to economic and statistics

25 literature, and then the numerous statistical analyses that

1   he does, the many variations that he tests of the information
2   sharing regression, the no-poach regression, the pay
3   structure regression, and the in-sample methodology.
4         And I'm going to get into the details in a bit, but
5   Dr. Singer follows what we call a two-step methodology for
6   proving impact.  And this is done commonly in cases.
7   *Urethane* is one such case, but we cite a lot of them.  It's a
8   very common and increasingly common way of showing widespread
9   impact.
10        In step one, you show -- Dr. Singer shows the
11  alleged anticompetitive conduct caused a generalized
12  suppression of grower pay, an aggregate suppression of grower
13  pay.  And in connection with that, he calculates the
14  percentages of pay suppression.  Of course, the centerpiece
15  of these analyses -- of the step-one analysis, is his
16  regression models, and I'll get into the details of those.
17  But it's important to remember that they are by no means the
18  only evidence.  He analyzes grower switching rates and he
19  analyzes an extensive, class-wide body of evidence from the
20  discovery record as well as economic literature showing how
21  the alleged conduct here generally operates to suppress pay
22  in a labor context.
23        In step two, Singer conducts analyses of the record
24  evidence and the statistical evidence to determine whether
25  there was so much variation in grower pay, that there's a

1  large portion of the class that might have, nevertheless,

2  escaped harm -- escaped the harm found in step one.

3          And he relies on a huge qualitative record about

4  the widespread aspects, the nationwide aspects of the

5  no-poach and the information sharing, the similarities among

6  the integrators and the class members nationwide, the

7  interconnectedness of grower pay, but he also does the pay

8  structure regressions and the in-sample regressions that

9  we'll talk about.  And he concludes that all or virtually all

10 members of the class suffered injury in the form of an

11 artificial underpayment due to the alleged conduct.

12         And, again, this methodology has been followed in

13 *In re Urethane,* the package seafood case, which went all the

14 way up to the Ninth Circuit en banc, so suffice to say -- and

15 in-sample was a big part of that -- suffice to say this

16 methodology for proving class-wide impact is well accepted in

17 the world of antitrust class actions.

18         So let's get into the steps.  But I see you're

19 about to ask a question here.

20         THE COURT:  I mean, I don't -- I don't think I

21 understand Pilgrim's really to challenge the models that

22 Dr. Singer is employing, just his application of them.  I

23 agree with you, there are many, many cases acknowledging and

24 applying regression analyses and in-sample methodology in

25 class action antitrust cases.  They seem like they're models

1   that economists use.  So the question here will be whether

2   Dr. Singer's analysis is faithfully and reliably tied to the

3   data and whether he has designed the models in a reliable

4   fashion that will be helpful for the jury, I think.

5           MR. WALKER:  I largely agree with that, certainly

6   for the regressions.  I don't think they challenge that that

7   is basically the gold standard in antitrust cases.  They say

8   they're not challenging the in-sample, for example, on a

9   generalized basis, but what they say is that -- they say by

10  the very nature of regressions, if you do what Dr. Singer

11  did, you will find widespread impact.  And to be clear,

12  that's the wrong way to look at in-sample, but that is going

13  right to the heart of the methodology, saying all those

14  courts that have relied on that methodology didn't realize

15  that it was rigged to find class-wide impact.

16          THE COURT:  Well, I guess Mr. Torres and I failed

17  to discuss, one of the criticisms in the papers, I think --

18  I think it's drawn to the in-sample methodology.  I think

19  the criticism in the papers was a lack of controls.

20          Am I right about that?

21          I'll ask you, Mr. Walker.  You're at the stand.

22  Or am I misreading the defendants' argument, do you think?

23          MR. WALKER:  I don't -- I don't think that's the

24  argument because -- because it's wrong, and I don't think

25  they made it, because the in-sample takes the regression

 1   from step one, the ISA and the NP -- the information sharing

 2   regression and the no-poach regression, and it applies those

 3   on a transaction-by-transaction basis to what are called the

 4   residuals of the model.  And those models have an enormous

 5   number of control variables.

 6           THE COURT:  I'm thinking of the wrong part of

 7   Dr. Singer's report then that Pilgrim's criticize for having

 8   a lack of controls.

 9           MR. WALKER:  I think, Your Honor, that's the

10   criticism of the critical elasticity regression.

11           THE COURT:  That's right.

12           MR. WALKER:  And the -- which Mr. Smith would be

13   happy to talk to you for hours and hours about, if that's

14   what you want.

15           THE COURT:  Great.

16           MR. WALKER:  Okay.  So step one, proof of harm to

17   the -- proof of pay suppression affecting the class.  As to

18   the -- Dr. Singer goes through in his report qualitative and

19   quantitative evidence.  And if Your Honor wants me to find a

20   citation for you -- some of these are ranges of paragraphs,

21   because I'm generalizing -- I'm happy to do that, but I

22   won't lard up the transcript with all the citations as I

23   talk.

24           But he goes through the many factors that render

25   the market susceptible to collusion, the high concentration,

1    the fact that the products and services at issue are fairly

2    fungible, the constant opportunities to collude through

3    business and social meetings, the employees bouncing around

4    among integrators, the nationwide sharing of information.

5    All of that is class-wide evidence about the susceptibility

6    of the market to cartelization.

7            He reviews extensively the economic literature

8    explaining how information sharing and no-poaches can cause

9    harm to the growers and how that sort of harm would tend to

10   be broadly felt, not limited to the one grower who might

11   have been poached, but there's economic literature about how

12   -- how this harm tends to be broadly felt.

13           And then Singer applies record evidence to

14   analyzing the economic effects in this case, the extensive

15   direct and circumstantial evidence that all co-conspirators

16   participated in the no-poach.  All of them shared

17   information through Agri Stats.  They shared information

18   directly through interfirm exchanges.  The evidence of the

19   integrators using the information that they shared in

20   setting pay.  All of this is situated -- all of Dr. Singer's

21   regressions is situated within this evidence that -- that

22   this kind of conduct would tend to cause harm to -- would

23   tend to cause suppression of pay.

24           The quantitative evidence, he conducts two

25   multivariable regression analyses, but for each of these

1    analyses, he does a number of robustness checks, so I'll
2    call it the information sharing regression and the no-poach
3    regression, but really it's a series of tests.  And just
4    sort of as a general matter, and this is something that will
5    come up.  Regression analyses are the gold standard in
6    antitrust cases.  And I agree with you that Pilgrim's
7    doesn't really contest that issue here, nor do I think they
8    could.

9          There is no question that the methodology itself
10   is reliable.  And the regression essentially is asking
11   whether a hypothesis, an economic hypothesis, can be
12   nullified through the use of statistics; right?  So the
13   regression compares data from -- well, take a step back.
14   The regression looks for -- looks at dependent variable pay
15   and looks at the effect of a conspiracy variable or a
16   conduct variable on that pay, holding constant a vast range
17   of grower-specific, macroeconomic, etcetera, factors that
18   might have also affected grower pay, with the idea being you
19   want to understand and quantify the relationship between the
20   conduct variable and grower pay.

21          And so Dr. Singer goes into these regressions
22   asking the question, can't I -- can I exclude the nulled
23   hypothesis?  Meaning, can I exclude the possibility that the
24   conduct had no effect on grower pay?  That grower pay
25   changes were just solely related to all these

1   grower-specific and macroeconomic variables.  And this
2   allows economists to directly measure the effects of the
3   conduct on the variable of interest, which here is grower
4   pay.
5          And I should say it's also the case that -- and
6   Dr. Singer says this in his report -- that you cannot
7   literally hold all else equal; right?
8          Mr. Torres said earlier, well, it's comparing
9   apples and oranges, comparing the benchmark integrators and
10  the information sharing to the co-conspirators, but the
11  regression is meant to make that apples to apples; right?
12  You're saying -- holding all else equal, can we still say
13  that the reason that the benchmark integrators' pay went up
14  more than the co-conspirators' is because of the conspiracy
15  variable that we're trying to measure.
16         And just to be clear too, Dr. Singer does not
17  assume that the benchmark integrators for purposes of the
18  information sharing regression are comparable.  He looks at
19  -- first of all, he acknowledges that they're smaller, and
20  he looks at whether their size is correlated to pay, whether
21  the size of all -- because all the integrators are a variety
22  of sizes.  He looks whether integrator pay is correlated
23  with size and finds that it's not.  He also runs through --
24  and by the way, that's Singer report, paragraph 211, and
25  note 513.

1          And he also goes through evidence in the beginning

2     of his report about how these benchmark integrators may be

3     smaller, but they're growing the same types of broilers,

4     they're paying contract growers who use grow houses to grow

5     them, they're selling the slaughtered chicken into the

6     marketplace.  They are similar in relevant ways to the

7     co-conspirators.

8          And then in the regression, of course, he controls

9     for an enormous number of variables; right?  Mr. Torres went

10    through all of these ways in which you would have to look

11    at, you know, well, what -- how many birds are they getting

12    in a flock?  Where are they located?  What was going on with

13    pay for other types of vocations in that area?  Dr. Singer

14    controls for all those things in his regression, right?  So

15    it's important to understand that it is not apples to

16    oranges.  He's very much doing a rigorous analysis to make

17    it apples to apples.

18         And he then looks at the results of the regression

19    to determine whether the coefficients on all the variables

20    that he's using in his regression make economic sense and

21    they do; right?  So increased flock size is correlated with

22    increased pay, things like that.  So he's not just blindly

23    accepting the results.  He opens up the hood of the

24    regression to make sure it's reliable, and, critically, he

25    finds that the conspiracy variable shows a statistically

1  significant and economically significant suppression of
2  grower pay.
3        And he then, as I said earlier, runs a bunch of
4  variations of that to see whether, you know, doing it at the
5  complex level versus the grower level makes the results go
6  the other way.  Whether, you know, certain benchmarks need
7  to be included or excluded.  He does all those tests.  So
8  this is not junk science, and it's not unmoored from the
9  facts of the case.  In fact, it's incredibly grounded in the
10  facts of this case.
11        I do want to address now a couple of their
12  information sharing model criticisms that I think are not
13  well-taken.  The first is that it fails a falsification test
14  when Dr. McCrary focuses only on the benchmark integrators
15  and decides two are going to be co-conspirators, two are
16  going to be clean, and he says, oh, look, you can tell that
17  these are bad benchmark integrators because it shows that
18  two of them have much higher pay than the other and that
19  doesn't make sense.
20        First -- you mentioned this earlier --
21  Dr. Singer's main criticism is, well, you're throwing out 98
22  percent of the data.  Putting aside whether there's a reason
23  for it, a falsification test -- and Dr. Singer sites
24  literature to this effect.  I believe it's the ABA -- or the
25  Federal Judicial Center on regression analysis -- that a

1   falsification test or a placebo test should make a small

2   change to the model; otherwise, you can't tell what's

3   causing these changes; right?  We know that Dr. McCrary

4   didn't properly test for -- didn't properly control for

5   state and regional fixed effects.  We also know that he gave

6   no reason for randomly selecting two of these integrators.

7   And this is an example that I've discussed before.

8           As I said earlier, regression needs to be testing

9   a hypothesis; right?  He has no reason -- there's nothing in

10  the record that would suggest that two of these could be

11  co-conspirators and two could be clean.  And it would be

12  like adding in the Mets pitching staff ERA and seeing

13  whether that has an effect on grower pay, and if it does,

14  you say, oh, look this model doesn't work.  But the question

15  is why would such a regression tell you anything about the

16  facts of this case.  And that's the central problem with a

17  number of these so-called falsification tests.  They're just

18  playing around with the numbers to undercut or to try to

19  undercut the weight of Dr. Singer's model.

20          And the same is true, although slightly different,

21  for the density variable.  They criticize Dr. Singer for not

22  including a density variable in his regression, essentially

23  not including square footage.  He already includes the

24  numbers of birds in the flock, which no one has ever been

25  able to explain why a density variable matters other than to

1    recognize that some growers get more birds than other

2    growers, and that might have an effect on pay.  Well,

3    Dr. Singer already controls for that.

4             He also acknowledges and cites to Dr. McCrary that

5    pay per pound is a very valid way to look at grower pay.  In

6    fact, that's almost all the grower pay contracts are in a

7    pay per pound.

8             And then Singer runs the test, acknowledging --

9    not acknowledging that the way Dr. McCrary does the test is

10   right, but saying, well, even if I run it but include the

11   proper control variables, we still find a statistically

12   significant pay suppression.  And this is important here.

13   What Dr. Singer is saying, though, is that in his judgment,

14   it's better to have more benchmark data, which -- as opposed

15   to basically just focusing on Gerber as the sole benchmark.

16   That's what happens if you -- if you try to control for

17   square footage.  And he says, in my view, the better way to

18   do it is to have four benchmarks, or three in some

19   specifications of the model, as opposed to just having this

20   little stub of the data.  Some huge portion of even the

21   benchmark data is thrown out when you do the -- when you add

22   in the square footage variable.

23             And, Sam, can you put up page 50 and 51 of

24   Dr. Singer's deposition?

25             I just want to clarify something too.  Pilgrim's

1  said Dr. Singer -- when Dr. Singer reruns the regression, he

2  finds statistically significant pay suppression, but lower.

3  And they say, well, see, this just goes to show -- and

4  Dr. Singer recognized that if you don't include a variable

5  that changes the economic significance of the result, that's

6  an important variable, and you should have included it.

7       If you could go to page 50, please.

8       And I just want to -- I just want to direct your

9  -- so the question is -- and so Pilgrim's cites the next

10  page of the deposition, but I just want to show that that's

11  not really the story.

12       The question is:  "And you said, if that number

13  changes" -- talking about the coefficient on the conduct

14  variable -- "dramatically due to the inclusion or omission

15  of a control variable, then that's a control variable that

16  you would to have in your model; is that right?"

17       And if you could scroll down.

18       He says -- he says, "I have an article on this

19  point I can cite to."  He says, "Every regression model

20  that's ever been estimated in the history of mankind has

21  omitted certain variables.  The question is, can we live

22  with it?  And the answer is yes.  The mere fact that you've

23  omitted a variable, it doesn't engender bias in the model;

24  right?  It's only a particular -- very type of omitted

25  variable.  And I keep coming back to that, and my answer is

1    that I want to know is it motivated in economic theory."
2    Talking about the variable.

3          He says, "Is it motivated in record evidence.  Is
4    it available in such a way that we're not going to have to
5    give up 90 percent of the observations."  90 percent of the
6    data.  "Then is it statistically significant on its own and
7    does it materially affect the coefficient," etcetera,
8    etcetera.

9          Dr. Singer is saying I considered this, and the
10   tradeoff I made is I would rather have more benchmark data
11   for a more robust model than to throw away almost all the
12   benchmark data to add in this variable that doesn't even
13   really control for anything that isn't already being
14   controlled for.

15         So the no-poach regression.  Dr. Singer uses the
16   natural experiment of the "war on the shore" that took place
17   March 2013 through July 2015.

18         You know, a little, maybe, sidebar color here, but
19   there's an enormous amount of direct evidence of the no-poach
20   in this case.  And there is clear evidence of a beginning of
21   the "war on the shore" and an end of the "war on the shore."
22   So Dr. Singer's no-poach model is not one of these Mets
23   pitching staff ERA things; right?  He is testing the
24   hypothesis, did this, what appears to be a cessation of the
25   no-poach, have an effect on grower pay?  And, secondarily,

1  can that be extrapolated nationwide?  And the answer is yes.

2          The information sharing model, again, multivariable

3  regression, controls for an enormous amount of

4  grower-specific and flock-specific factors, and he finds that

5  there's a statistically and economically significant effect

6  on grower pay from the conspiracy variable.  And then he

7  again tests a number of specifications of this, moving

8  variables in and out and trying to see whether the model

9  holds up.  He looks at the coefficients on the variables and

10  finds that they make sense.  And then he says, does this

11  apply more broadly?  And he does not blindly apply this

12  result he finds in Delmarva to the rest of the case.

13          He, first of all, just looks at the summary

14  statistics of the Delmarva growers and the non-Delmarva --

15  and the nationwide group of co-conspirators and finds that

16  statistically they are comparable, which makes sense because

17  some of those growers in Delmarva have complexes outside of

18  Delmarva.

19          He also notes the many other pieces of evidence

20  that give the benchmark what he refers to from the literature

21  as external validity, meaning is there a sound basis for

22  thinking this applies outwardly.  He notes that integrators

23  all produce broilers using contract growers.  They all use

24  the same type of grow-out facilities, generally.  They all

25  grew under contracts, nearly a hundred percent of which

1    compensate pay per pound.  They all use contracts that have a

2    base pay with some additional components added on, and,

3    often, they are the same additional components, things like

4    fuel pay and whatnot.  They all use the tournament system.

5              There's evidence -- there's an enormous amount of

6    evidence, circumstantial and direct, that the NPA was

7    nationwide, that it was implemented in the same way as

8    nationwide.  There's parallel conduct and conformance for

9    integrators nationwide.  He cites all this in his report.

10   There's evidence that all the co-conspirators shared

11   information through Agri Stats and through direct interfirm

12   exchanges.  There's record evidence that they used Agri Stats

13   to set pay, including that they looked at a nationwide

14   average pay, which you wouldn't expect they would do, if pay

15   in Delmarva, say, was wildly different and totally

16   incomparable to pay outside of Delmarva.

17             THE COURT:  Well, Pilgrim's says that different

18   integrators use the Agri Stats data for different purposes

19   and used it in different ways.  I assume there's record

20   evidence to support that.

21             MR. WALKER:  Well, you know, I think we'd have to

22   get into the nitty-gritty, but, for example, they say, well,

23   some integrators used it when they were raising pay.  And

24   you look at the evidence, and it's -- they were, huh, should

25   we raise pay?  Well, let's look at what other people are

1  doing, right, when we raise pay.  Does that mean that

2  they're not using it to suppress pay?  I would say not.

3          I mean, the issue is that they're all

4  participating in Agri Stats.  Agri Stats gives everybody a

5  nationwide average as well as more specific complex

6  averages, and they're all -- they're all using Agri Stats in

7  one way or another.  This is just part of the extrapolation

8  evidence.

9          He discusses evidence of pay structure within

10  complexes, especially due to the tournament system.  He

11  discusses record evidence that the integrators would look to

12  other complexes within their own company when setting pay.

13  And, of course, there's evidence of them looking to each

14  other, looking to other integrators, when they're setting

15  pay because of all the direct information sharing and the

16  Agri Stats.

17          And then he also discusses all the evidence of a

18  nationwide market, which -- and then he -- there's the

19  economic pay structure correlation regression, which I'll

20  discuss in a bit.  But, in short, this is not a situation

21  where he blindly compared -- he blindly extrapolated to the

22  rest of the marketplace.

23          And this is where it is distinguished from the

24  cases they rely on.  For example, one of the cases that

25  Mr. Torres cited was this -- I believe it's called *Farmers*

1  *v. Directsat.*  That was a FLSA labor, unpaid wages case.

2  The expert being excluded was a former Department of Labor

3  examiner, who opined on damages.  And the first thing the

4  court said was he's not qualified as an expert in statistics

5  to do it.  And then it went on to say, he doesn't even look

6  at the underlying data to see whether it's reliable.

7          Dr. Singer spent an enormous amount of time

8  cleaning and verifying the data.

9          That he -- he didn't have any reason to believe

10  that his model -- the -- it wasn't even a benchmark.  It

11  wasn't a regression that this guy was doing -- was

12  comparable to the rest of the class.

13          It's not even close to what Dr. Singer is doing

14  here.

15          And then, of course, they cite to *Kamakahi,* which

16  is the egg donor case.  In that case, Dr. Singer had data

17  for three out of dozens of industry participants, and he

18  testified and admitted that he did not have a method for

19  showing class-wide impact, but said he could find one.

20          That was common at one time, more common at one

21  time, to go in and say, well, we don't have the data and the

22  evidence, but we'll show you later.  And, in fact, that's

23  why we asked for and argued for and eventually you granted

24  the schedule that combine class and merits discovery and

25  class and merits expert reports, because Dr. Singer here

1    shows he has a model.  He shows that he has a regression,

2    and he grounds that extrapolation in the facts of the case.

3            And I direct Your Honor to the *National*

4    *Association of Realtors* case, which has a much more

5    disparate set of benchmarks.  It was using real estate

6    markets in other countries to estimate damages or damages

7    and conduct in the United States.  And what that expert did

8    is he said, okay, what are some relevant parameters.  Look

9    at GDP of these other countries, look at corruption levels.

10   And he says, I find that these are a good benchmark.  He,

11   frankly -- at least according to the opinion.  I'm not in

12   the case so I don't know exactly what the expert did -- did

13   much less than what Dr. Singer is doing here.  And the

14   defendants made all the arguments about how there's all

15   these differences between the benchmarks, and the court

16   said, well, that's for the jury to decide whether they find

17   your benchmark probative of harm or not, by, you know, a

18   preponderance of the evidence.

19            I also direct Your Honor to the *SourceOne* case,

20   which we cite, the dental supplies case.

21            There is -- there, again, they were vastly

22   different businesses being used as a benchmark here.

23   They're the same integrators, the same types of integrators

24   doing the same types of things here, being used as a basis

25   for extrapolation.  This isn't one of those situations where

1    it's just blindly being done.

2              THE COURT:  But it is against the factual

3    background in this case that I think is not disputed, that

4    there is a strong and compelling geographic tie to the farms

5    and the processing facilities in a way that's not -- that I

6    don't -- I don't see a similar analogy in the cases that the

7    plaintiffs' point is to.  These growers are largely within

8    50 miles of the processing facilities for reasons that make

9    good economic sense.

10             And there -- maybe there are -- I think -- I don't

11   think anyone disputes local and regional factors unique to

12   each area -- I think Dr. Singer agrees to this -- that

13   affect grower compensation.

14             It's not clear, is it, that -- well, we know.  For

15   example, if we're thinking about a market and we're thinking

16   about fungibility or, here, transferability, a grower in

17   Alabama is not -- show me the case where a grower in Alabama

18   went to California because the grower compensation was too

19   low.

20             And I can see, from your colleagues, you have such

21   a case.  Okay.  But --

22             MR. WALKER:  Yeah.  I mean, we're sort of getting

23   into the relevant market discussion, actually, and I would

24   say there is -- there is evidence of growers changing

25   locations when they change integrators.  So I don't -- I

 1   don't want to shade too much into that, because I don't
 2   think that's --
 3           THE COURT:  Let's reserve that question.  I'm
 4   really focused on the case law.  Can you show me one of your
 5   cases or point to one of the cases you're relying on for
 6   showing class-wide impact in a national market where there
 7   are so many strong regional and local factors tying --
 8   separating the markets?
 9           MR. WALKER:  Well, I would say for one, the
10   *National Association of Realtors*.  I mean, one of the
11   arguments of the defendants is real estate is, by its
12   nature, a localized industry, and the benchmark being used
13   wasn't even the United States.  It was other countries'
14   industries being used as a benchmark.
15           THE COURT:  Maybe Mr. Smith will get into this.
16   We can reserve the question.
17           MR. WALKER:  Yeah.  The -- two points.  One is
18   Dr. Singer makes the point -- and, again, I don't want to
19   get into the relevant market, but it's important -- that
20   there's a difference between a relevant antitrust market for
21   showing the ability of the defendants to cause harm and
22   localized nature of labor; right?
23           *High-Tech*, they had -- you know, intel was based
24   in Silicon Valley and Portland.  You had companies that were
25   in various places; right?

 1              You have the *Beltran* case, which is in the
 2    District of Colorado, which is a -- which involves au pairs.
 3              I think there is not a labor case that doesn't
 4    involve a certain amount of localization.
 5              And as Dr. Singer says, just because there's --
 6    just because a cardiologist's pay in New York City might be
 7    higher than in, say, you know, Alabama -- to give your
 8    example -- doesn't mean that there's not a nationwide market
 9    for cardiologists.  But pay has local components, and the
10    models control for some amount of the local -- and state and
11    local effects.
12              THE COURT:  Well, we're not only creeping into
13    Mr. Smith's area, we're thrusting straight into it, but ...
14              I mean, isn't that example -- I thought -- reading
15    your papers, I thought contrasting growers who build
16    specialized facilities to specifications in a regional area,
17    with whatever skills are involved in growing chicks, that
18    does not strike me as a strong comparison with cardiologists
19    in New York or anywhere else.  Cardiologists are going --
20    surely, Dr. Singer would say if he was here, cardiologists
21    are going to move a lot more than growers because they can.
22    Their skills will transfer.  The economics of surgeon pay or
23    physician pay, the fact that they're not tethered -- they
24    may be tethered to clinics, who knows, but is that really --
25    is that the metaphor?  Is that the comparison that the

```
1    plaintiffs want to rest on?
2              MR. WALKER:  No.  I mean, although, I'll say that,
3    you know, we -- Dr. Singer does a switching analysis, and it
4    shows that 40-some percent of growers who switch integrators
5    move.
6              THE COURT:  But isn't that an astonishingly low
7    number of growers in a class of 25,000?
8              MR. WALKER:  Who switch?
9              THE COURT:  I can't remember how many, but it's a
10   -- is it .1 percent?
11             MR. WALKER:  The total number of switches is lower.
12   But I'm talking about when growers switch, 43 percent of the
13   time, when they switch integrators, they move to a different
14   -- another farm.  Another -- and, again, I can tell Mr. Smith
15   is really champing at the bit to go.  But another fact from
16   the case is testimony that growers come -- new growers come
17   from out of state all the time.  And so all this goes to show
18   -- well, there's two things.  One is this gets into relevant
19   market, right, which is different from impact -- and you were
20   getting at that earlier -- but it -- but putting that aside,
21   like in the -- like in the -- well --
22             THE COURT:  Mr. Walker, I'm going to interrupt
23   you.  You told me at the beginning of your argument how you
24   and Mr. Smith had divided responsibilities.  I want to honor
25   that, and I am -- I mean, we're pulling you into -- let's
```

1    have this argument once, and why don't Mr. Smith and I have

2    the argument.  So go ahead.

3            MR. WALKER:  Okay.  I appreciate that.  I do want

4    to make one last point, though, that the -- if you look at

5    the cases that -- like the *National Association of Realtors*

6    case and the *SourceOne* case -- in fact, *Beltran* says that

7    you just want them to be comparable.  The -- for purposes of

8    using a benchmark; right?  And so in the *National*

9    *Association of Realtors* case and the *SourceOne* case, what

10   the expert did was decide whether there are some relevant

11   factors that make the extrapolation make sense.  And I would

12   say if you read those cases, what Singer did here and the

13   facts here go way beyond that.

14           So, yes, there may be some regional differences

15   but for the relevant extrapolation, all those facts I went

16   through, the fact that grower pay is set using the same

17   factors; you know, the nationwide character of the no-poach

18   agreement and the way it was implemented, all of those make

19   for the extrapolation being reliable.

20           Now, whether a jury will ultimately decide that

21   they don't buy that it can be extrapolated that way despite

22   all that evidence, it, to me, seems not the realm of

23   *Daubert*; right?  That seems like -- the question is could a

24   jury looking at this piece of evidence, along with all the

25   other evidence, decide that, more likely than not, the

1    growers suffered impact here.

2           THE COURT:  Well, surely, it's both at *Daubert.*

3    The Court's gatekeeping function requires me to make some

4    evaluative determination.  For example, if you're comparing

5    grower migration with lizard migration, then there's a

6    question about the usefulness and reliability for trial, but

7    your point is well-taken.

8           And I've been so captivated by this discussion,

9    that we have gone 15 minutes longer than I meant to.  And I

10   can see smoke coming from the transcription device here, so

11   we'll take 45 minutes, and we'll pick up here at a quarter

12   after one.  Thanks, everyone.

13          (Recess taken.)

14          THE COURT:  It would be too whimsical and

15   inappropriate, probably, to ask by a show of hands who had

16   chicken at lunch, I assume.  I don't know.

17          All right.  Mr. Walker.

18          MR. WALKER:  All right.  Thank you, Your Honor.

19          So I want to briefly go back to talk about the

20   legal standard on the use of benchmarks and yardsticks, just

21   to cite and quote from some additional cases, and then I'm

22   going to move on to the step two of impact evidence, if

23   that's okay with Your Honor.

24          THE COURT:  Great.  Thank you.

25          MR. WALKER:  So I want to revisit some of the case

1  law just to quote from it to seat the discussion in the

2  right way.

3          For instance, the *National Association of Realtors*

4  case says:  To demonstrate the reliability of his

5  methodology for choosing comparators, all the expert was

6  required to do was make a "rational" -- this is all the

7  quote, "To make a rational connection between the screening

8  criteria and his selection of comparable markets."

9          And then it quotes the *Blood Reagents* case, which

10  says:  "A proposed yardstick must be rejected as

11  inadmissible where the expert testimony is so deficient that

12  the comparison is manifestly unreliable and cannot logically

13  advance a material aspect of the proposing party's case."

14          THE COURT:  Will you say that one more time and

15  maybe just a little more slowly.  I get worried about our

16  court reporter keeping up when we're reading quotes quickly,

17  So I got distracted.

18          MR. WALKER:  A proposed yard -- this is the

19  *National Association of Realtors* quoting from the *Blood*

20  *Reagents* case:  "A proposed yardstick must be rejected as

21  inadmissible where the expert testimony is so deficient that

22  the comparison is manifestly unreliable and cannot logically

23  advance a material aspect of the proposing party's case."

24          And in the *Beltran* case, which is in the District

25  of Colorado, it says about benchmarks, which is what the

1   Delmarva integrators are here.  While there are -- "While

2   there are differences between any group of workers, in order

3   to be a benchmark, the group has to be similar but cannot be

4   the same."

5       The *Prograf* case says:  "Because evaluating these

6   factors in terms of evaluating a benchmark, generally

7   involves weighing facts, deciding whether the plaintiff has

8   met this burden of showing comparability ordinarily is a

9   question for the trier of fact."  And that's quoting the

10  *American Bar Association Antitrust Law Developments*.

11          And *Urethanes* also endorses the use of benchmarks.

12  There, the expert had only about 50 percent of the class

13  data -- we have a hundred percent -- for purposes of looking

14  at the summary statistics and whatnot, but the court still

15  found that McClave was able -- the plaintiffs' expert there

16  -- was able to extrapolate damages for the entire class, and

17  that even involved making assumptions about products that

18  were custom-made combinations of the products that were

19  price-fixed that were specifically negotiated and custom

20  priced.  And the court found that even his assumptions,

21  built on top of the extrapolation, were acceptable matters

22  for the jury to consider.  And that's the *Urethane* case, the

23  discussion in the Tenth Circuit.

24          So here -- and I also wanted to go back and make

25  another point on the facts, which, as you noted, the low

1  switching rates.  Just sort of as a matter of explanation,

2  we think that's evidence of the no-poach agreement

3  nationwide; right?  The only time the switching rates spiked

4  was during the "war on the shore."  So there was a uniformly

5  low switching during the class period and it spiked during

6  the "war on the shore."  All right.  Thank you for letting

7  me revisit that.

8        So the step two analysis involves both qualitative

9  and quantitative evidence showing that there is -- it is

10  highly unlikely that any class member, let alone a large

11  number,  escaped the harm measured in step one during the

12  entire relevant damages period.

13        As to the qualitative evidence of widespread harm,

14  Singer discusses a lot.  There is the nationwide character

15  of the information sharing, which we talked about earlier,

16  including Agri Stats publishing, and, at least a number of

17  the co-conspirators, using and looking at, when setting pay,

18  the nationwide average.  There is use -- the co-conspirators

19  broadly using it to monitor and set grower pay.  The

20  co-conspirators broadly engaging in direct sharing of

21  information -- of grower pay information and using that pay

22  to set their own compensation.

23        He goes through the nationwide character of the

24  no-poach agreement.  For every co-conspirator, there is

25  either direct evidence, explicit references to recruitment

1    restrictions consistent with the no-poach, and/or record

2    evidence of parallel conduct in conformity with the

3    no-poach.  And we have evidence that we cite in the brief.

4    Dr. Singer cites a lot of evidence where employees,

5    high-level employees, of some of these defendants talk about

6    there being industry-wide practices surrounding the

7    no-poach.

8            Singer also discusses at length the evidence of a

9    nationwide geographic market, which Mr. Smith will get into

10   in a little bit.  He discusses the economic theory behind

11   the idea that the no-poach would be expected to have

12   widespread suppression effects.  He discusses the

13   compensation structures within complexes, between complexes

14   of integrators, and between integrators, the evidence that

15   they looked to each other when setting pay.

16           So Dr. Singer does these two econometric analyses

17   I'm going to talk about in a second, but it doesn't take

18   place in a vacuum, as I've said many times today.  And the

19   question of widespread injury to the class is one where you

20   take in all the evidence and look at it all together to see

21   whether it was likely that more than a small number of class

22   members were likely to have escaped the injury that's

23   already been measured in step one.

24           Okay.  So Dr. Singer first performs a pay

25   structure regression, which we heard about earlier, and

1    that's a correlation analysis, basically.  And both

2    correlation analyses and the use of regressions is very

3    common in antitrust cases.  And I don't think Pilgrim's

4    really disputes that those are reliable methodologies,

5    generally.

6            And -- but what Pilgrim's does is they impose --

7    and there was a discussion about this earlier -- a legal

8    standard based on the *Railway* case that I don't think

9    actually is the legal standard.  In fact, the *Railway* case

10   specifically says:  "The Third Circuit Court of Appeals has

11   rejected the notion that antitrust injury in an employee,

12   boycott, or no-hire context can never be proven by common

13   evidence.  The court of appeals recognized that evidence

14   showing that compensation of the class members was

15   correlated over time may be evidence to show that antitrust

16   injury in a wage suppression case may be proven on a

17   class-wide basis."

18           And there are numerous other cases that talk about

19   this sort of correlation evidence.  The *Packaged Seafood*

20   case, the tuna case from the Southern District of California

21   that went up to the Ninth Circuit en banc said:  "Although

22   price correlation models cannot prove a conspiracy's

23   existence or common impact on its own, this type of evidence

24   can be helpful in understanding industry behavior and show a

25   likelihood of common impact."  And then it talks about how

1    one of the plaintiffs' experts ran correlations across

2    products, products and defendants, and customer types.  In

3    each case, he found the correlation coefficients to be high

4    and positive.

5           In *Domestic Drywall,* a case involving arguments

6    that the markets were highly regionalized.  That was one of

7    the defendants' main arguments was that every drywall

8    market, based on construction costs and demand factors, was

9    regional, not national.  The Court said Dr. Lamb, the

10   plaintiffs' expert, "also presents a correlation analysis

11   which shows the prices charged by the drywall manufacturers

12   are highly correlated with each other."

13          And then in *High-Tech,* the plaintiffs' expert --

14   the Court said:  "The plaintiffs' expert showed movement

15   over time of the average compensation of each title with the

16   average compensation of the firm's Technical Class."  So it

17   was basically just showing a correlation of averages between

18   job titles and the class broadly.

19          So it's just not true that you need to prove some

20   -- I'm not, frankly, even sure what the standard is that's

21   being proposed by Pilgrim's Pride, but I would say that our

22   pay structure shows that both at a complex level and a

23   grower level, pay moves with the average of the complex, the

24   industry, and the region.

25          And I can -- I can, you know, break that down more

1    if you want exactly those different parameters.  But

2    Dr. Singer just doesn't show one correlation.  He shows that

3    even when you're looking at correlation of grower pay to the

4    average within a complex, or the average complex within an

5    integrator, or the average complex -- particular average

6    complex pay within the entire industry, he runs this pay

7    structure on multiple levels and finds very high and

8    positive correlations.

9              I would like to also discuss Saravia's arguments

10   against the pay structure regression, why it's rigged.  One

11   of them goes to just the use of it, the use of a correlation

12   analysis at all for cases like this, which I think the case

13   law rejects that idea that it can't be used at all as part

14   of the proof of common impact.  But this is the -- and there

15   was a little bit of a two ships passing in the night, I

16   think, on the briefing, because what Saravia does is she

17   simplifies Dr. Singer's regression, and he talks about her

18   simplified form.  And then she runs the pay structure --

19   then she does a long formal proof over the -- using his

20   actual regression equation.

21             And there's two things that are premises of

22   Dr. Saravia's proof that need to be discussed, because I

23   think they show that there are faulty premises, and her

24   discussion of why it's rigged, it doesn't carry any water

25   here.

1          She says there has to be some sort of trend in the
2   pay.  And she says as the number of observations goes to
3   infinity, the coefficient on the correlation is going to go
4   to one.  And I would say as to the first premise --
5   Dr. Saravia is talking about this in the abstract as a math
6   problem.
7          Dr. Singer is observing a trend in the pay based
8   on his information sharing and no-poach regressions.  This
9   isn't just a hypothetical trend in pay.  And, for example,
10   in the information sharing regressions -- in both of his
11   regressions, he controls for macroeconomic trends that might
12   be explaining the trend in the pay.  He controls for
13   individual grower differences that might be causing the
14   trend in the pay.
15          So the trend is in -- she assumes a trend as part
16   of her proof, but that's sort of assuming away all the
17   evidence in step one that's gotten you here, that explains
18   what trend we're talking about.
19          And her second point about going to infinity, there's
20   nowhere near infinity.  The largest number, I think, is like
21   9,000, and that's when you take the average grower -- or
22   that's when you take the growers' pay and correlate it to
23   the industry.
24          But a number of these correlation analyses have a
25   much smaller number.  For example, looking at the grower pay

1   to the average within complexes or within an integrator,
2   you're talking about a couple hundred observations.  When
3   you're talking -- when he does a correlation between the --
4   between the complex average and an integrators' average pay,
5   there are maybe five or six observations.  We're not talking
6   about an infinite number.
7           So I think that sort of high-level remove from the
8   facts of the case infects a lot of these arguments we've
9   been talking about from the defendants' experts today.
10      Dr. Singer is using the pay structure in the context of
11  having found, controlled for, and quantified the trend in
12  grower pay.  He's not just assuming a trend in grower pay.
13          And you see this carry through to Dr. Saravia's
14  other argument where she -- she makes a hypothetical dataset
15  and says, look, the pay here moves all around, but if
16  there's any sort of trend, Dr. Singer's regression picks it
17  up.  And it's like, well, yes, he's picking up whether
18  grower pay and complex average pay moves within correlation
19  of a trend.  He also happens to measure that trend and
20  identify it as the conduct in this case.
21          So these pay structure regressions should not be
22  looked at just as mathematical proofs, and they should be
23  seated within all the other evidence in this case showing
24  widespread impact.
25          And, second, Dr. Singer runs the in-sample

1   methodology, which, in a nutshell, takes the regression,

2   applies to it to every -- every transaction, finds what's

3   called the "but-for" price, the price that would have been

4   paid but for the conduct the anticompetitive conduct, and he

5   compares it to the actual price paid.  And it finds that --

6   with the information sharing regression, for example, it

7   finds that 70-some percent of the transactions suffered

8   harm.  And it -- but, importantly -- and this is what

9   Dr. Saravia gets wrong -- you don't move on to the in-sample

10  unless the regressions have found a statistically

11  significant and economically significant effect in step one.

12          So Dr. Saravia says, well, look, regressions have

13  all this noise and if -- even if there is no effect in step

14  one, that noise will show up as widespread impact in step

15  two.  And our response to that is, well, the effects in step

16  one, which are statistically and economically significant,

17  show that it is not noise; right?  This statistically

18  significant is ruling out -- that phrase is ruling out the

19  possibility that the result of that regression happened by

20  random chance.  Dr. Saravia's hypothecated dataset that she

21  runs it on is literally random chance.

22          So step one is already ruled out random chance.

23  And if you had random chance, you would never see 76 percent

24  of the transactions being affected.  And Dr. Singer talks

25  about this in his report.  He says, if you look at

1    Dr. Saravia's -- if you apply my in-sample to Dr. Saravia's

2    made-up, randomized dataset, you find roughly 50 percent

3    injury, which is what you would expect with random chance.

4    And, basically, if you add up all the over and

5    underpayments, you get zero, which is what you would expect

6    for randomized data; right?  It's showing that there is no

7    suppression, as opposed to Dr. Singer's where you get

8    70-some -- 75, 76 percent of the transactions experiencing

9    injury.  And you're getting a 6-or-so percent aggregated

10   underpayment, which is how you run the in-sample.

11          And so I would just say that the in-sample

12   methodology -- this exact way of running it has been run and

13   accepted in many cases, including the *Packaged Seafoods* case

14   that went up to the Ninth Circuit, en banc, in the name

15   *Olean,* but also recently in the *Broiler* meat case.  And I

16   think we actually attached the relevant part of the *Broiler*

17   -- the defendants' expert, who did the exact same thing

18   Saravia does here.  He says, hey, look, if you apply the

19   in-sample to an uninfected dataset, you get 90 percent harm.

20   And the court rejected that because that's a misuse of the

21   regression methodology.

22          And so I think it bears noting, when you look at

23   all of this evidence of widespread impact, the fact that the

24   conduct was widespread across an industry that is fairly

25   uniform, when you see that all of the co-conspirators are

1    participants and participating in the same ways, when you

2    see the evidence of -- the record evidence of pay being

3    linked together, and then you look at that in connection

4    with the two quantitative analyses, Dr. Singer concludes

5    that all or nearly all of the class has been injured, which

6    is -- which is more than the widespread injury standard in

7    *Urethane*.

8            THE COURT:  Thank you, Mr. Walker.

9            MR. WALKER:  Thank you.

10           MR. SMITH:  Good afternoon, Your Honor.  Gary

11   Smith with Hausfeld.

12           I'm going to be handling the conspiracy opinions

13   and the relevant market opinions.

14           I did sort of want to clarify one thing.  When

15   Mr. Torres was talking about the overarching agreement

16   earlier, he made a comment that it's fine for Dr. Singer to

17   talk about the constituent agreements, but not the

18   overarching agreement.  I'm just wanting to make sure if

19   that's the current position, because that's inconsistent

20   with the position in the papers, and it can short-circuit a

21   fair amount of my argument if I don't have to defend

22   Dr. Singer's analyses of the no-poach and the information

23   sharing agreements separately.

24           THE COURT:  How do you think it's inconsistent?

25           That's what I took away from the papers, was that

1  Pilgrim's is criticizing Dr. Singer's focus on the two

2  subelements of the overarching conspiracy, but offering an

3  opinion about the existence of the overarching conspiracy

4  without adequate support.

5          Did you hear something different today?

6          MR. SMITH:  So I thought I did hear something

7  different today.  I thought that they were taking a

8  categorical position that an expert economist cannot opine

9  on whether record evidence is consistent or inconsistent

10  with competition or collusion.  That's how I read their

11  papers.  And that categorical position would suggest that

12  Dr. Singer can't say anything about conspiracy, whether it's

13  overarching or whether it's a constituent component.

14          THE COURT:  I don't -- I don't -- we'll hear from

15  Mr. Torres in response, but I don't understand that to be

16  Pilgrim's position, and I don't --

17          MR. SMITH:  Okay.

18          THE COURT:  And I'm not persuaded by it if it is

19  Pilgrim's position.

20          MR. SMITH:  Okay.

21          THE COURT:  I mean, the expert has to testify -- I

22  mean, it has to be in the context of the plaintiffs' theory

23  of the case and the data and evidence in the case, and basic

24  economic principles, I think, are things that they can talk

25  about.  But maybe I'm misunderstanding -- maybe the ships

1   are crossing again.

2          Mr. Torres, has Mr. Smith just described your

3   position correctly, or do you know?

4          MR. TORRES:  No, Your Honor.  And I'm not really

5   sure exactly -- oh, I'm sorry.

6          THE COURT:  Go ahead and be seated if we need to

7   for a minute so you're by the microphone.

8          MR. TORRES:  Yeah.

9          THE COURT:  Thanks.

10         MR. TORRES:  Okay.

11         No, Your Honor.  The point that we're making is

12  that to the extent that he's here -- this is a Rule -- you

13  know, Rule 702 motion.  The basis of it is really to exclude

14  an expert who hasn't provided a reliable objective -- a

15  reliable opinion, reliable methodologies, reliable economic

16  principles in order to substantiate the conclusion.  And if

17  you look at his report, as I pointed out this morning,

18  there's one sentence that he proffers, which he purports

19  supports the concept of two mutually reinforcing components

20  of a conspiracy.

21         THE COURT:  Okay.

22         MR. SMITH:  So I think where the confusion is, is

23  that if you look at the list of paragraphs that they're

24  seeking to exclude at the section beginning on page 27 of

25  their *Daubert* brief, it includes every single paragraph in

 1   which Dr. Singer references any record evidence of
 2   conspiracy in the case.  And so I think that is what is
 3   driving the disconnect, but maybe I should just go through
 4   my argument and make those points.
 5           THE COURT:  I think an expert can consider that
 6   evidence, should consider that evidence, if it's relevant to
 7   the opinion that the expert is articulating.  But this is
 8   where I was fearful that in this category and the last,
 9   we've become untethered from the testimony that we're
10   actually going to hear from the expert, which would allow us
11   to make these decisions.  When we're talking about a
12   250-page report, we can extract things from a report that we
13   have objection to hypothetically, but -- I'll listen to
14   anything you would like to say.
15           MR. SMITH:  Okay.  So given what Your Honor has
16   said about the ability of an expert economist to review
17   record evidence, I think I'm going to focus on the points
18   Mr. Torres made about the overarching agreement, and then I
19   will get into the relevant market analysis.
20           So I want to point out just from a legal standard,
21   Pilgrim's doesn't cite a single case excluding any expert
22   economist's offering of a conspiracy opinion, whether it's
23   an overarching opinion or whether it's some other
24   subcomponent of a conspiracy opinion.
25           Mr. Torres brought up that there's nothing other

1  than that one paragraph connecting the two components of the

2  overarching agreement together.  Dr. Singer testified, and,

3  in his report, laid the foundation for the fact that these

4  two agreements are mutually reinforcing.  Not only in that

5  it doesn't make sense to share information with your

6  competitors if you're -- unless you're also agreeing not to

7  hire one another's growers, but also because they have

8  mutually reinforcing asymmetry -- asymmetry of information

9  components.  If you suppress grower mobility, you're going

10 to suppress their ability to learn about wages of other

11 integrators.  And if you prohibit -- or sorry-- and

12 obviously the information exchanges are going to create

13 information asymmetries because the integrators have all the

14 information and the growers have none.

15         So we think there's -- it's not just that one

16 paragraph in that one passing reference.  There's also the

17 information asymmetry point that's mutually reinforcing.

18         And just -- and this is in our papers, Your Honor,

19 but just as a matter of common sense.  It doesn't make a lot

20 of sense that the same 21 companies would be engaged in two

21 parallel schemes at the same time, both with the goal of

22 suppressing grower pay, and that those two schemes were

23 entirely untethered from one another.  I mean, it's just not

24 plausible that the same companies would do these things, but

25 then also those things are unrelated from one another.  So

1  we think there's just basic logic and economic theory behind
2  the fact that the overarching agreement, that two
3  constituent components were mutually reinforcing.
4        Mr. Torres also brought up a point that we had
5  disavowed the -- any competitive effects of sharing anything
6  other than grower pay data, and that you need to share
7  grower efficiency data in order to know who are the best
8  growers to poach.
9        Well, we've shown in the record -- and this is at
10 footnote 13 of our opening class brief.  The integrators
11 were sharing the tournament-adjusted pay rates of their
12 growers with one another, including Pilgrim's Pride and Koch
13 Foods for a period of two years.  Those tournament-adjusted
14 pay rates are going to tell you who the better growers are.
15 It tells you who the growers are that are winning the
16 tournament.
17        So it's just not true that there's no factual
18 support that the exchange of pay information has that
19 symbiotic relationship with a no-poach, because they are
20 sharing information, besides performance data, that is
21 telling you exactly who is winning the tournament, who are
22 the better growers, who are the prime candidates for
23 poaching.  And, again, that's footnote 13 of our opening
24 class brief.
25        There was a discussion about how -- I guess there

1  was an allusion to the fact that they hadn't developed

2  procompetitive justifications for any of the conduct in that

3  case.  I mean, that's just not true.  There's plenty of

4  procompetitive justifications in their expert reports.

5  They're not a highlight of the class briefing, but they

6  exist.  I'm not sure what they're talking about when they

7  reference the need for a supplemental report.

8          More to the point.  Rule of reason isn't a

9  separate claim.  It is a mode of analysis.  It's a legal

10  standard. There has always been the spectre in this case

11  that this case may be tried under the rule of reason.  We

12  don't think that's what should happen, but we've all known

13  it's possible.  We discussed it at the motion to dismiss

14  stage. And to the extent that they didn't develop the

15  procompetitive justifications that they needed to develop,

16  that's on them.  That's a waiver.  That doesn't require

17  opening the record or deciding this issue now.

18          And I think we're going to talk about this a lot

19  more tomorrow, but there was a discussion about *Comcast* in

20  the context of the overarching conspiracy, and I'm just not

21  sure why *Comcast* came up at all.  I mean, *Comcast* is a

22  modeling point, and we've addressed *Comcast* by measuring

23  harm separately for the two forms of conduct.  I mean,

24  that's the problem in *Comcast*.  You have one model for four

25  theories, I knock out three theories, what do you do?  We

1    have separate models.  So if you knock out one theory, we're

2    good.  So I'm not really sure why *Comcast* came up here, but

3    I did want to respond to it since it did come up.

4            THE COURT:  For what it's worth, I read Comcast

5    the same way.  Maybe there's a *Comcast* problem here that

6    might arise.  I think what Mr. Torres said ultimately, is,

7    well, we're putting everyone on notice that that may be an

8    issue here and --

9            MR. SMITH:  Okay.

10           THE COURT:  -- that's fair.

11           MR. SMITH:  All right.  So I'm going to turn to

12   relevant market unless there's other things Your Honor would

13   like to discuss about the conspiracy opinions.  I mean,

14   we've cited in our brief that structure, conduct,

15   performance analysis is reliable.  Pilgrim's hasn't

16   addressed any of those cases trying to say that structure,

17   conduct -- sorry -- structure, conduct, performance analysis

18   is reliable methodology in antitrust cases.  Those include

19   *Urethanes*.  I think we have a string cite of, I think, nine

20   different cases across the circuit courts.

21           THE COURT:  What's the issue?

22           THE REPORTER:  I would just ask him to slow down a

23   little bit.

24           MR. SMITH:  Yeah.  Sorry.  I talk fast and I'll

25   try to be mindful of it.

```
 1              THE COURT:  You're using big words too, so I know
 2    you stringed them together.
 3              MR. SMITH:  So Mr. Torres didn't address the
 4    arguments at page 27 to the end of their *Daubert* brief,
 5    which had to do with Dr. Singer's structure, conduct,
 6    performance analysis, I take it from Your Honor's comments
 7    earlier.  We view those attacks as categorical attacks, that
 8    experts can't look at the record evidence and evaluate
 9    whether it's consistent or inconsistent with collusion.
10              We've cited tons of cases that say that that's not
11    true, that you can do that.  That includes *Urethanes*, which
12    got affirmed in the Tenth Circuit.  I don't plan to spend a
13    lot of time on that, based on Your Honor's remarks, and I
14    think I'll just move on to relevant market unless there's
15    specific questions.
16              THE COURT:  I have so many questions.
17              MR. SMITH:  Okay.
18              THE COURT:  But, no, go ahead, please.  I'm not
19    being bashful about raising them in the course of our
20    discussion.  This has been a helpful discussion so far
21    today.
22              MR. SMITH:  Okay.  So there was a lot of talk
23    about local decision-making for grower pay.
24              And, Sam, can you bring up the Jayson Penn
25    testimony, and we may look at the exhibit too.
```

     1          So there is evidence -- and we cite this.  This is

     2     Exhibit 34 of our class reply -- that every single pay

     3     decision at Pilgrim's Pride ran through its CEO, Jayson

     4     Penn.  These are not localized pay decisions.  And to the

     5     extent that localized pay decisions bear into a relevant

     6     market analysis -- and I'm not conceding that they do -- you

     7     know, we have -- unfortunately, he didn't answer any

     8     questions about it, Your Honor, because he invoked his Fifth

     9     Amendment rights, but the underlying exhibit we examined him

    10     on is Mr. Stroud -- who's the highest level executive at

    11     Pilgrim's that did not plead the Fifth -- communicating that

    12     any grower pay increase or adjustment is going to have to be

    13     run by Jayson Penn for approval.  So we just don't agree

    14     that these are localized pay decisions in this case.

    15          There's --

    16          THE COURT:  You agree that grower pay is -- and I

    17     think Dr. Singer agrees -- that grower pay is affected by

    18     local and regional factors?

    19          MR. SMITH:  Absolutely.  And we control for that

    20     in our econometric analyses.  And this is the point we make

    21     about levels and changes; right?  There can be different

    22     levels of grower pay based on local taxes, local labor

    23     costs, but there can still be common changes that ripple

    24     through the market.  And so -- so, yes, we agree that there

    25     are localized factors, but we think our econometric analyses

1   take those into account and make sure that we're not

2   attributing any of the anticompetitive effects to those

3   localized factors.

4           I want to respond to a couple of the cases they

5   brought up when they were talking about relevant market in

6   the context of Rule 23.  We do not agree that relevant

7   market is part of the Rule 23 analysis in a Section 1

8   conspiracy case, involving horizontal competitors.

9           The two cases that were referenced were *Black.*

10  That is a Section 2 monopolization case.  Section 2

11  monopolization cases, of course, have market power.

12  Relevant market is required elements.  They're not per se

13  offenses.  The same is true of *Cox* in the -- I think it was

14  the Eastern District of Oklahoma.  That was a tying case.

15  Tying claims are rule of reason claims.  So we don't agree

16  that this is relevant if this case is tried under the per se

17  standard.

18          More to the point, Your Honor.  If you look at the

19  motion to dismiss opinion in this case, which is -- I

20  believe Your Honor so ordered the transcript, so I'm

21  referencing the transcript from that hearing.  At page 25,

22  "The Tenth Circuit has stated that horizontal price-fixing

23  and group boycott are per se violations, and so a

24  plaintiff's failure to allege a relevant market is not fatal

25  to such a claim."

1           And Your Honor in that ruling cited the Tenth

2    Circuit's 2008 decision in *Campfield v. State Farm*.  We

3    think that's the prevailing standard here.  I mean, there

4    have been some references to this isn't price-fixing.  I

5    think we'll talk about that a little more tomorrow, but, of

6    course, we lay out in our class certification papers what

7    the governing standards are, and we believe this is

8    absolutely price-fixing.  It doesn't matter that they didn't

9    agree on a specific price level.

10          THE COURT:  So let me make sure I understand.

11   Your position is you're required, under Rule 23(b)(3), to

12   show predominance, and with respect to the elements of your

13   Section 1 claim, including impact and damages?

14          MR. SMITH:  Correct.

15          THE COURT:  You seek to certify a nationwide

16   class, so you agree that part of your required proof is to

17   show nationwide impact?

18          MR. SMITH:  Uh-huh.

19          THE COURT:  Your point is that's a different proof

20   than that -- this market is a nationwide market.  Is that

21   what you're saying?

22          MR. SMITH:  Right.  So I think maybe taking a step

23   back and thinking about why do we care about market

24   definition; right?  The reason we care about market

25   definition is that in restraints that are not per se

1  unlawful, we want to make sure that the defendants have

2  market power because we are trying to assess whether the

3  restraint in this particular instance had any competitive

4  effect.  So we haven't decided, as a legal system or a

5  society, that this is something that gets condemned without

6  further inquiry, and so we're going to look at those market

7  realities.

8       So you define a relevant market simply to show do

9  they have a dominant share of that market, did they have

10  market power.  And we just don't care about that inquiry in

11  a per se offense.  I mean, I'm going to get into the fact

12  that we actually will be able to show monopsony power in

13  this case in any relevant or geographic market, no matter

14  how defined, but the point of the exercise is not germane to

15  a per se claim.  And so that is our position, Your Honor.

16       THE COURT:  And how do you think we'll try -- if

17  we get to trial -- a theory that has -- let's say your

18  no-poach agreement is evaluated as a per se -- is per se

19  illegal, and the information sharing agreement would be

20  evaluated under the rule of reason.  What does that look

21  like at trial?

22       MR. SMITH:  So you're saying assume there's no

23  overarching conspiracy claim that goes forward tethering

24  them together?  Because there is law that --

25       THE COURT:  Let's -- let's not assume that.  Let's

1   assume that that's your theory and there's sufficient

2   evidence to get that question to the jury.  So with an

3   overarching agreement then and the two constituent

4   agreements, how does that work?

5           MR. SMITH:  In terms of the proof that we'll

6   provide or in terms of what we say about relevant market?

7           THE COURT:  Well, what will we instruct the jury

8   to look for?  What would be the standard that they'll apply?

9           MR. SMITH:  Right.  So if the overarching

10  agreement is intact, right, then I would argue that there's

11  -- it's a per se claim, there's no rule of reason claim

12  necessary to be put to the jury.  I understand we're going

13  to brief that later and maybe we end up in a different

14  place, but we're not here now.  We haven't briefed that at

15  all.  I mean, they don't even try in their briefing to argue

16  for rule of reason treatment other than a passing reference

17  in our offensive *Daubert* motion, in their opposition to that

18  motion.  They don't argue it in the class brief.  They don't

19  argue it in the motion directed at Dr. Singer.

20          So if -- assuming that we still have the

21  overarching claim, the verdict form should say was there a

22  violation, was there impact, and if so, what are the

23  damages.  And there would probably be sub-verdict forms

24  saying which of the alleged co-conspirators participated in

25  the conspiracy.

1          But in this instance, we're not putting relevant

2     market, we're not putting procompetitive justifications.

3     Those things are not on the jury form.

4          THE COURT:  Well, I'm sure we will have a lot of

5     argument about the jury form.

6          MR. SMITH:  Yeah.

7          THE COURT:  But I understand your theory, and I

8     think I -- by your answer, I think I understand what you

9     think the law is on this point.  It's helpful.  Thank you.

10          MR. SMITH:  Okay.  So, again, some first

11     principles on relevant market analysis.  This is a highly

12     fact-intensive issue.  It is almost always a jury question.

13     The Tenth Circuit, in *Black,* just ruled that ordinarily

14     challenges to relevant market analysis, dueling relevant

15     market definitions are "class-wide rebuttal evidence."  The

16     resolution of which are "a matter for the jury."

17          So, you know, this is sort of to get to one of the

18     points Your Honor made earlier, that we just don't really

19     think this discussion is particularly germane to class

20     certification.  We think -- you know, this is not really a

21     summary judgment issue, but it is a factual question for the

22     jury.

23          Of course, I'm going to go through the analysis

24     because there is the *Daubert* motion before us.

25          So I'm going to start with revelant services

1    market; right?  This is the part of the relevant market

2    analysis that decides is grower services the appropriate

3    boundaries of the relevant market.  Mr. Torres didn't

4    discuss this in his opening, but it's in their motion, and

5    so I'm going to respond to it nonetheless.

6         The sole argument that they raise for exclusion of

7    Dr. Singer's opinion that the relevant services market is

8    limited to broiler grow-out services is their attack on the

9    critical elasticity regression that Dr. Singer performs.

10   Now, that regression is an input into the hypothetical

11   monopsonist test.  The hypothetical monopsonist test is

12   evaluating whether a small but significant, non-transitory

13   decrease in price -- I hope that was slow enough.  Okay.

14   Whether that decrease in price would be profitable for a

15   hypothetical monopsonist.

16        What you do is you estimate a critical elasticity,

17   you measure the actual elasticity.  If the actual elasticity

18   is less than the critical elasticity, then you pass the

19   test, and you know you've properly defined the relevant

20   services market.

21        So PPC doesn't contest any of those based

22   principles; right?  They don't say that you can't do an HMT

23   test.  They don't say that the small but significant,

24   non-transitory decrease in price is inappropriate.  They

25   just don't like the way that Dr. Singer has specified that

1    model.

2         It's sort of worth noting, though -- and this ties

3    into the discussion we just had about what's the whole point

4    of this analysis; right?  It's to show market power.  And so

5    there's three reasons why.  Even if you excluded this

6    regression, we still can have Dr. Singer opine on market

7    power in this case.

8         The first reason is that we show market power

9    directly; right?  We show market power through

10   anticompetitive effects and the NPA and the ISA regression

11   model.  And so we don't need to resort to indirect proof of

12   market power.  Indirect proof of market power is the only

13   way -- or the only reason you would even define a relevant

14   market in the first instance.

15        The second reason is that Dr. Singer, in addition

16   to his econometric analyses, cites record evidence that

17   growers possess unique skills, that they have

18   industry-specific assets that are hard to transfer, and that

19   there are exit barriers in the market.  That record evidence

20   on its own can be evidence of a relevant services market's

21   boundaries.  You don't need to have quantitative evidence of

22   a relevant market, although we do.  And there's no case they

23   cite saying you have to have quantitative evidence to prove

24   up a relevant market, and you can't do so just with record

25   evidence.

1          The third and probably the most salient for

2    purposes of this discussion is in addition to the estimated

3    critical elasticity, Dr. Singer includes a number of

4    literature studies on the estimated elasticity for the sale

5    of broilers, and he corroborates his analysis by looking at

6    those elasticities in the literature.  They don't challenge

7    any of those studies as unreliable.  And in each one of

8    those -- whether you take the critical elasticity that

9    Dr. Singer measured using the data in this case or whether

10   you take the measurements from the literature -- which are

11   very aligned with one another -- in every instance, you're

12   going to pass the hypothetical monopsonist test.

13          The one thing they say about that -- not in their

14   brief, but in their expert report, I believe -- is, well,

15   you can't use critical elasticities from the literature

16   because those are looking at the sale of chicken, not

17   raising chicken.  And our rebuttal to that -- this is in

18   Dr. Singer's rebuttal report -- those are entirely tethered

19   to one another.  You can't sell a piece of chicken that you

20   don't grow.  And so we think that the critical elasticities

21   in the literature are a fair proxy for one another.

22          So all of that is to say -- before responding to

23   the specific reasons why we think Dr. Singer's measurement

24   of critical elasticity, using the data in this case, is

25   reliable and admissible -- if the Court reached a different

1    conclusion, it really doesn't alter the opinions at trial in
2    this case.  It would just mean that we have three roads to
3    roam, not four.
4           Sorry.  I just saw you writing something, so I was
5    going to wait.
6           Okay.  So at the end of the day, what Pilgrim's
7    complain about the critical elasticity measure -- regression
8    is that it doesn't include control variables.  What that is
9    trying to measure is the relationship between two variables
10   of interest, price and supply or quantity.  When you add
11   control -- and that's -- by the way, that's what's called a
12   simple regression; right?  A simple regression is just
13   measuring two variables of interest; right?  We don't care
14   about -- this isn't a causation regression; right?  We're
15   not trying to rule out independent causes.  We're just
16   trying to say when price goes up, what happens to quantity.
17          What Pilgrim's is saying by saying you need to add
18   control variables into the regression, they're saying that
19   you can't use simple regression models in antitrust for any
20   purpose whatsoever.  Because the second you include control
21   variables, now you're talking about multiple regression
22   analysis.
23          Now, we cite Wooldridge, the econometric treatise,
24   for the proposition that for measuring relationship between
25   just two models, you want a parsimonious model that doesn't

1    include extraneous variables because it's not a causation

2    analysis.  We're not trying to rule out independent causes.

3    We're just trying to measure the relationship between two

4    simple variables.

5            Sam, can you bring up the reference manual at 269.

6    There should be highlighted text.

7            MS. DERKSEN:  268?

8            MR. SMITH:  269.  Go down to 269.

9            All right.  I'm just going to read it because

10   apparently our exhibit here doesn't have the -- oh, there we

11   go.

12           Okay.  Sorry.  "A regression model attempts to

13   combine the values of certain variables, the independent

14   variables, to get expected values for another variable, the

15   dependent variable.  The model can be expressed in the form

16   of a regression equation.  A simple regression equation only

17   has one independent variable.  A multiple regression

18   equation has several independent variables."

19           And if you can bring up Wooldridge at 34, please.

20           All right.  And this is contrasting the use of the

21   two types of regression models.  "In some cases regression

22   analysis is not used to determine causality, but to simply

23   look at whether two variables are positively or negatively

24   related, much like a standard correlation analysis."

25           And what we're trying to do with the critical

1   elasticity measurement is we're really just trying to look

2   at the relationship between these two variables using a

3   simple regression.

4          There's just no authority that Pilgrim's cites

5   saying that you can't use a simple regression model in any

6   noncausation context or in any context whatsoever.

7          Their cases are all in the causation context.  And

8   for what it's worth, we agree with them that if you had a

9   causation regression, if you were trying to show causation

10  and you didn't have any control variables, that's a problem,

11  and that's what the cases say.

12         But if you look at *Blue Diamond* from the Eighth

13  Circuit, they cite that case.  It is a -- it's not an

14  antitrust case at all.  It is, instead, measuring causation

15  in that case.

16         If you look at the *Mushroom* decision, this is an

17  antitrust case, but, again, here, we're looking at

18  causation.  If you look at page 5 of that opinion, it says:

19  "The EMC defendants also contend that the control variables

20  Dr. Leffler uses in his regression models have no logical

21  relationship with mushroom prices, and, that, therefore, the

22  models cannot reliably demonstrate defendants' conduct was a

23  but-for cause of price increases."  Right?  We're not using

24  this model to determine but-for prices.  We're not using

25  this model to determine causation.

1          That's the same thing with the two in-circuit
2   cases they cite.  They cite a district court opinion from
3   Colorado.  It was a discrimination case.  Again, the
4   regression that lacked control variables was trying to prove
5   causation for the discrimination.
6          The *NCUA* case in the District of Kansas from 2016,
7   that was a loss causation regression in a securities case.
8          So we just don't think it's -- the one -- the one
9   argument they have to exclude the one component of the
10   relevant services market opinion, we don't think is a proper
11   application of econometrics in this case.
12          I suppose the related point -- I think we talked a
13   little bit earlier about omitted variable bias.  Maybe we
14   did not.
15          At the end of the day, the argument that you
16   should have included an additional control variable, you
17   have to tell us what that variable is, and you have to show
18   us that it alters the result.  They haven't been able to do
19   so.  They haven't identified any legitimate omitted variable
20   in this case that alters the results of the analysis.
21          You know, the only thing that they do do is they
22   introduce this time-trend variable, right?  And they say,
23   well, you put the time-trend variable in other regressions,
24   why didn't you put it in this one too.  And the reason is
25   because of a problem with multicollinearity.

 1           So multicollinearity -- all right.

 2   Multicollinearity is a problem where you have a high

 3   correlation between two variables in the model; right?  And

 4   in this instance, it's between the time-trend variable and

 5   it's between the per capita log of income variable.  And

 6   when you have this high relationship between two variables,

 7   this multicollinearity problem, it biases the results of the

 8   regression, and you got nonsensical results, which is why

 9   when Dr. McCrary does this to Dr. Singer's critical

10   elasticity measure, you end up getting results that aren't

11   statistically significant.  They have no meaningful economic

12   interpretation.

13           And I'm going to quote from the *Cook* case, which

14   we cite in our brief.  This is a District of Colorado case

15   that explains the problem of multicollinearity.  And, again,

16   this is at page 1116.  "The existence of multicollinearity

17   can cause regression parameters to be estimated imprecisely

18   and thus interfere with the predictive power of the

19   regression analysis."

20           So what Dr. McCrary is doing here is he's not

21   showing that we've omitted some legitimate variable.  He's

22   introducing a variable that breaks the regression because

23   it's multicollinear with another variable of interest in the

24   regression.

25           There is one other thing they say.  I'll just

1  address this quickly.  They say, oh, if you put an organic

2  chicken variable into the regression, that breaks it too.

3  And Dr. Singer explains in his rebuttal that's not true.  So

4  what -- they have two specifications of the model.  One of

5  them has the multicollinearity problem, one of them

6  introduces organic chicken, but also the multicollinearity

7  problem.  And so in both instances, the nonsensical results

8  we're seeing are driven by the multicollinear variables.

9          All right.  Unless there's any questions on that,

10  I can pivot to the geographic market arguments that were so

11  pressing earlier in the day.

12          THE COURT:  Just one moment.

13      Maybe I misunderstood something you said just a moment

14  ago, but --

15          MR. SMITH:  Sure.

16          THE COURT:  At least in Dr. Singer's information

17  sharing agreement regression, Pilgrim's does point to a

18  control that they think is missing.  It's the

19  pay-per-square-foot control.

20          MR. SMITH:  Yeah, but these are different

21  analyses; right?  So they're saying that's an omitted

22  variable for the causation regression, which is what the ISA

23  regression is doing there; right?  This is a -- they don't

24  make that same criticism of this regression.  I mean, they

25  make the criticisms that I just discussed --

1                THE COURT:  I understand.

2                MR. SMITH:  -- but they're not making that same

3     one.

4                THE COURT:  I understand.  Go ahead.

5                MR. SMITH:  Okay.  All right.  So the geographic

6     market.  Again, I want to start with some basic principles;

7     right?  So the whole point of the exercise here is to

8     determine whether the co-conspirators have monopsony power

9     in the market at issue.

10               Now, we, of course, opine that the relevant market

11    is nationwide, and that they should have 98 percent

12    nationwide.  We offer the alternative analysis that you

13    could do it geographically and say that it's the Agri Stats

14    regions, in which case you still have between 78 and 98

15    percent monopsony power.  But more to the point, even if you

16    define the market the way they want to define the market.

17    Even if you said it's 50, 60 miles around the complexes,

18    they haven't identified any one of those areas where you

19    don't have monopsony power in the geographic market; right?

20               And so at least in terms of the merits of the case

21    -- and I know here we're talking about Rule 702.  But in

22    terms of the merits of the case, whoever is right here, you

23    get to the same result, which is that there's monopsony

24    power in the relevant geographic market.

25               But with that, I'll get into the main argument.

1   So the main argument has changed quite a bit from the
2   opening brief to the reply brief.  In the reply brief, PPC
3   is now saying that the horizontal merger guidelines require
4   you to define the narrowest geographic market possible.
5   That basically you have to run the hypothetical monopsonist
6   test and if it passes at a nationwide level, then you have
7   to run it at a smaller level and a smaller level and a
8   smaller level.
9           There's no case that says that.  And the
10  horizontal merger guidelines don't say that, and their
11  experts don't say that.  The horizontal merger guidelines
12  that they cite, that discussion is about the relevant
13  product market.  It's that you define the narrowest product
14  market that you can.
15          And I'm going to quote from that.  So that same
16  passage that they cite, even as to the relevant product
17  market, doesn't draw that bright-line rule that they would
18  have you take away from it.  That section says:  "The
19  agencies may evaluate a merger in any relevant market
20  satisfying the hypothetical monopsonist test."  Okay.  So it
21  is not saying that you must define the smallest market and
22  you can only look at that one.  It is saying that there are
23  myriad markets that you can evaluate for purposes of
24  assessing anticompetitive effects, which is what we really
25  care about in an antitrust case.

1          They go on that the -- the rule that Pilgrim's

2     cites "does not lead to a single relevant market" for

3     evaluating anticompetitive effects.  So there is no

4     bright-line rule that you have to cut it up into smaller and

5     smaller pieces until you fail the hypothetical monopsonist

6     test.

7          And if you think about it, it's sort of a

8     nonsensical rule, which is why it's not in their expert

9     reports, which is why it's not in any case law.  If you had

10    an -- if you had to always define smaller and smaller

11    relevant markets, that would mean you could never have a

12    nationwide market.  Because if you had a nationwide

13    conspiracy with a hundred percent market share, they'd also

14    have a hundred percent market power in all of the submarkets

15    that were defined.

16         But according to Pilgrim's, you would have to use

17    the small market, even though they have a hundred percent

18    share in the nationwide market.  That's just not a rule.

19    It's not a rule in econometrics, it's not a rule in

20    antitrust, and, you know, I would encourage you to read the

21    horizontal merger guidelines, if you're interested in this

22    issue, because I think it's illuminating on the point.

23         There was a discussion -- I'm going to switch a

24    little bit to some of the cases they cite.  They cite

25    *DeSlandes,* which is about low-skilled fast-food workers.

 1   And I appreciate Mr. Torres' correction that, in fact, the

 2   growers are high-skilled workers.  We thought some of the

 3   representations in the brief about them being low-skilled

 4   workers weren't very fair to our clients.

 5              But this case is just not like *DeSlandes*.  I mean,

 6   these people move across state lines to get into the

 7   business.  They move across state lines to switch

 8   integrators when they're allowed to.  Obviously, the

 9   no-poach is an impediment to that.  And after this argument,

10   I'm going to walk through some of the deposition testimony

11   on that point.

12              These workers are more like the McDonald's

13   franchises than they are like the McDonald's workers; right?

14   And so, you know, they say the evidence -- and that really

15   contrasts this case from cases like *McDonald's*; right?  The

16   *McDonald's* case, there's no evidence whatsoever that any

17   McDonald's worker ever moved to get into a better McDonald's

18   location.

19              And that's not what we have here.

20              So, Sam, I want to go through some of this

21   deposition testimony now.  So why don't we start, Sam, with

22   Kevin Croft.

23              Your Honor, Kevin Croft was a Sanderson grower.

24   He was noticed up as an absent class member deposition, so

25   he's not one of the named plaintiffs.  And Mr. Croft is

1    asked about a grower that he knows that switched.

2         "QUESTION:  Originally, back in 2014 before they

3         switched, where was it located?

4         "They sold their contracts and farms that were in

5         either a Pilgrim's or a Tyson division in

6         Nacogdoches.  Came to Palestine, purchased

7         property, and built a Sanderson Farms farm."

8         So right there, we have evidence of growers

9    selling their farm, picking up their roots, moving their

10   families to get into a better position with a different

11   integrator.

12        Can we pull up Randy Pettus?

13        Randy Pettus is an executive for Sanderson Farms.

14        And please do feel free to yell at me if I'm going

15   too fast.

16        THE COURT:  She'll be yelling the whole time.

17        MR. SMITH:  Sorry.  I apologize, Your Honor.

18        All right.  So Mr. Pettus testifies:  "I can

19   remember farms; I just can't remember their names right now

20   that, you know, they were growing for Tyson some place, they

21   sold their farm, they came to grow for us or growing for

22   Pilgrim's or growing for somebody else, and they sold their

23   farm and came to grow for us."

24        Let's look at Joe Sanderson's deposition.

25        I have about nine of these, and I apologize for

1  going through nine, but this seems like it's a point of

2  contention, so I think it's important to highlight the

3  evidence.

4          Joe Sanderson says:  "But, you know, there are

5  some people that come in and buy land so they can grow

6  chickens.  We have a high percentage of people that will

7  come in and buy land so they can grow the chickens.  It's a

8  high percentage that are not residents at the time we build

9  that complex that will come in and buy land so they can grow

10  chicken for us."

11          THE COURT:  Is it the case that if you go through

12  all nine of these, you'll provide anecdotal evidence that

13  there are people who have moved in to new markets or have

14  sold out of old markets and moved into new markets?

15          MR. SMITH:  Well, I would like to push back a

16  little bit on the anecdotal point, given that we're talking

17  about the CEO of an integrator saying it's a high percentage

18  of individuals that do it.  I guess I would say it's

19  corroborated by the empirical analysis that we've done.

20          They reference in their brief .001 percent of

21  growers.  It's closer to 2 percent, right, that relocate

22  their farms, that pick up roots, and that will move to get

23  into integrator's complex.  It's 336 of the roughly 700

24  growers that are able to switch notwithstanding the

25  no-poach.

1          So, you know, look, I know 2 percent isn't 10

2     percent, but, of course, we're looking at a world that has a

3     no-poach restraint in it and is going to have some limiting

4     factor on grower mobility.  I mean, at the end of the day, I

5     think the point is what you care about is whether growers at

6     the margins are going to move around.  You don't need to

7     show that, you know, 50 percent of growers are going to

8     move.

9          And then the instance of new growers, and we think

10    new growers move all the time.  And when you're setting pay

11    for the new growers, you're setting pay for the old growers.

12    They don't give them different contracts.  So if you're

13    trying to attract sufficient new growers to fill your

14    complex, that's going to affect the pay of the existing

15    growers that aren't relocating.

16         But I think Your Honor was going to say, am I

17    going to keep reading the same quotes, and all of the quotes

18    were pretty much the same.  It's growers moving from

19    California to Texas to get into the business.  It's

20    integrator witnesses talking about how it's not uncommon for

21    growers either to move across state lines or to relocate

22    generally, either to sell their farm and buy a new farm or

23    to get into the business of raising broilers.

24         And we can hand those up for you.  They're all

25    cited in the expert reports, but if you'd like copies, Your

 1    Honor, we've got a stack for you.

 2           THE COURT:  And the numerical data, the quantitive

 3    data is what you just recited.  It's 336 out of 700 growers

 4    that were eligible to switch or could switch, I think --

 5           MR. SMITH:  That were able to; right?

 6           THE COURT:  Were able.

 7           MR. SMITH:  So there's 24 -- there's 24,000

 8    growers in the United States at any given time.  Or I -- let

 9    me restate that.  There's 24,000 throughout the entire class

10    period.  It's closer to 20,000 at any given time.

11           What we've shown empirically, by matching up name

12    and address data in the structured databases that were

13    produced, is that they're about 700 switches throughout the

14    class period, people who were able to switch notwithstanding

15    the no-poach.  And of those 700, 336 moved, physically

16    relocated, their farms to do so.

17           You know, I guess -- well, never mind, Your Honor.

18    Nothing further on that particular point.

19           THE COURT:  And the 2 percent figure means -- is

20    what?  That's 700 switches out of -- what is 2 --

21           MR. SMITH:  It was 336 over the 24,000.  It's

22    rough justice.  I think it's like 1.6 or 1.7.  I believe I

23    said closer to 2, so ...

24           But even, again, Your Honor, if I stood up here

25    and I showed growers switch 20 percent of the time, they

1 would stand up and say, well, that doesn't sound like a very

2 effective conspiracy.  So, I mean, to some extent, our

3 ability to prove this up is limited by the fact that there

4 is a restraint in the marketplace.

5         And, Your Honor, I don't have anything else on the

6 geographic market point unless Your Honor has any other

7 questions.

8         THE COURT:  Mr. Torres told me that we need to

9 decide this issue now as part of class certification.

10 You've just spent a good bit of time discussing it, but I

11 think the plaintiffs' position is that it has no relevance

12 to class certification of this class for the claim that

13 you've asserted.

14         MR. SMITH:  That's correct, Your Honor.  I mean,

15 look, there's a world in which -- and we don't think this is

16 the way it will play out, but there's a world in which we

17 brief this, and, on summary judgment, we get a ruling we

18 don't expect or that we think is inconsistent with the case

19 law.

20         If that happens, the proper procedure is that they

21 can bring a motion for decertification, if that's justified.

22 You know, we think it wouldn't be for a lot of the reasons I

23 just said.  There is monopsony power in whatever market

24 geographic that you define, and that's the reason we care

25 about the inquiry.

1          And so we don't -- we don't actually think that
2    decertification motion would be successful even at that
3    juncture, but that's the procedure to go through.  We don't
4    -- we don't engage in free-ranging merits inquiries at the
5    class certification stage.  And I guess I should add, you
6    know, at least for purposes of today, we're talking about
7    whether this is junk science, and I sure hope I've convinced
8    you this isn't junk science.
9          THE COURT:  I mean, any class certification at
10   this stage of the proceeding is a preliminary certification,
11   that's true, and circumstances often change between the
12   class certification and trial, so I don't disagree with
13   that.
14          What else do you plan to cover, Mr. Smith?  I'm
15   just wondering whether we might take a break now.  I think
16   I --
17          MR. SMITH:  Well, that, actually, Your Honor, is
18   basically the totality of it.  I was here to address the
19   conspiracy arguments and the relevant service and geographic
20   market arguments.  So I think plaintiffs are complete with
21   our rebuttal presentation.
22          THE COURT:  Then, this is what I would propose.
23   I would like to take a few minutes to digest what you've
24   said, and go through my notes and think more about it and
25   figure out whether I have more questions for you before you

```
1    yield the podium.
2            So let's take 10 or 15 minutes and we'll come
3    back.  Thank you.
4        (Recess taken.)
5            THE COURT:  Mr. Smith, I think I may have just one
6    -- one or two questions left for you.
7            MR. SMITH:  Sure.
8            THE COURT:  It became evident early in my review
9    of the papers that you can't skip the footnotes in these
10   briefs.  There's a lot of meat in the footnotes.  The
11   defendants raise at different points in their papers an
12   argument -- it's a variation of an argument that
13   Dr. Singer's opinion is out of line with the plaintiffs'
14   theory in the case.
15           I think we spoke earlier about performance versus
16   pay, and you talked about the sharing of the tournament data
17   through Agri Stats and the like, but there's also, I think
18   -- I think in one of the footnotes in Pilgrim's opposition
19   to your class certification, there's a -- what I understood
20   to be an argument that Dr. Singer is misaligned with your
21   theory on -- it has to do with a difference between base pay
22   and total pay for the growers.  Do you have that argument in
23   mind?  Do you remember that?
24           MR. SMITH:  I don't have it in mind, Your Honor,
25   but --
```

1              THE COURT:  Then maybe let's hear from Pilgrim's,

2    and if there's something you would like to add, we could --

3              MR. SMITH:  This is in the class brief, not the

4    *Daubert* brief, you're saying?

5              THE COURT:  Right.  In a footnote.

6              Okay.  All right.  Thank you.

7              Mr. Torres, I assume there's something else you

8    would like to say?

9              MR. TORRES:  A couple of things, Your Honor.

10             Your Honor, let me start, if I could, with the

11   national class and the importance of making a determination

12   in the context of class certification, determining whether

13   it's a nationwide market.  And in the *Funeral Consumers*

14   decision in 2012, let me read exactly the language on that

15   point.  The court stated that:  "Because plaintiffs brought

16   this case as a nationwide class action, the recovery they

17   seek under Section 1 of the Sherman Act and Section 4 of the

18   Clayton Act requires that they show the relevant geographic

19   market is national," in order to show the antitrust impact

20   element of their claim, even at the class certification

21   stage.

22             And, in addition, in the *Exhaust Unlimited*

23   decision v. *Cintas Corp.*, a Southern District of Illinois

24   decision, the court states and I quote:  "Common proof of

25   actual injury to each class member requires that all class

1   members operate in the same relevant market, otherwise, they

2   could not be affected in a common manner by the challenged

3   conduct."

4          So those questions -- I mean, those quotes from

5   those decisions, Your Honor, explicitly explain the reason

6   that a determination has to be made concerning a national

7   market.

8          THE COURT:  So I'll confess that among the cases I

9   read, neither of those were in the group I read.  What

10  courts are they from?

11         MR. TORRES:  I'm sorry, Your Honor.

12         THE COURT:  *Funeral Consumers*?

13         MR. TORRES:  This is *Funeral Consumers* and the

14  cite is 695 F.3d 330, and it's the Fifth Circuit, 2012.

15         And the *Exhaust Unlimited, Inc. v. Cintas*,

16  C-I-N-T-A-S, *Corp*, 223 F.R.D., at -- it's the Southern

17  District of Illinois, 2004.

18         And *Black* as well, Your Honor, in the -- on this

19  relevant market point, and this is -- I don't have the exact

20  page because I have the Lexis printout, but the language is:

21  "Because market power contextualized by the relevant market,

22  inquiry into an antitrust defendant's market power

23  necessarily begins with defining the relevant market."  And

24  "A defendant's market share is a necessary, but not

25  independently sufficient, component of establishing its

1   power in the relevant market."

2          And then there's a discussion concerning the

3   relevant market.

4          THE COURT:  So if you go back a page in that

5   decision, though, the Tenth Circuit makes clear that the

6   plaintiffs in that case had to prove monopoly power in the

7   relevant market and that it was willfully acquired or

8   maintained because it was a Section 2 claim.  Those are not

9   elements of the Section 1 claim that the plaintiffs have

10  here.

11         MR. TORRES:  But one of the elements of the

12  Section 1 claim, they still -- they're required to show

13  impact.  And if you're alleging a national class, that you

14  have to show impact with respect to the national class.

15  It's their pleading.  It's the way they framed the issues in

16  terms of the -- of their analysis.  And this is precisely

17  what -- you know, what the *Funeral Consumers* decision

18  states.

19         THE COURT:  Okay.  I'll sort it out.

20         MR. TORRES:  Okay.

21         THE COURT:  But what Mr. Smith said makes sense to

22  me.  When we're talking about the relevant market and the

23  purposes for engaging in that analysis, what's the relevance

24  in that exercise if we're in a per se illegal world?

25         MR. TORRES:  Because the issue is to decide

1   whether there's been antitrust impact, and in order to
2   determine whether there's been antitrust impact, it's
3   necessary to understand what the market is.
4          THE COURT:  Well, we have a national class that
5   the plaintiffs seek to certify.  They're going to have to
6   convince me that they can -- that there's class-wide proof
7   susceptible of showing injury to that whole class.  That's
8   the nation.
9          MR. TORRES:  That's their allegation, Your Honor.
10  And we're saying in a class action context, the Court can
11  look beyond the mere pleadings and actually look at the
12  reality of what the market is in order to make that
13  Section 1 assessment concerning impact.
14         THE COURT:  Okay.  All right.
15         MR. TORRES:  Number two, Your Honor, in the in --
16  plaintiffs cited to the *In re Broiler* decision as one of the
17  cases that has blessed the in-sample methodology.  As far as
18  I know, this is not a case that considered and evaluated the
19  in-sample analyses or the critiques that were made by
20  Dr. Saravia in her expert report.
21         The third point, Your Honor, on the critical
22  elasticity point.  In connection with this point about this
23  being a correlation exercise, not a regression exercise, but
24  the fact is that there are actually two regressions in the
25  critical elasticity test.  One deals with the actual

1    elasticity, the second with the critical elasticity.

2            In each of those -- and the critique that is made

3    by Dr. McCrary, is that in each of those, there has to be

4    control variables, and they failed to provide evidence of

5    what those control variables were.

6            And the reason it's important is because you have

7    two lines, and they're making a judgment in terms of whether

8    to determine the market, whether the actual pay is above or

9    below the line.  But you need to look at the actual

10   regressions concerning those two lines in order to make that

11   determination.  And that's where the absence of control

12   variable, according to Dr. McCrary, is relevant.

13           THE COURT:  So what's the control that's missing?

14           MR. TORRES:  Pardon me?

15           THE COURT:  Does he identify a control that's

16   missing that needed to be part of the analysis?

17           MR. TORRES:  He gave -- he gave one example of the

18   linear trend, how that could affect it, but there may be

19   others.

20           THE COURT:  But that's not a control variable that

21   he's arguing needs to be included in the analysis, is it, or

22   do I misunderstand?

23           MR. TORRES:  Well, what he's saying is that --

24   they don't articulate what the control variables were for

25   the actual elasticity and the critical elasticity.  So you

1    don't know whether that line that they're setting is an

2    accurate representation, because he has -- no information

3    has been presented concerning the control variables.

4              THE COURT:  So the argument is that there are

5    control variables that he needed to include that he didn't,

6    or the argument is he just didn't tell us what controls he

7    had, if any.

8              MR. TORRES:  Yeah.  Your Honor, a regression that

9    has no controls, you know, as matter of law, is not -- has

10   no reliable value.  And this relates to a separate point

11   concerning omitted variables that are considered key in the

12   case.  And we're going to cite -- because this deals with

13   the -- and ties into the density, the housing density, the

14   failure to control in that context, but it's a similar issue

15   that I'll turn to shortly.

16             THE COURT:  I just want to make sure I understand

17   what you just said.  Did you just say that an analysis that

18   doesn't -- what did you say?  A regression that doesn't have

19   controls is invalid as a matter of law.  Did I misunderstand?

20             MR. TORRES:  The regression -- he has two

21   regressions that he has to articulate what controls were

22   used in each of those regressions, and his critique is that

23   that's not set forth in the report.  So it has no

24   understanding as to the validity of the accuracy of those --

25   of those two lines, because there's no definition or

1    description of the regressions that were run and the

2    underlying controls that were used.

3            THE COURT:  And what is it that makes that

4    inadmissible as a matter of law?  And what authority would I

5    go to?  I read that phrase, I think, three times in

6    Pilgrim's briefing, and I'll tell you each time you lost me,

7    because there wasn't a citation that made clear that the

8    statement you were making is a legal principle as opposed to

9    application to the kind of judgment we're talking about

10   under 702.

11           MR. TORRES:  It's a 702 point under the -- the

12   requirement that the methodology has to be reasonably

13   applied.  And his judgment -- or opinion is that it was not

14   reasonably applied because of the failure to identify and

15   specify those controls.

16           THE COURT:  Okay.  And I see Mr. Smith jumping out

17   of his seat.  We'll come back to you, Mr. Smith.  We'll have

18   a chance to hear from everybody before we stop.  It's too

19   important to skip over any of this.

20           Go ahead, though.  You're on a roll, Mr. Torres.

21           MR. TORRES:  Okay, Your Honor.  And then in

22   connection with the academic references -- again, this is on

23   the critical elasticity point that were cited by Dr. Singer

24   as relevant.  And I'll just -- I'll mention what some of

25   them are.  One of them is from the -- it involves data from

 1   Turkey from 1983 to 1998.  And it involves -- and it's

 2   comparison to the broiler production and the wholesale price

 3   of chicken.

 4          Another is from Indonesia, from 2000 -- from a

 5   2000 survey, and this involves a comparison of the number of

 6   birds versus the number of chickens.

 7          And the others go back -- one goes back to 1965,

 8   1979, and 1965.  Those are -- that's the sum and total.

 9   This appears at Exhibit 37 of Dr. Singer's report.  I mean,

10   McCrary's report.

11          On the -- returning to the housing density point,

12   Your Honor.  And this is the point where in connection with

13   omitted variables and the importance of ensuring that if you

14   -- obviously, experts can differ in terms of what the

15   appropriate control variables are that you include in a

16   regression, but if you omit a key variable, then that

17   renders the regression unreliable.  And the cases that we

18   cite in support of that proposition, Your Honor, are

19   *National Credit Union v. UBS*, *Werede*, W-E-R-E-D-E,

20   *v. Allright*, and *Reed Construction v. McGraw-Hill*.

21          THE COURT:  How does a -- how does a judge without

22   a PhD from Stanford, with opinions from two qualified

23   experts in economics who disagree about whether a key

24   variable is -- goes to the weight or admissibility of the

25   opinion, how do I resolve that?

 1          MR. TORRES:  Well, in this -- in this particular

 2   instance, Your Honor, you respond by looking at Dr. Singer's

 3   testimony, where he essentially -- and I showed it this

 4   morning -- where he indicated -- and he was asked a question

 5   in terms of if you run a regression and you have some

 6   variables, and then it's challenged, and it turns out that

 7   they've identified a variable that was excluded, and that

 8   variable has a materially significant impact on the outcome,

 9   then it's not -- the model would not be considered reliable.

10          He didn't link it to this case, but the variance

11   between the reported value in his model and the -- and the

12   outcome, if he had included the omitted variable, would be

13   70 percent.  So, therefore -- I read through his own

14   testimony.  That's a variable that renders the model

15   unreliable.

16          And the three cases I cited, Your Honor, are cases

17   that take -- distinguish between cases where there's just

18   disagreement in terms of what the inclusion of the variables

19   are and makes the more critical point that if you establish

20   that there's a key omitted variable, then that is -- then

21   the regression results are not reliable.

22          So in this case, it's the legal argument that --

23   or the legal position as set forth in those decisions and

24   his own admission concerning what's a material -- and

25   considered a key variable.

1          THE COURT:  Okay.

2          MR. TORRES:  Switching, Your Honor.

3          You heard the reference to -- or the response in

4   connection with the low switching rates, and I had mentioned

5   during our argument the .01 percent.

6          And the response from the plaintiffs was that,

7   well, 43 percent of those moved.  But that's still -- .01

8   percent is still an infinitesimally small number, and it

9   doesn't really say anything about moved to where.  Because

10  they're talking about a national market, but no analysis was

11  done here.  In one case, I think the example they gave and

12  some other examples, they may move across the state line.

13         So the point is that in terms of the underlying

14  quantitative number is infinitesimally small, number one.

15  And, number two, there actually is data that was never used

16  by Dr. Singer to actually do the analysis in connection with

17  switching rates in other areas.  The only thing he did was

18  looked at Delmarva, the switching rate in Delmarva, found

19  out that -- you know, and concluded that -- well, two

20  things.

21         One, he admits that switching rate is important

22  for determining outputs with respect to grower pay.  That's

23  number one.  But then he admits that there is a difference

24  between the switching rates in Delmarva and the switching

25  rates in the rest of the country.

1           And a subcomponent of his next argument is that he

2    finds that after the commencement of the "war on the shore,"

3    the switching rate in Delmarva increased or doubled.  And

4    they -- the plaintiffs love that because they -- they argue

5    that this shows that switching rates were directly related

6    to the alleged no-poach agreement.  But what he fails to do

7    is to consider what was happening outside the country -- as

8    he's done with some of these other tests -- what was

9    happening outside the country with respect to switching

10   rates.

11           Instead, what he does is he presents a chart,

12   where he takes an aggregated high-level average and just

13   takes one average, and then compares that and makes a

14   declaratory statement that it shows that the switching rates

15   remain the same.  But that -- that analysis -- or there is

16   no analysis.  It's just an average.

17           And if you actually look at his own charts where

18   he does it on an integrator basis, and he actually -- and

19   you actually -- and a regional basis -- and the regions, by

20   the way, are the regions that were set forth in the

21   Agri Stats data -- he actually does no analysis with respect

22   to that, but the one thing that is clear from that data is

23   that there's variance throughout the region.  There's

24   variance throughout the -- among integrators.  But ignored

25   all of that and conducted no analysis to determine whether

1    there was any difference -- any significant difference

2    between Delmarva and outside the country, from which you

3    could draw some kind of inference that the impact was -- you

4    know, that there was -- that the impact or the switching

5    rate did not change outside Delmarva because of the alleged

6    continuation of the no-poach agreement.

7              THE COURT:  I'm sure I know the answer to this

8    question, and I'm not trying to be tricky, but you keep

9    saying "outside the country."  You mean outside --

10             MR. TORRES:  Outside Delmarva.  Outside Delmarva.

11   Sorry, Your Honor.

12             And just on that last point, Your Honor, this

13   includes -- and this is at paragraph 234 of his report.

14   This includes areas where you see one of the differences

15   that exist in the country that could impact on switching

16   rates and it's a lot -- you know, common sense difference,

17   which is what is the concentration, the relative

18   concentration of integrator companies within different parts

19   of the country.

20             And last, in connection with some of the data that

21   he did present, concerning Agri Stats, that was broke down

22   into regions, he was asked about how -- does he have any

23   knowledge about the way those regions were developed, what

24   the standards were, what the criteria were, absolutely no

25   idea.  So, really, nothing, other than a superficial

1    assessment of what happened outside of Delmarva, based on

2    these gross averages that really mask all the barriers that

3    existed there.

4          On the pay structure, Your Honor.  The trend

5    that's relevant here is -- he's talking about -- first, let

6    me back up.  He's talking about correlation, and he makes

7    the point that, well, correlation is different from this

8    rigid, structured paradigm that we articulated based on the

9    Pennsylvania case, and he said that's not the standard.  And

10   the standard, when you're doing these types of analysis, is

11   correlation, and that really doesn't require any kind of

12   level of rigidity in connection with assessing whether you

13   have met the criteria.

14         But the criteria here and the test that's being

15   measured and the conclusion that's being assessed is

16   Dr. Singer's opinion concerning the price structure.  In his

17   opinion -- and this is at -- let me see -- at paragraph 289

18   of his report, where he says that they moved in lockstep.

19   He's not referring to there was some correlation in

20   connection with pay at some level.  He's saying -- and his

21   opinion is that they moved in lockstep.  I'm sorry.  It's

22   259, not 289.

23         And, Your Honor, I would just refer you to the

24   *Kamakahi* decision where the issue came up concerning his use

25   of pricing -- there was the pricing structure case, the

1  human egg donor case, where the court looked at the kind of

2  analysis that he did here and excluded his testimony.

3          Just one second, Your Honor.

4          Yeah.  On the pay structure -- and this is the

5  point from *Kamakahi* that also applies here -- is because it

6  was really detecting a trend within a dataset, not across

7  the dataset.  And that's relevant here because what he's

8  referring to -- and, really, the predicate or his basis for

9  argument that there was transmission across the country from

10 some inflated rate, at one level, is that there is -- it's

11 across -- that is correlation across the datasets.

12         Thank you, Your Honor.

13         THE COURT:  Thank you.

14         Mr. Smith.

15         MR. SMITH:  And I'll be -- I'll be very brief,

16 Your Honor.

17         THE COURT:  Brief, but not fast.

18         MR. SMITH:  I'll be brief and slow.

19         So I just want to clarify a few things and give

20 you a couple of citations to the record.  If you look -- if

21 you look at the Singer report, the opening Singer report, at

22 paragraph 71, you'll see that Singer identifies that there

23 are 750 -- some 750 growers that switched, 43.5 percent of

24 which, or 336 growers, physically relocated their farms to

25 do so.  You can do the math yourself, Your Honor.  That's

 1   not .001 percent.

 2          The discussion about control variables in the

 3   critical elasticity regression.  There are no control

 4   variables in the critical elasticity regression.  This is

 5   the point we walked through with the econometrics literature

 6   about the difference between simple and multiple regression

 7   analysis, and how simple regression analysis is used when

 8   you're doing something other than determining causation,

 9   when you're only evaluating the relationship between two

10   variables in the critical elasticity context, that is price

11   and supply or quantity.  I just wanted to clarify what the

12   criticism was and what our response to it was.

13          And, you know, there were these references to

14   there's some omitted variable, but we don't know what it is,

15   and that's not the *Daubert* standard.  You have to come

16   forward and show what an omitted variable is, have a

17   legitimate omitted variable, show that it is appropriate to

18   introduce that variable, and that it doesn't bias the

19   results.

20          For the critical elasticity regression, the only

21   thing they have is the multicollinear time-trend variable,

22   which probably was designed simply to break the regression.

23          And this is a quote from the *Mushroom Direct*

24   *Purchaser* case.  I think Mr. Walker will have a few and have

25   a similar quote from the *Urethane* case.  "There must be more

1  than a mere possibility that an expert's model is unreliable

2  in order to exclude it from the jury's consideration."  And

3  this was a discussion in the context of "the use of

4  meaningless control variables."

5         All that Pilgrim's has gotten up and offered for

6  you is the mere possibility of an omitted variable in the

7  critical elasticity regression.  That is nowhere near

8  sufficient under Rule 702.

9         Unless Your Honor has questions, that's all I

10  have.

11         THE COURT:  Thank you.

12         MR. WALKER:  Your Honor, may I get up and make a

13  couple of points?

14         THE COURT:  Would you, please.

15         MR. WALKER:  So I just want to briefly and slowly

16  take them in reverse order.  The *Kamakahi* case -- I think we

17  talked about this earlier.  You know, Dr. Singer testified

18  that he just did not have the evidence in that case because

19  it hadn't been elicited by the plaintiffs, but hypothesized

20  that he could find a pay structure if given the evidence.

21  And the court said, well, you just don't have the evidence,

22  you don't have the evidence.  It wasn't sufficient.

23         Here, he goes through all the analyses we

24  discussed about pay structure and record evidence and

25  quantitative evidence.  I'm not going to go through it

1  again, except to say it's a vastly different case than

2  *Kamakahi.*

3          I would say with the switching rates, I didn't

4  entirely follow the discussion, but I think the key factor

5  there is the jump in rates, the change in rates, during the

6  "war on the shore" is something that is not seen elsewhere.

7          There were different baseline switching rates in

8  different parts of the country, but the sort of salient fact

9  is during the "war on the shore," there was a jump not -- as

10  far as I know, not seen elsewhere.  And I don't think their

11  experts pointed out any jump elsewhere either.

12          THE COURT:  Well, but Mr. Torres did say, but it's

13  an artificial market because of the density of integrators

14  and growers in that region.  It's not representative, for

15  example, of -- and now I'm making this up -- New Mexico.

16  And did Dr. Singer account for that?

17          MR. WALKER:  Dr. Singer does account for that.  I

18  mean, there's the -- there are, you know, regressions, like

19  the ISA -- the information sharing regression, which account

20  for regional differences in pay.  There's the in-sample,

21  which is run on transactions.

22          But also the key fact is a baseline level -- a

23  higher baseline level of switching doesn't mean that there's

24  different competitive baseline -- different competitive

25  scenarios in each market that meaningfully will change

1   whether the results can be extrapolated.  What he would say

2   is, what we see here is a jump that we think we would see a

3   similar jump elsewhere.  Even if the numbers of switches may

4   be lower, the change would be similar because of -- and it's

5   the change in rates that matters for purposes of impact, not

6   just the baseline rates.

7           In fact, I think -- I'm not entirely sure they

8   made this argument, but to the extent the baseline level

9   made Delmarva more competitive, I would think that it would

10  make a conservative benchmark.  But I don't really think

11  they made that argument.  And, in any event, what you really

12  want to focus on is the -- is the change in rates that

13  happened at that time, that would, we think, happen

14  elsewhere if the no-poach broke down across the country.

15          On the omitted variables, the -- typically, you

16  test for an omitted variable by take the regression with all

17  the data and the benchmarks and everything, and you add in a

18  control variable, and you see whether it changes the

19  results.

20          We talked about it earlier.  What they did was

21  completely broke the model, changed -- you know, took out 98

22  of the pay -- 98 percent of the transactions and then said

23  -- or 90 percent or what it is -- and then said, oh, here's

24  this variable.  If you add it, it changes the results of the

25  model.  That's not testing for an omitted variable.

1          And I would say that the case law doesn't really
2     support them either.  In *Urethanes,* in the Tenth Circuit,
3     the court said -- well, first said, the use of variables
4     bears on the weight of the expert's opinions, not their
5     admissibility.  This is the Tenth Circuit *Urethanes* case.
6          The court also said, "the exclusion of major
7     variables or the inclusion of improper variables may
8     diminish the probative value of a regression model.  But
9     such defects do not generally preclude admissibility, and
10    courts allow use of a regression model as long as it
11    includes the variables accounting for the major factors."
12         And then the court says expert "had no need to
13    consider every measurable factor, just the 'major' ones."
14         As I said earlier, A, they're not really testing
15    for an omitted variable because of the way they changed the
16    regression.  But, B, the regression already accounts for the
17    flock size, which no one has ever explained why the size of
18    the house matters for grower pay, independent of the number
19    of birds that the grower is growing at a time.
20         In any event, I think he clearly accounts for the
21    major variables.  He has all sorts of control variables for
22    grower characteristics, macroeconomic -- you know, I just
23    don't -- regional fixed affects.  I just don't see how you
24    could say that he excludes a major variable under these
25    circumstances.

1          And I would say -- I didn't catch all the cases

2     that Mr. Torres rattled off, but at least the -- I don't

3     know how to pronounce it -- *Werede* case, W-E-R-E-D-E, that

4     model -- first of all, the court said it was relying on

5     "Tenth Circuit authority on the use of statistical evidence

6     in discrimination cases."  And it seems at odds with

7     *Urethane* in the antitrust context.  But in any event, in

8     that case, the model had essentially no control variables.

9     It included -- it only included starting salaries and race

10    or national origin.  Didn't control for any of the other

11    things that might have affected the hiring and pay in a

12    discrimination case.

13         And then my last point -- I promise -- for right

14    now, at least.  Mr. Torres said that he doesn't think the

15    in-sample method was used in the *Broilers* case.  In

16    footnote 3, on page 1, of our option brief, here's -- from

17    the *Broilers,* it denied the *Daubert* motion, challenging

18    regression that "calculated what the market price of whole

19    broilers should have been but for the alleged conspiracy,"

20    and deeming a class member impacted if they "paid an actual

21    price exceeding the but-for predicted price by examining the

22    but-for price for specific transactions."

23         And we actually attached the expert report from

24    the *Broilers* case.  If you have a desire to read yet another

25    economic expert report, it's there for you to see what the

1  defense expert did in trying to rebut the in-sample

2  regression, and his arguments were essentially the same as

3  what Dr. Saravia is making here.

4           THE COURT:  Thank you.

5           MR. WALKER:  Thank you, Your Honor.

6           THE COURT:  Mr. Torres, we've already heard from

7  you a lot, but it's your motion.  Is there -- do you have a

8  final word?

9           MR. TORRES:  Just a few points, Your Honor.

10          Your Honor, first of all, the comment that was

11 just made by plaintiffs concerning housing and it not having

12 an impact in pay, I will refer Your Honor to Dr. Carey's

13 expert report, which goes on at length in terms of

14 demonstrating the critical nature of housing, the technology

15 that's used in connection with grower pay.

16          THE COURT:  What I thought I understood the

17 concern to be was that from the plaintiffs' perspective,

18 Pilgrim's hasn't explained why accounting for flock size

19 doesn't account for the housing density concerns.

20          MR. TORRES:  Well, Your Honor, the issue is that

21 -- and he explains this in terms of housing density, but

22 when you look at the actual results that were generated from

23 the model, you know that because it completely changes --

24 whatever qualitative decisions are made about how housing

25 density impacts grower pay, the actual results show that

1    there's a 70 percent reduction in terms of that -- of that
2    variable.
3            THE COURT:  Without any other change to
4    Dr. Singer's model?
5            MR. TORRES:  Without -- well, in --
6            THE COURT:  You isolated that one -- one control.
7            MR. TORRES:  They isolate it -- as I understand
8    it, what the exercise was, was to include the housing
9    density variable, and the reason they included the housing
10   density variable was because of the record evidence
11   concerning those four growers that I mentioned before,
12   Freebird, Gerber, Holmes, and Murray's, where you had all of
13   these qualitative differences relating to the way that the
14   market was run.
15           And so there are a lot of -- you know, there are a
16   lot of different elements of the way those alleged -- you
17   know, the integrators operated their business and the manner
18   in which the outcomes, with respect to pay, were really
19   impacted by those issues, which included the fact that they
20   have fewer birds, and they require more space and they
21   require more time.  So it's not just a matter of space.
22   They also require more time, more out time.  In terms of --
23   the focus was, you know, kind of laser-focused in terms of
24   the health of the birds.
25           And there were a lot incremental costs that were

1  associated with this, which also relates to the housing

2  issue.  So it's not a simple matter of just saying that he

3  looked at, you know, the square foot or certain other

4  aspects that don't directly go to density.

5              THE COURT:  Dr. McCrary ran that test against a

6  different dataset than Dr. Singer's dataset.  Yes?

7              MR. TORRES:  Well, now, as I understand it, it was

8  -- it was -- well, the dataset that he ran was the dataset

9  that was used by Dr. Singer, and the adjustment or the

10  correction, I believe, that he made was that he included the

11  housing density.

12             Yeah.  I'm sorry.  This is what I would clarify,

13  it was Dr. Singer who made the adjustment.  In other words,

14  when he got the report from Dr. McCrary, he made the

15  adjustment. Sorry.  I misspoke.

16             THE COURT:  Understood; okay?

17             MR. TORRES:  Yeah.

18             And then the last point, Your Honor, is just going

19  back to -- to close the loop on this issue concerning the

20  omitted variable.  And this is from the *National Credit*

21  *Union* decision.  It also kind of ties into one of the issues

22  that Your Honor was inquiring about earlier, which is, you

23  know, the falsification test.  And this is from *National*

24  *Credit Union*, where the court -- where the court essentially

25  states that the purpose of the falsification test is to

1    assess whether a regression is so incomplete and flawed that

2    it cannot reliably measure impact.  You know, not to

3    identify an omitted variable.  And this is the language that

4    the court uses.  To have required -- the party in that case

5    -- but "to have required the defendant to have constructed

6    and conducted the proper analysis to correct the plaintiff's

7    error would be to improperly shift the burden of proof."

8            And that's what they're seeking to do here, to

9    shift the burden of proof with respect to this housing

10   density issue, that we have to identify an omitted variable.

11   But even if that were the standard, we have identified the

12   omitted variable, which is housing density.

13           THE COURT:  Okay.

14           MR. TORRES:  Thank you.

15           THE COURT:  All right.  Thanks for your patience

16   today, everyone, and the discussion.  It's helpful.  It

17   definitely adds some context and contour to the papers.

18           We'll resume tomorrow at 9:00 a.m. with class

19   certification.

20           I think a lot of the work we've done today relates

21   to the -- at least the predominance elements, and the 23(a)

22   elements are just not nearly as complex, I don't think, and

23   fact specific -- well, they are fact specific.  I think the

24   argument will move more quickly.  In fact, I'm sure of it

25   because we'll recess by about one tomorrow.  So we're going

1   to march through this and without a lunch probably.  Bring

2   snacks if you need some so you don't pass out at the table.

3   We won't stop to resuscitate anyone.

4           I hope you have a restful night.  Thanks for your

5   excellent argument.  We'll be in recess.

6           (PROCEEDINGS CONCLUDED.)

7

8                   REPORTER'S CERTIFICATE

9           I, Joanna Smith, Registered Professional Reporter

10  and Certified Shorthand Reporter, in and for the State of

11  Oklahoma, do hereby certify that the foregoing is a correct

12  transcript from the official proceedings in the

13  above-entitled matter.

14

15                  CERTIFIED:   /s/Joanna Smith_____
                                 Joanna Smith, CSR, RPR
16                               United States Court Reporter
                                 101 North 5th Street
17                               Muskogee, Oklahoma  74401
                                 joanna_smith@oked.uscourts.gov
18

19

20

21

22

23

24

25

**United States District Court**
**Eastern District of Oklahoma**