1                   IN THE UNITED STATES DISTRICT COURT

2                  FOR THE EASTERN DISTRICT OF OKLAHOMA

3    _____

4    IN RE:  BROILER CHICKEN GROWER
     ANTITRUST LITIGATION (NO. II)
5    _____

6
     HAFF POULTRY, INC., et al.,      )
7                                     )
                        Plaintiffs,   )
8                                     )
     vs.                              ) Case No.  20-MD-2977-RJS-CMR
9                                     )
     TYSON FOODS, INC., et al.,       )
10                                    )
                        Defendants.   )
11

12                     TRANSCRIPT OF PROCEEDINGS

13                          JULY 14, 2023

14              BEFORE THE HONORABLE ROBERT J. SHELBY

15                  UNITED STATES DISTRICT JUDGE

16                   MOTION HEARING - VOLUME II

17
     APPEARANCES:
18

19   FOR THE PLAINTIFFS:        DANIEL J. WALKER
                                Berger Montague PC
20                              2001 Pennsylvania Avenue, NW
                                Suite 300
21                              Washington, DC  20006

22                              PATRICK F. MADDEN
                                Berger Montague PC
23                              1818 Market Street, Suite 3600
                                Philadelphia, Pennsylvania  19103
24
     REPORTED BY:               JOANNA SMITH, CSR, RPR
25                              United States Court Reporter

**United States District Court**
**Eastern District of Oklahoma**

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFFS:          GARY I. SMITH, JR.
                                  Hausfeld, LLP
 3                                600 Montgomery Street, Suite 3200
                                  San Francisco, California  94111
 4
                                  MELINDA R. COOLIDGE
 5                                SAMANTHA R. DERKSEN
                                  Hausfeld, LLP
 6                                888 16th Street, NW, Suite 300
                                  Washington, DC  20006
 7
                                  W.A. EDMONDSON
 8                                Riggs Abney Neal Turpen
                                  Orbison & Lewis
 9                                528 NW 12th Street
                                  Oklahoma City, Oklahoma 73103
10
                                  LARRY D. LAHMAN
11                                ROGER L. EDIGER
                                  Mitchell & DeClerck, PLLC
12                                202 West Broadway Avenue
                                  Enid, Oklahoma  73701
13
                                  J. DUDLEY BUTLER
14                                Butler Farm & Ranch Law Group, PLLC
                                  499-A Breakwater Drive
15                                Benton Mississippi  39039

16   ON BEHALF OF THE DEFENDANT
     PILGRIM'S PRIDE:             MARC E. KASOWITZ
17                                HECTOR TORRES
                                  DAVID E. ROSS
18                                KEVIN A. CYRULNIK
                                  HENRY BROWNSTEIN
19                                MICHAEL PECORINI
                                  Kasowitz Benson Torres LLP
20                                1633 Broadway
                                  New York, New York  10019
21
                                  LARRY D. OTTAWAY
22                                Foliart Huff Ottaway & Bottom
                                  201 Robert S. Kerr Ave.
23                                12th Floor
                                  Oklahoma City, Oklahoma  73102
24

25
```

**United States District Court**
**Eastern District of Oklahoma**



1   APPEARANCES CONTINUED:

2   ON BEHALF OF THE DEFENDANT
    SANDERSON FARMS:                ADAM C. DOVERSPIKE
3                                   GableGotwals
                                    110 North Elgin, Suite 200
4                                   Tulsa, Oklahoma  74120

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

195

1                          <u>INDEX</u>

                                                    <u>PAGE</u>
2

    Further Argument on behalf of Defendant Pilgrim's Pride
3      by Mr. Torres                                    196

4   Argument on behalf of Plaintiffs
       by Ms. Coolidge                                  198
5

    Argument on behalf of Defendant Pilgrim's Pride
6      by Mr. Kasowitz                                  205

7   Argument on behalf of Plaintiffs
       by Mr. Walker                                    207
8

    Further Argument on behalf of Defendant Pilgrim's Pride
9      by Mr. Kasowitz                                  231

10  Further Argument on behalf of Plaintiffs
       by Mr. Walker                                    274
11

    Further Argument on behalf of Defendant Pilgrim's Pride
12     by Mr. Kasowitz                                  282

13

14

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**
**Eastern District of Oklahoma**

```
 1                          PROCEEDINGS
 2   JULY 14, 2023:
 3              THE COURT:  Good morning and welcome back,
 4   everyone.
 5              We'll go back on the record in Case No.
 6   6:20-MD-2977, our In Re:  Broiler Chicken Grower Antitrust
 7   Litigation and constituent cases.
 8              I don't think there's a need for us to make
 9   appearances.  I think we have the same counsel we had
10   yesterday.  Both sides are nodding.  Some of you have
11   changed some seats.  I anticipate we may hear from others of
12   you today.
13              As a lawyer, I can't think of a time that I didn't
14   walk out of a deposition or hearing and think, shit, I wish
15   I had said whatever.  So in five minutes or less, what did
16   you mean to say yesterday that you didn't get out in the
17   course of our discussion, if anything?
18              Mr. Torres, anything you want to add?
19              MR. TORRES:  No, Your Honor.  The only --
20              THE COURT:  Just seated by the mic is good.
21   Thanks.
22              MR. TORRES:  Oh, excuse me.  Sure.
23              To summarize in terms of the key issue, it's
24   really whether you can boil this down to a battle of the
25   experts or whether the experts that have been propounded
```

United States District Court
Eastern District of Oklahoma

1    really have failed to fundamentally proffer and provide

2    expert opinions that are reliable and that are relevant to

3    the case.  And that based on that standard, they are able to

4    show that it really is something that goes to the

5    fundamental nature of their claim.  And it's the nexus

6    between those, because it's not just a battle of the

7    experts, it's essentially they have a requirement to show

8    that and proffer evidence.  And these cases that have

9    excluded Dr. Singer, have basically applied this principle

10   that there is a level of unreliability that has to be

11   established for us to prevail, and we believe we've

12   submitted sufficient evidence to demonstrate that, Your

13   Honor.

14          THE COURT:  I appreciate that.  Thank you.  I

15   think that came out in your argument yesterday.

16          Anything from the plaintiffs that we missed

17   yesterday?

18          MR. WALKER:  I don't think so, Your Honor.  You

19   mentioned yesterday a footnote in the Pilgrim's class

20   opposition that I think had some nexus with Dr. Singer's

21   reports.  I can address that today when we talk about class

22   or if you want to address it now, I'm happy to do that.

23          THE COURT:  We can just take it up then when we're

24   talking about class.  That's fine.  All right.  Well, I

25   appreciate that.

1          I think in just keeping with our practice, we're
2    taking up the class certification motion this morning. It's
3    the plaintiffs' motion.  Plaintiff has the burden.  Why
4    don't we invite the plaintiffs to take the podium first, if
5    you would like, Ms. Coolidge.
6          MS. COOLIDGE:  Thank you, Your Honor.
7          Plaintiffs ask the Court to certify a class of
8    similarly situated growers of broiler chickens, appoint
9    plaintiffs as class representatives, and appoint Berger
10   Montague and Hausfeld as class counsel.
11         Plaintiffs in the class satisfy each of the
12   elements of Rule 23(a).  The class is sufficiently numerous.
13   There are questions of law or fact common to the class.
14   Plaintiffs' claims are typical of the claims of the class
15   members, and the plaintiffs have protected and will continue
16   to protect the interest of the class.
17         The class also satisfies Rule 23(b)(3) because
18   common issues predominate over any individualized issues.
19   And class treatment for the claims of the thousands of class
20   members is superior to individual adjudication for each.
21         I expect that Mr. Walker will be up here much
22   longer than I today, as he will address the predominance
23   issues under Rule 23(b)(3) and commonality, which is
24   subsumed in the discussion of predominance.
25         Mr. Madden will address any issues relating to

1    purported class waiver and arbitration clauses.  And I am

2    here to briefly get out of the way the contested issues of

3    Rule 23(a) of typicality and adequacy.

4         The typicality prong of Rule 23(a) is met when

5    class members are at risk of being subjected to the same

6    harmful practices, and thus their claims are based on the

7    same legal theory.  This is the doctrine elucidated by the

8    Tenth Circuit in *DG ex rel. Stricklin v. Devaughn*, which

9    Pilgrim's has not distinguished here.

10        The Tenth Circuit has also held that every member

11   of the class does not need to share a factual situation

12   identical to that of the named plaintiff in order to satisfy

13   the typicality prong.  That's in *Colo. Cross Disability*

14   *Coal. v. Abercrombie & Fitch.*

15        Pilgrim's argues that the named plaintiffs are not

16   typical because they did not actually try to switch

17   integrators.  But our theory of harm is not that every

18   grower would have switched, but that -- in a competitive

19   world -- but that no-poach agreements cause pay suppression

20   by limiting mobility and making it less likely that

21   integrators have to raise pay in order to maintain an

22   adequate base of growers.

23        It is not true that the named plaintiffs didn't

24   try to switch integrators.  For example, Mr. Walters

25   testified that he tried to switch from Sanderson to Mar-Jac

1    and then Wayne, but was unable to do so.  That's in Exhibit

2    46 of our reply brief.

3           And when Mr. Upchurch was asked whether he

4    remembered any growers working for Tyson's Ashland complex

5    that left to work with another integrator, he said no, and

6    when asked why, he said, "Well, it was pretty much agreed

7    with everyone that your growers stay out of my area, so no

8    one could -- no one could go.  I mean, we were stuck."

9    That's in our Exhibit 9.

10          But, more importantly, Pilgrim's argument is

11   inconsistent with the law on typicality.  In *DG ex rel.*

12   *Stricklin*, the Tenth Circuit upheld certification of a class

13   of all foster children within the custody of the Oklahoma

14   Commission for Human Services.  The defendants argued that

15   the named plaintiffs who had been abused were not typical of

16   the class as a whole, in which only 1.2 percent of children

17   had been abused.

18          The Tenth Circuit noted that plaintiffs' claims

19   were that the defendants' policies and procedures left all

20   foster children at risk of abuse of neglect.  That risk

21   constituted an injury to every class member, and thus the

22   named plaintiffs' claims were typical of the rest of the

23   class.

24          Similarly here, the defendants' policies and

25   procedures, in participating in the no-poach agreement and

1    the information sharing agreement, not only put every class

2    member at risk of lower pay, but we have shown actually had

3    the effect of suppressing pay for all class members.

4         For these reasons, the named plaintiffs are

5    typical of the rest of the class because they were impacted

6    whether or not they personally tried to switch integrators.

7         You see this same conclusion in the vast majority

8    of no-poach cases around the country.  *In re Geisinger*

9    *Health & Evangelical Community Hospital Healthcare Workers*

10   *Antitrust Litigation* from Pennsylvania rejected the claim

11   name that a no-poach plaintiff cannot show injury if they do

12   not allege that they sought work at a co-conspirator.

13        And in the *In re High-Tech Employee Antitrust*

14   *Litigation*, the court held, in the Northern District of

15   California, "That no-poach agreements impact all employees,

16   not just those who would have received cold calls but for

17   the anti-solicitation agreement and regardless of geography

18   or job title."

19        That court also noted that in antitrust cases

20   typicality usually will be established by plaintiffs and all

21   class members alleging the same antitrust violations by

22   defendants.

23        In this case, all class members, regardless of

24   their individual integrators, allege the same injuries

25   arising from common conduct, suppression of compensation due

1    to defendants' no-poach and information sharing agreements.

2           Plaintiffs also satisfied the adequacy prong of

3    Rule 23(a), because the named plaintiffs have no conflicts

4    of interest with the class, and the named plaintiffs have

5    and will continue to prosecute the case vigorously in the

6    interest of the class.

7           Across the two final approval hearings so far in

8    this action, this Court has already twice held that

9    plaintiffs have skillfully represented the class and the

10   settlement classes.

11          Pilgrim's argues that the named plaintiffs are not

12   adequate class representatives because they lack personal

13   knowledge about the case, but that is untrue and irrelevant

14   under Rule 23(a)'s adequacy determination, which focuses on

15   an absence of conflicts and vigorous prosecution.

16          To briefly take the allegation that plaintiffs are

17   not knowledgeable, in this case not only are each of the

18   named plaintiffs steeped in the business of broiler growing

19   for more than a decade, but when the defendants quizzed some

20   of the named plaintiffs, including Mr. Weaver and

21   Ms. McEntire, on things like the names of the defendants and

22   co-conspirators, their duties as class representatives, and

23   their understanding of the case, they gave accurate and full

24   responses, which Pilgrim's does not dispute.

25          Pilgrim's claims that Mr. Mason testified that he

1   was unaware of the facts other than that from information

2   provided by counsel, but that is the opposite of what he

3   testified.  He said it was "common knowledge, kind of, or

4   scuttlebutt, whatever you want to call it, amongst growers,

5   that it was hard to switch integrators."

6           Pilgrim's hasn't actually cited to any testimony

7   demonstrating a lack of understanding of the case.  What

8   Pilgrim's does cite to is testimony that the class

9   representatives deferred to counsel on matters of case

10  strategy, which is undoubtedly appropriate, particularly

11  here, where the named plaintiffs are barred under the

12  protective order from seeing the evidence produced by the

13  defendants and third parties.

14          Plaintiffs are farmers, not economists or

15  antitrust litigators.  Pilgrim's critique is like

16  criticizing a medical patient for not advising the surgeon

17  how to perform a medical procedure.

18          "The law is clear that a plaintiff is adequate,

19  even where his knowledge of collusively set rates and of his

20  claims came solely from his attorney and from reviewing the

21  complaints."  That's a quote from *In re Universal Services*

22  *Fund Telephone Billing Practices Litigation* from the

23  District of Kansas.

24          To an element that is relevant under the adequacy

25  inquiry of Rule 23(a), plaintiffs have vigorously prosecuted

1  the case, devoting dozens of hours, including assisting with
2  the complaint, preparing interrogatory responses, producing
3  documents, advising on settlements, attending hearings, and
4  preparing for depositions.
5           Finally, Pilgrim's argues that named plaintiffs
6  who grew broilers for only part of the class period have a
7  conflict with those who grew longer, but that is not true.
8  It doesn't matter which years the plaintiffs were growing
9  during the class period.  All plaintiffs have the same
10  interests as other class members in proving that they were
11  harmed by the defendants' conduct and in maximizing the
12  class recovery.
13          And Pilgrim's cites no support for its argument
14  that different time periods creates a conflict.  And,
15  frankly, if it did create a conflict, then no price-fixing
16  case could ever be certified, because it is extremely common
17  for a customer to purchase a price-fixed product just once
18  or twice during a multiyear price-fixing conspiracy, and
19  courts do not hold that creates a conflict.
20          For these reasons, the named plaintiffs here have
21  more than met the adequacy prong of Rule 23(a).
22          THE COURT:  Thank you, Ms. Coolidge.
23          I'm going to propose that we break this into
24  smaller bites as the plaintiffs, I think, have done in their
25  presentations and hear from the defendants with respect to

1   each as we move forward, so I appreciate that.

2           Mr. Kasowitz, I think you're on deck today.  Is

3   there anything you would like to address with respect to

4   typicality and adequacy?

5           MR. KASOWITZ:  Yes, Your Honor, just quickly.

6           I think that the -- on the typicality point, I

7   think the real point here is that of these eight named

8   plaintiffs, five of them, Butler, Upchurch, Weaver,

9   McEntire, and McEntire were located in areas where there was

10  only one integrator, one chicken company, and -- which means

11  that they couldn't have been subject to a no-poach

12  agreement, which is demonstrably different from those

13  putative members of the class who were in areas where there

14  were -- according to these allegations, according to the

15  plaintiffs' allegations, where there was competition and

16  where there were local no-poaches.

17          So I think that that is -- you know, from our

18  point of view, the real issue about both typicality and

19  adequacy from the plaintiffs' point of view, and I think

20  it's a real problem for them.  It's an issue that's going to

21  come up more when we talk about (b)(3), but for our purposes

22  right now, it's really the singular issue on typicality and

23  adequacy.

24          THE COURT:  But doesn't that argument recast the

25  plaintiffs' theory in the case?  I mean, the harm here is

 1    not that an integrator -- excuse me -- a grower couldn't
 2    change; it's the economic consequence of the no-poach
 3    agreement.  So even if I'm an integrator in an area where
 4    I'm geographically bound, I'm still damaged, if we accept
 5    Dr. Singer's opinions, which will be the hypothetical that
 6    we'll be batting back and forth today.  But if we accept
 7    Dr. Singer's opinions, then the damages are still present,
 8    even for those who are geographically bound and couldn't
 9    move.
10              MR. KASOWITZ:  Even if you accept the opinion,
11    Your Honor -- and we don't.  It goes without saying.
12              THE COURT:  That was clear.
13              MR. KASOWITZ:  But even -- even if you do, there's
14    a significant -- no one can dispute -- and the plaintiffs
15    can't and don't dispute -- that there is a difference in
16    impact in a situation where you have one integrator in a
17    particular town or a particular local 45, 50-square mile
18    area, where there's no competition, and there's no no-poach
19    issue -- no no-poach issue -- no one is keeping that named
20    plaintiff from trying to go someplace else; right?  Okay.
21    So that's clear.  It's as clear as a bell as to whether or
22    not there's a problem and an impact at this level.
23              Dr. Singer's argument that there's some kind of
24    amorphous -- strike that.  I don't -- that there's some kind
25    of impact in some way, on that same -- on that same grower,

1  who's in that area, from no-poach agreements in Delmarva --

2  which, if we're in Nacogdoches now, okay, where the -- where

3  the couple was, the McEntires, and then you go to Delmarva,

4  which is hundreds and hundreds of miles away, I mean --

5  sure, he says that, but just common-sense rationality, which

6  the Court needs to apply, there's clearly a difference in

7  impact, has to be.  And Dr. Singer can't deny that.

8          So we'll get into those issues when we deal with

9  (b)(3), but there can't be any dispute that those five --

10  that those five growers, those five putative named

11  plaintiffs, are situated differently than folks who are in

12  areas where there are more than one integrator and there is

13  more competition, I think.

14          THE COURT:  I understand.

15          MR. KASOWITZ:  Thanks, Your Honor.

16          THE COURT:  Thank you.

17          MR. KASOWITZ:  Thanks, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Walker.

20          MR. WALKER:  Thank you, Your Honor.

21          Again, this is Dan Walker from Berger Montague on

22  behalf of the plaintiffs.

23          I will be addressing the predominance

24  requirements.  I guess just off the bat, I don't think there

25  is -- there's really much engagement on the argument that if

1    predominance is satisfied, commonality is valid.

2    Commonality requires a single issue common among the class

3    members.  We say that common issues predominate among the

4    entire class.  So I'll just in jump in on predominance.

5              Plaintiffs have put forward ample evidence, all

6    common to the class, capable of proving each of the elements

7    of their claims at trial by a preponderance of the evidence.

8    This is more than enough to satisfy the predominance

9    requirement of Rule 23(b)(3).

10             Notably, plaintiffs are not required to prove the

11   merits of their claims at the class certification stage,

12   rather plaintiffs must simply show that there are "common

13   questions that are capable of the class-wide proof."  And

14   that's from the *Urethane* opinion in the Tenth Circuit.

15             And as the Tenth Circuit recently said in *Black,*

16   "Common issues are those for which the same evidence will

17   suffice for each member to make a prima facie showing or the

18   issue is susceptible to generalized class-wide proof."

19             And plaintiffs are only required to demonstrate

20   the common issues predominate as to the case as a whole, not

21   as to each element of each claim, although plaintiffs do, we

22   believe, demonstrate that common issues predominate as to

23   each element.  And that comes from *Amgen,* the Supreme Court

24   case.  *Black* also made that point in the Tenth Circuit.

25             And, further, plaintiffs are confident about the

1    strengths of the merits issues.  Discovery has revealed an

2    enormous amount of evidence that we think proves the

3    existence of the conspiracy, proves impact from the

4    conspiracy, and proves class-wide impact and aggregate

5    damages.

6              But, importantly, at the class -- at the class

7    certification stage, plaintiffs don't need to prove that

8    they'll ultimately win on any issue.  Plaintiffs need to

9    only show that the issue could be resolved for the whole

10   class, win or lose, in one fell swoop.  That's from the

11   *Amgen* case.  *Amgen* calls it a fatal similarity.  If, for

12   example, proof fails as to impact for all class members,

13   that's a class-wide issue.  That's not -- it doesn't

14   devolve.

15             And, finally, Dr. Singer offered analyses and

16   opinions that all or nearly all class members were injured

17   by the conspiracy, that there was market power in the

18   relevant markets, opinions that the evidence is consistent

19   with the conspiracies, and evidence as to aggregate damages.

20   If the Court finds that Dr. Singer's analyses are reliable

21   and admissible evidence, then that evidence is, by

22   definition, class-wide evidence capable of proving elements

23   of plaintiffs' claims.

24             THE COURT:  And how do the plaintiffs establish

25   predominance if Dr. Singer's opinions are not received?

```
 1            MR. WALKER:  Well, let's take each of the
 2    elements; right?  So there's predominance as to the
 3    existence of the conspiracy.  90 percent of the trial is
 4    going to be about whether the conspiracy took place, how it
 5    took place, who participated in it.  You know, all the --
 6    all the arguments that were presented against Dr. Singer's
 7    views of the conspiracy by the defendants, all of that is
 8    class-wide evidence, and the existence of the conspiracy is
 9    a class-wide issue; right?  So that evidence doesn't need to
10    come in through Dr. Singer; right?  We are going to be
11    playing, you know, days of -- witnesses testifying at trial
12    and through deposition clips, all the documents that are
13    going to come in.  We can establish the existence of the
14    conspiracy regardless of Dr. Singer's opinions, although we
15    think his opinions on the conspiracy are reliable.
16            THE COURT:  What do the plaintiffs maintain is the
17    conspiracy that needs to be proven at trial now?  Is it --
18    is it -- the pleading says, I think, 21 co-conspirators.  We
19    have settlements with some integrators.  Is the conspiracy
20    question for trial now whether the plaintiff can prove that
21    Pilgrim's conspired with one or more other integrators to
22    suppress grower wages?  Or is the proof what you plead, 21
23    co-conspirators in a nationwide conspiracy?
24            MR. WALKER:  I think -- those are two questions.
25    I think one is yes to your first question, but I think we
```

 1   will prove at trial that there was a conspiracy involving

 2   all the integrators, all the alleged co-conspirators.

 3            THE COURT:  On the jury verdict form, we'll just

 4   be asking whether the jury finds that Pilgrim's conspired --

 5            MR. WALKER:  Yes.

 6            THE COURT:  -- with one or more other -- is that

 7   right?

 8            MR. WALKER:  Yes.  Sorry.  I didn't mean to talk

 9   over you.  Yes, that's correct.  I think the jury verdict

10   form will be was -- you know, did Pilgrim's conspire?  Did

11   it cause harm?  It's not going to say class-wide harm

12   because that's not on jury verdict forms that I've seen.

13   And then a blank for the aggregate damages figure.

14            THE COURT:  So that was just the first part,

15   though, without Dr. Singer's opinions.  How else do the

16   plaintiffs certify a class if the Court does not receive

17   Dr. Singer's opinions?

18            MR. WALKER:  Well, I think there's two questions.

19   One is -- and I believe *Beltran* from the District of

20   Colorado makes this point.  Proof of just a conspiracy is

21   enough to satisfy the predominance requirement of 23(b)(3),

22   because the question is does -- do class-wide issues

23   predominate to the case as a whole such that trial is not

24   going to devolve into minitrials.  And there's, you know,

25   plenty of case law out there that proof of predominance of

1   just a conspiracy could satisfy the predominance requirement

2   under 23(b)(3) on its own.

3          But if your question is how do we show class-wide

4   impact without Dr. Singer's -- well, how do we show

5   class-wide impact and aggregate damages without Dr. Singer's

6   analyses.  I don't think we can show aggregate damages

7   without Dr. Singer's estimations.  And proof of class-wide

8   impact, we would have to go on all the record evidence that

9   is part of Dr. Singer's opinions about how -- you know, the

10  economic theory behind how -- how agreements like this, the

11  alleged conduct can cause harm, and how -- and how in the

12  context of this market, that can cause harm.

13         But to your point, I think, yes, our -- we rely

14  very heavily on Dr. Singer's analyses for proof of impact

15  and aggregate damages.

16         THE COURT:  Different courts seem to take

17  different approaches.  It seems to me that the suggested

18  best course in the Tenth Circuit for a trial court is to

19  identify the issues, identify those issues as common or not

20  common, and then there's a qualitative sort of assessment

21  about what are the most important questions.  I think -- it

22  seems like courts engage in that analysis.  And so let me

23  just see if I have this right.  Even without Dr. Singer,

24  then the plaintiffs argue, I think -- you maintain that the

25  common question about the existence and scope and duration

 1   of the conspiracy still overwhelms whatever individualized

 2   questions there might be about impact and damages.  Is that

 3   your -- have I said your position correctly?

 4          MR. WALKER:  I believe you have.  And I would say

 5   if that came to pass, there's also the question of -- and I

 6   believe this was the premise of *Black* -- that you certify an

 7   issue class and then have -- and then you deal with damages

 8   in another way.  But, of course, in *Black,* the issue there

 9   was the damages theory didn't -- didn't match up with the

10   calculations done, which is not the issue here.  But, in any

11   event, that's -- that's, you know, one avenue there as well.

12          THE COURT:  How could any individual grower

13   establish antitrust impact without Dr. Singer's baseline

14   but-for transaction costs?  So, I mean -- you'd have to

15   measure each -- each grower would have to measure its impact

16   against a no-poach or information sharing agreement without

17   a benchmark.  Could that be done?

18          MR. WALKER:  Well, I think you would have to --

19   you would have to go on the theory of how -- you know, the

20   economic theory and the facts as applied to that, as to how

21   this conduct could suppress pay below the competitive

22   levels.  But, you know, frankly, I don't -- I think -- I

23   think it would be a very difficult -- a very difficult case

24   to prove impact without the economic analysis.

25          THE COURT:  I don't mean to oversimplify this.

 1  It's a -- we're engaged in a rigorous analysis, but it's
 2  hard for me to escape the conclusion that predominance rises
 3  and falls with Dr. Singer's testimony.
 4          MR. WALKER:  Well, again, I would say predominance
 5  to the case -- I mean, our view is predominance to the case
 6  as a whole.
 7          THE COURT:  I probably said that wrong.  I don't
 8  know if I mean predominance.  Well, I guess -- my thinking
 9  about this continues to evolve.
10          Go ahead.  I'm listening.
11          MR. WALKER:  Okay.  And I'm -- just to finish my
12  thought, in case -- predominance, we think is satisfied by
13  predominant -- by the class-wide proof of the conspiracy.
14          THE COURT:  Right.
15          MR. WALKER:  Which is not going to involve
16  Dr. Singer too much.  I mean, he'll -- he'll testify at the
17  end, but most of the trial is going to be consumed with the
18  evidence of what took place in the marketplace.
19          THE COURT:  Yeah.  He's not going to be sponsoring
20  evidence about a conspiracy.  He'll be talking about what he
21  read and how it informs his opinions, but he's not the
22  sponsor of any evidence about a conspiracy.
23          MR. WALKER:  Exactly.  We're going to be spending
24  days getting that evidence in -- into trial through all the
25  usual methods.

```
 1              THE COURT:  But before we leave the conspiracy,
 2     you set out the evidence, I think, in your brief about what
 3     you think the evidence is of the overarching conspiracy, but
 4     will you summarize it in plain language?  What is the --
 5     what is the proof at trial of the overarching conspiracy?
 6              MR. WALKER:  The proof at trial of the overarching
 7     conspiracy is largely the proof of the constituent parts.
 8     It's -- but we do maintain that it -- it doesn't make sense
 9     to separate them out as if they were two completely separate
10     operating conspiracies that --- that were not part of an
11     overall scheme, in particular, because they go to the same
12     effect.  They were effectuated by the same people, at the
13     same time.
14              THE COURT:  But doesn't that approach conspiracy
15     from the wrong side?  I mean, I think the formation of a
16     conspiracy is the intent of the co-conspirators to join in a
17     common purpose.  So looking at the effects and saying it
18     makes sense to evaluate them as if they were together is a
19     separate question than whether -- did Pilgrim's intend to
20     join into a conspiracy with one or more other
21     co-conspirators for the purpose of suppressing grower wages,
22     through one or both of these vehicles?  Is that not the way
23     to think about conspiracy?
24              MR. WALKER:  I would say it is, but the evidence
25     of that is in the conduct of the -- of the participants in
```

1  the conspiracy; right?  I mean -- we cited to the jury

2  instructions on conspiracy, and I don't need to get into

3  those now, but, you know, there's -- there's not this

4  requirement that sort of seems to be the background of a lot

5  of Pilgrim's arguments, that you need to show, you know,

6  every member of the conspiracy was operating in lockstep;

7  right?  You prove conspiracies through direct evidence to

8  some degree and through circumstantial evidence.  And the

9  question is can you prove this intent that you're talking

10  about through this direct and circumstantial evidence.  And

11  we think, in both cases, it's the same companies, the same

12  people, in many cases, operating together toward this common

13  goal of suppressing grower pay.  They did it through a

14  no-poach and they did it through an information sharing, and

15  each of those elements support each other; right?  I mean,

16  that's -- we have testimony.

17       I asked one of Pilgrim's witnesses, "Why would you be

18  giving all this information to your competitor that

19  identifies who your best growers are?  Aren't you worried

20  that they're going to go and take those growers?"

21            And he said, "Oh, no, we don't go after each

22  other's growers."

23            Like that kind of evidence is the kind of evidence

24  that's going to show you how these things lock together.

25  There's other evidence like that.  I don't want to get into,

1   you know, all the granular bits of the evidence, but that's
2   the -- that's the -- that sort of logic behind it.
3           THE COURT:  Together with Dr. Singer's testimony
4   then, it's just basic economic principles that it's not in
5   the best interest of an entity to share this kind of
6   information with your competitors unless you have these
7   other assurances.  That's integral to tie in those two, is
8   it?
9           MR. WALKER:  I think it will help the jury
10  understand how those things tie together, but I don't think
11  we -- sorry for the double negative.  I don't think we can't
12  make that point without Dr. Singer testifying.
13          But I do think he -- he can seat it in the
14  literature of the economics profession and that sort of
15  thing, but I don't think it's necessary.
16          THE COURT:  How do you think -- so as part of a
17  rigorous analysis where I'm required to pierce the complaint
18  and evaluate the record -- this is a conceptual question.
19  And the courts confront this in conspiracy cases, but I
20  haven't read a court sort of showing their work.  This seems
21  to be tricky in a conspiracy case, because so much of it
22  relies on inferences that could reasonably be drawn from the
23  evidence because there's so rarely direct evidence of
24  intent.  So how do you think -- how do you think I approach
25  that in the framework of the law, when we look at the

1    overarching conspiracy for certification here?

2            And I'm mindful of -- and Mr. Kasowitz and I are

3    going to talk about this.  This seems a really important

4    piece of this in this case.  The invocation of Fifth

5    Amendment supports a jury instruction, an adverse inference

6    jury instruction.  That seems -- only the jury can decide in

7    the context of the record as a whole whether to apply that

8    inference or not.  That will be a jury question.  But it

9    seems -- it seems highly relevant when we consider the -- I

10   guess, the constellation of facts that might support an

11   overarching conspiracy at this stage, or am I just hung up

12   on the wrong thing at Rule 23?

13           MR. WALKER:  Well, I think at Rule 23, the

14   question is are there common questions that generate common

15   answers.  And the existence of the conspiracy is a common

16   question for the class, and the -- we will put forth our

17   proof, which we think is quite strong, that answers that

18   there was a conspiracy.  That you can -- that a jury can

19   conclude that it's more likely than not the conspiracy that

20   we allege happened.

21           But if the jury decides they don't go with our

22   proof, then the whole class loses; right?  That's the

23   *Amgen's* "fatal similarity," to use a quote from *Amgen*.

24           That's what *Black* talks about with impact; right?

25   That it's -- that there's all this rebuttal evidence, and

 1    that doesn't mean that this devolves into a thousand
 2    minitrials.  What it means is if the jury doesn't believe
 3    that our evidence shows it's a conspiracy, we all lose as a
 4    class.
 5           And, you know, sort of, to complete the circle
 6    there, if we brought this case on behalf of any individual,
 7    we would be using the same evidence of a conspiracy.  It's
 8    not like it changes when we bring it on behalf of a class.
 9           And so I would say as to the sort of meta-level
10    of, you know, how Dr. Singer's analysis factors in here is
11    -- under *Tyson*, the court is not to resolve the battle of
12    the experts at class.  And *Black* quotes *Tyson* at 6 -- 69
13    F.4th at 1185, "persuasiveness is, in general, a matter for
14    the jury and not grounds for denying class certification
15    unless no reasonable juror could have believed plaintiffs
16    evidence of an essential element of their claim."
17           And so, you know, as we talked about yesterday, we
18    believe Dr. Singer has offered reliable, admissible
19    evidence; right?  His opinions are that -- you know, that
20    the evidence is consistent with a conspiracy, that there is
21    wide -- more than widespread impact.  And we think that just
22    by definition, that is class-wide evidence capable of
23    proving the essential elements of the claim.
24           THE COURT:  The more rigorous standard to apply,
25    it seems to me, to Dr. Singer's testimony, is the standard

 1   we were talking about yesterday.  It would be gatekeeping
 2   function under Rule 702 and *Daubert.*  Surely, if
 3   Dr. Singer's opinions clear that hurdle, they're -- it
 4   seems, by definition, they've cleared the relevance hurdle
 5   -- the persuasiveness issue for trial under Rule 23(b).
 6            MR. WALKER:  I think that's right, Your Honor.
 7   I put a -- you know, to make sure I understand your point,
 8   I don't think there is daylight between reliability and
 9   admissibility and what *Tyson* says is, you know, the no
10   reasonable juror standard.
11            THE COURT:  And *Black.*
12            MR. WALKER:  And *Black.*
13            THE COURT:  Right.  Okay.
14            MR. WALKER:  So I don't want to belabor the common
15   evidence too much because we talked a lot about it
16   yesterday.  But the plaintiffs have put forward, both
17   through Dr. Singer -- but, also, you know, there's an
18   enormous amount of underlying evidence in Dr. Singer's
19   report and more that will come in at trial -- to establish
20   each of the elements of plaintiffs' claims.
21            There is -- as to the evidence of the conspiracy,
22   there's, you know, the industry-wide evidence about the
23   conduciveness to cartelization, and, then, of course, all of
24   the evidence of the behavior of the alleged co-conspirators,
25   both with respect to the information sharing and with the

1    no-poach.  There is -- there is evidence of the

2    co-conspirators using the information they shared in

3    connection with setting pay, and, then, of course, all the

4    direct evidence of the no-poach and the circumstantial

5    evidence of the no-poach and the conduct of these parties in

6    conformance with the no-poach agreement.

7              Pilgrim's Pride's primary argument in their

8    briefs, as far as I can tell, on the conspiracy is that

9    there is all this other evidence that the conspiracy didn't

10   exist or evidence inconsistent with the conspiracy.

11             And, again, to keep going back to *Black* and *Tyson*

12   and *Amgen,* those are fatal similarities; right?  If they

13   convince the jury that the spaghetti charts mean that there

14   was no conspiracy, then they win on that -- on that key

15   element of the claim, but it's class-wide.  There's no,

16   then, okay, let's have a thousand minitrials for each of the

17   class members.

18             And, more importantly, what matters for class cert

19   here is not who's right on that, as we talked about.  The

20   question is, can a jury, in light of all the evidence, find

21   more likely than not, having put forward a prima facie

22   showing from which a jury -- capable of proving more likely

23   than not an element of your case.

24             THE COURT:  Is that right?  Is that an accurate

25   statement of the standard I'm required now to apply under

1  the rigorous analysis?  It's not just a -- it's not like a
2  12(b) standard.  Could a jury look at -- could any
3  reasonable jury look at this evidence and conclude it's
4  sufficient.  There is something more here, something more
5  robust.  I think you have a preponderance of the evidence
6  standard you need to meet at this stage, don't you?
7            MR. WALKER:  The standard on class, from *Urethane*,
8  is have plaintiffs put forward evidence capable of proving
9  their case on a class-wide basis.  And for each of the
10  elements, then you ask are there common questions that will
11  create common answers.  And the courts -- if you're asking
12  about the rigorous analysis, the rigorous analysis is to
13  answer that question, can each of the elements under Rule
14  23(b)(3) be satisfied with -- are they capable of being
15  satisfied with class-wide proof?
16            THE COURT:  And do you have admissible evidence
17  that would establish that at trial?
18            MR. WALKER:  Correct.  And then just to circle
19  back to *Beltran*.  As we said, the courts -- this is to quote
20  *Beltran*.  "Courts often find that whether a conspiracy
21  exists is a common question that predominates over other
22  issues and has the effect of satisfying Rule 12(b)(3)."  And
23  this is why the Supreme Court said in *Amchem*, "Predominance
24  is a test readily met in certain cases alleging violations
25  of the antitrust laws."  It's a type of case that is

1    conducive to class-wide proof because so much of it focuses

2    on proof of the conspiracy, which is a class-wide issue

3    involving class-wide evidence.

4            Again --

5            THE COURT:  Intuitively, I understand why some

6    courts have said that, and I don't see -- I don't remember a

7    case where, I think, a district court was reversed for

8    relying on that.  But the clear trend in the case law in my

9    view is to -- is to more carefully scrutinize each of the

10   elements.  If we were thinking about an antitrust claim, a

11   Section 1 claim with three elements of proof, seems like I'm

12   going out on a limb if I just say, well, there's pretty

13   strong evidence about one and so I'm satisfied.  I'm not

14   even really going to carefully consider the other two.  I

15   don't think you would want to be defending that on appeal.

16           MR. WALKER:  Luckily, I don't think we're in that

17   -- we're in that category, so I don't want to engage too

18   much with the speculation.  But I will say there is the

19   issue, class issue.  I mean, the *Black* case did find that

20   the damages because of their -- their modeling problems

21   didn't satisfy one element and certified the class.  But

22   your point is taken, Your Honor, and I think we show for

23   each element that there is class-wide proof capable of --

24   that there's class-wide evidence capable of common proof.

25           Again, there's a question of monopsony power in

1   the relevant market.  If that becomes an issue we need to

2   prove at trial, we have evidence, class-wide evidence, in

3   the form of Dr. Singer's analyses, which itself relies on an

4   enormous amount of record evidence in this case, in addition

5   to econometric analysis.

6          And as in *Black,* that's a class-wide issue that is

7   common for all plaintiffs.  There's no plaintiff that we

8   would bring a case for where if we had to show monopsony

9   power, we wouldn't use the same evidence; right?  And if the

10  jury finds that they're not convinced -- if we have to prove

11  it and they're not convinced, all plaintiffs lose on that

12  issue.  It's a fatal similarity.  The case doesn't devolve

13  into a thousand minitrials.

14         And then, of course, there's the impact element.

15  As a big-picture point, this is a nationwide conspiracy with

16  conduct that is substantially similar across the country,

17  directed at harming plaintiffs that are similarly situated

18  in the relevant ways.  They are all contract growers, all

19  getting paid in cents per pound.  Under the tournament

20  system, the factors that they're evaluated under the

21  tournament system, the objective factors, which are

22  controlled for in Dr. Singer's regressions, are all

23  objective factors that are largely or entirely the same

24  across the country.  And the conduct in the information

25  sharing and the no-poach, we have evidence that this is a

 1   nationwide conspiracy.

 2           And as many courts have held, this sort of

 3   nationwide character is such that you would expect there to

 4   be impact on a class-wide basis.  There's no reason, in

 5   light of all the evidence, that you would expect impact to

 6   be different in pockets.  And there's this -- there's the

 7   *Urethanes* quote that's often used where -- in a case like

 8   that, where there's nationwide elements, you -- there's an

 9   inference of class-wide impact.

10           And *Black* comes back and says, well, we're

11   limiting that to its facts because we don't think it applies

12   in every antitrust case, but there are cases where a jury, a

13   reasonable jury, could conclude from certain nationwide

14   elements that there is nationwide impact.

15           And so I don't think *Black* got rid of this idea

16   that you can infer from certain nationwide elements of the

17   case that there is class-wide impact.  I think what it said

18   was in every antitrust case, you can't infer or assume or

19   there's no rebuttable presumption of class-wide impact, but

20   with certain nationwide characteristics, nationwide impact

21   can be inferred just from those characteristics.

22           THE COURT:  What inferences could a jury find here

23   that would support that?  Is it that -- is one of the key

24   inferences that there's no reason for integrators from

25   Arkansas and Kansas to enter into this agreement, if the

1    agreement wasn't going to have a mutually beneficial effect

2    for the integrators?

3            MR. WALKER:  I think that is an inference that the

4    jury could draw.  I think that the jury could draw

5    inferences from the fact that they all engage in nationwide

6    sharing of information, all received nationwide data, and

7    use that data, as well as other direct communications of

8    grower pay, in setting grower pay.

9            But in terms of the no-poach, I absolutely believe

10   that that is an inference the jury could draw.  There's also

11   -- you know, unlike in *Urethanes*, there's no negotiation of

12   grower pay here.  Grower pay is set by, essentially,

13   take-it-or-leave-it contracts.  There is incredible

14   similarities in operations among the co-conspirators here.

15           And unlike in *Urethanes*, these products are much

16   more homogeneous.  In *Urethanes,* you had a series of

17   different commodity chemicals, and then you also had these

18   custom-made chemicals that were made for individual

19   plaintiffs, individual class members, that were

20   custom-negotiated prices, and the court still said, well,

21   you look at -- there's certain basic nationwide facts from

22   which impact can be inferred.  And you don't have to -- and,

23   of course, in *Urethanes,* they went beyond that, just like we

24   do.  There was all this econometric evidence showing

25   nationwide impact.  But I do think the inference is more

1   something -- I read *Urethanes* as saying a jury could infer

2   from these facts that there was -- it was unlikely that any

3   large number of class members escaped impact, if that makes

4   sense.

5          But, of course, we have the class-wide evidence of

6   impact in the form of Dr. Singer's reports.  We obviously

7   believe they're reliable and admissible, and we also then

8   have Dr. Singer's analysis, as well as the record evidence,

9   that the impact would be widespread, which we believe is all

10  reliable and admissible evidence.  And if those are

11  admitted, then, by definition, I would say under *Tyson* and

12  *Black*, there is -- there is class-wide evidence capable of

13  proving common impact.

14         And Pilgrim's arguments are mainly, on impact,

15  that there's counterevidence of impact; right?  That there

16  are parts of the country where things operate differently or

17  even within complexes, there are differences.

18         But I think under *Black*, the response to that is,

19  again, that is rebuttal evidence to plaintiffs' evidence

20  that a jury will consider.  And if the jury decides that

21  plaintiffs can't prove impact, then they lose, they all

22  lose.  You're not going to then go into every single

23  plaintiff and show -- you know, do some minitrial on impact.

24  It's -- that's our evidence of impact.  And if the jury

25  doesn't accept it, then it's a fatal similarity.  We lose in

 1   one fell swoop.  But that the persuasiveness of each side is
 2   not a matter for class certification, that's a matter for
 3   summary judgment or trial.
 4          And then, finally, Dr. Singer -- oh, let me go to
 5   that footnote that you asked about yesterday.  I think now
 6   is a good time to address that.  I believe it's footnote 5
 7   in Pilgrim's opposition.  Is that the one you asked about,
 8   Your Honor?
 9          THE COURT:  Was it is footnote 3 or footnote 5?  I
10   don't remember.  And I might have given you the wrong
11   number.
12          MR. WALKER:  It's -- well, I'm going to talk about
13   footnote 5, and I hope that's the one you were asking about.
14          THE COURT:  Great.
15          MR. WALKER:  Pilgrim's says that Dr. Singer's
16   analysis doesn't fit the theory, because we allege, as they
17   say, an illegal scheme that suppressed the base pay amount.
18   They say it's a base-pay conspiracy.  That's not what we
19   allege.  That paragraph of the complaint that they're citing
20   is talking about how the tethering of base pay through the
21   tournament system is one of the elements of equity that
22   proves class-wide impact.  But if you look at the complaint,
23   all throughout the complaint, it's referred to as a
24   conspiracy to suppress grower compensation.  And that's what
25   Dr. Singer calculates is total grower compensation.

1    THE COURT:  The former theory was the one, I

2    think, advanced in *Wheeler*; is that right?  That was the

3    argument the plaintiffs made there, I think, was that the

4    baseline pay was reduced.  Or am I --

5    MR. WALKER:  That's correct.  They also, I think,

6    alleged some things that were getting into the lost-profits

7    area, or at least required looking at opportunity costs and

8    that sort of thing, which we don't either.  But you're

9    right, that that was the -- that was the *Wheeler* case, which

10   is different for lots of reasons.

11   So I just wanted to address that point in case

12   that was what you were asking about yesterday.

13   And then so -- so, finally, we have class-wide

14   evidence capable of proving aggregate damages.  We have a

15   theory.  We have a calculation for if the entire overarching

16   conspiracy, including the information sharing and the

17   no-poach, is -- if the jury finds both, and that is captured

18   by the information sharing model because the benchmarks

19   there didn't participate in either the information sharing

20   or the no-poach.

21   We have a model that looks specifically at the

22   no-poach harm, which is the no-poach regression, because

23   those Delmarva integrators were participating in the

24   information sharing but not in the no-poach, and so we were

25   able to isolate that harm.

1              And then if the jury finds that the no-poach

2    didn't exist; right?  If, at trial, the jury finds that, you

3    know, no, there was no evidence of a no-poach, or at summary

4    judgment, Your Honor finds there's no evidence of a

5    no-poach, then you would look to the information sharing

6    model, because the information sharing model then would --

7    because then there would be no, no-poach to control for, if

8    that makes sense, Your Honor.

9              THE COURT:  In addition to predominance, is that

10   argument a response to the *Comcast* problem that was raised

11   yesterday?

12             MR. WALKER:  It is.

13             THE COURT:  Right.

14             MR. WALKER:  It is.  There's no -- there's no

15   plausible theory that is not accounted for in the aggregate

16   damages modeling of Dr. Singer.

17             THE COURT:  To summarize, you have competent

18   evidence of damages no matter which box the jury -- which

19   boxes the jury checks on the form?

20             MR. WALKER:  That's correct.

21             THE COURT:  Understood.

22             MR. WALKER:  And it's class-wide, of course.  And,

23   in fact, I think the case law is clear that there is a much

24   lower standard for -- for proving -- you know, for damages

25   being variable for -- across the class because -- because

1  the amount of damages can vary.  The fact of damages, the
2  impact is one thing.  The amount of damages often varies,
3  and that's -- that's not a -- that's not a bar to class
4  certification usually.
5          THE COURT:  Many courts have said that.
6          MR. WALKER:  Yes.
7          THE COURT:  All right.  Thank you, Mr. Walker.
8          MR. WALKER:  All right.  Thank you, Your Honor.
9          THE COURT:  Mr. Kasowitz, predominance.
10         MR. KASOWITZ:  Thanks, Your Honor.
11         I've got a little bit on this.
12         Years ago -- I graduated from law school in 1977,
13  and the first case that I was assigned to as a first-year
14  associate was an antitrust price-fixing case involving a
15  client called Eagle Electric, which for folks who were in
16  New York, if they traveled over the Queensboro Bridge, you'd
17  see a big sign for Eagle Electric.  And what they did was
18  they made fuses and plugs and wiring devices and the like.
19  And the allegations against them -- which were brought by --
20  not just by the government, but in an antitrust class action
21  -- were the old-time, smoke-filled room.
22         A bunch of CEOs, high-level executives, in a
23  particular industry, sitting around and marking up price
24  books.  And that got found out, and there were -- there were
25  lots of legal consequences and folks went to jail, all of

1   that.

2           During three years of scorched earth discovery in

3   this case Your Honor, 90 depositions, millions of pages of

4   documents that have been produced, thousands of pages of

5   exhibits and expert reports and the like, the plaintiffs

6   have not come up -- contrary to what's been said -- and

7   we're going to go through it in some detail -- but the

8   plaintiffs have not come up with a scintilla of evidence

9   that there was any smoke-filled room here.

10          And nor have they come up with a scintilla of

11  evidence that there was any -- to coin a phrase that we've

12  heard -- any overarching agreement among 21 companies, which

13  operate 147 chicken production plants, to suppress the pay

14  of each and every one of the 24,000-plus growers who do

15  business in this country.

16          Nor, Your Honor, is there a shred of evidence that

17  there were any directions or instructions or guidelines or

18  even a single email, anywhere, from the CEOs or other

19  high-level executives of these integrators, like we had in

20  the *Eagle Electric* case, or from anyone else for that

21  matter, talking about it, stating, implying, or suggesting

22  that payments to growers should be or were being suppressed

23  industry-wide.

24          Now, we heard some characterizations today that

25  such -- that there's lots of evidence.  There's a ton of

1    evidence.  It's going to -- it's going to be presented, you

2    know, at some point.  Heard some of that yesterday too.  But

3    we haven't seen any of that overarching evidence.  There is

4    some discussion about a -- and, in fact, Your Honor, every

5    time you ask about it, typically, the answer that comes

6    back, well, there's this exchange of pricing information.

7    That's what we mostly see.  There's an exchange of pricing

8    information, and why would you exchange pricing information

9    if you weren't going to use it to fix prices.

10         What there isn't is any kind of detailed

11   discussion of that pricing information at all, what it is.

12   Nor was there any discussion of how it's used.  And I'm

13   going to go into that in some detail with emails and the

14   like here.  But the reality is, nor is there any discussion

15   whatsoever of the recognition that exchanging pricing

16   information, in and of itself, is not illegal, and, in fact,

17   has a very significant procompetitive effect.  And there are

18   lots and lots of courts in this country that have recognized

19   that.

20         THE COURT:  So before we get too far down your

21   path, Mr. Kasowitz, I want to start where you started.  I

22   don't think you defined the question correctly in the first

23   instance, but let's explore this.  I don't think what the

24   plaintiffs are going to be required to prove at trial is

25   that 21 integrators joined in a nationwide conspiracy to

 1   affect 147 plants and all 24,000 growers.  That's -- didn't
 2   you set the bar too high?
 3          At trial, won't the question for the jury be here
 4   whether Pilgrim's conspired with one or more other
 5   integrators to suppress grower wages, through one or both of
 6   these mechanisms?  Isn't that the question?
 7          MR. KASOWITZ:  Yeah.  I didn't say that -- I
 8   didn't say that that was going to be the standard.  What I
 9   said, Your Honor, respectfully, was that there's no evidence
10   of that.  And I said and what I mean is that because there
11   is no evidence of that, they're going to go to, as they've
12   said, these two other purported conspiracies, a conspiracy
13   to no-poach, and a conspiracy to exchange pricing
14   information.
15          So I -- that's what they're going to try and
16   prove.  And what I'm going to show, Your Honor, is that
17   there is no evidence that that was ever done, either one of
18   them, ever done on any kind of national basis.  They do have
19   to show that, Your Honor.
20          And I'm going to get into *Wal-Mart* to -- Your
21   Honor picked it up, you know, perfectly at the end of the
22   presentation of 23(b)(3), with the plaintiffs' counsel, to
23   talk about what the -- what they need to do at this -- at
24   this class certification stage.  And *Wal-Mart* sets it forth
25   pretty carefully, and I'm going to go into that too.

 1                  So you're right, Your Honor, I wasn't -- I wasn't
 2       saying that they have to prove -- I wasn't saying that they
 3       have to -- that they have to prove that in that way.  That's
 4       what they're claiming.  And to get to that -- to get to that
 5       claim of an overarching conspiracy, they have to prove at
 6       trial -- and if we were to go to trial -- that there is this
 7       no-poach agreement.  They have to prove that there's a
 8       no-poach agreement.  They have to prove that that's a
 9       conspiracy.  They have to prove that that impacted on
10       members of the class.  They can't do that.  And that's what
11       I'm going to take and go through some detail to demonstrate
12       that they can't prove any element of that.  They can't prove
13       that there was -- I'm sorry.  They can't prove that there
14       was a conspiracy.  They can't prove that there was impact.
15       And then I'm going to do it with the information sharing.
16                  THE COURT:  Well, I'm all ears.  I don't know if
17       you have in mind addressing this as part of your
18       presentation, but maybe this is a good place to start.  What
19       do we do with the adverse inferences?  Because those --
20       those are questions that bear on each of those points, I
21       think.
22                  There were executives at Pilgrim's who invoked the
23       Fifth Amendment in response to specific questions about the
24       existence of a conspiracy, the scope of the conspiracy, the
25       purpose of the conspiracy.  Yes?

```
 1            MR. KASOWITZ:  Yes, there are.  There are
 2   executives at Pilgrim's who invoked the Fifth Amendment with
 3   respect to those questions.  And the reason that they
 4   invoked the Fifth Amendment with respect to those questions
 5   was that they were being prosecuted by the United States
 6   government for price-fixing with respect to -- not a
 7   grower's conspiracy -- but with respect to allegations of
 8   fixing price with respect to downstream sales of broilers.
 9            THE COURT:  And they were acquitted, I think,
10   ultimately, but --
11            MR. KASOWITZ:  Your Honor, they were tried three
12   times.  Three.  The jury was hung twice, and on the third,
13   they were acquitted.  So to the -- to the extent -- I'm
14   sorry, Your Honor.  You wanted to ask something?
15            THE COURT:  Go ahead.
16            MR. KASOWITZ:  To the extent that there's a
17   consideration of inference with respect to their invoking
18   the Fifth, which was -- which was done during the time that
19   -- their depositions were taken, I think, before the third
20   trial it came about.  I'm pretty sure of that.  But to the
21   extent that there's a question about inferences to be drawn,
22   it will also be presented to the jury that they were
23   prosecuted three times, two juries hung, and one acquitted.
24            THE COURT:  That may be.  I'm not -- I'm not
25   familiar with the case law about that question.  But it
```

     1  seems to me an impasse at class certification.  When the
     2  defendant -- when Pilgrim's says in its papers, for example
     3  -- and you do repeatedly -- there is no evidence to support
     4  this point, no evidence to support this point, etcetera.  I
     5  think I've underlined that in the brief at least four times
     6  in your papers.  Couldn't the jury find, based on the
     7  invocation of Fifth Amendment and an adverse inference
     8  instruction, that Pilgrim's was part of a nationwide
     9  conspiracy for this very purpose?
    10          And if a jury could draw that inference, based on
    11  the Court's instruction and that invocation in a civil case,
    12  isn't there evidence that would support the plaintiffs's
    13  theory at this stage?
    14          MR. KASOWITZ:  I don't think so, Your Honor.
    15  First of all, the Fifth was taken with respect to every
    16  single question at these depositions because of the posture
    17  of where these -- where these CEO -- where the CEO, who was
    18  acquitted, was in the criminal process.  Number one.
    19          Number two.  That CEO doesn't have a relationship
    20  with the company anymore.  But the other point here,
    21  Your Honor, is they're very, very specific points.  They are
    22  certain things that we are being specific about and that the
    23  plaintiffs' haven't been.
    24          What the -- when the plaintiffs say there's tons
    25  of evidence of an integrator-wide conspiracy that Pilgrim's

1    participated in to -- to suppress the price of grower pay

2    with respect to this no-poach -- this no-poach -- this

3    no-poach conduct.  That's what they say.  Okay.

4            I was very careful leading up to this, and I will

5    be very careful in showing that there isn't such evidence at

6    that level, top-down evidence at that level; okay?  Or at

7    least they haven't shown it; okay?  They haven't shown it.

8    What they have shown, what exists, what is contained within

9    the -- you know, an appendix that Dr. Singer attaches to his

10   report are examples of individual, no-poach agreements

11   between the managers of plants, of various integrators, at

12   different locations in the United States.

13           That does not establish the top-down,

14   integrator-wide conspiracy that they are alleging here.  And

15   *Wal-Mart* makes very, very clear that they have to -- that

16   they have to establish -- they have to -- they have to come

17   forth with hard evidence at this point in order to be able

18   to establish the glue by which the numerous decisions and

19   conduct at hundreds of plant, affecting thousands of

20   growers, whether or not that can proceed on a class-wide

21   basis.  That's our point.

22           And so -- so when we look at the evidence, we look

23   at it carefully.  What -- they're -- they're very general.

24   The statements that have been made have been very general in

25   saying, hey, there's all this evidence of collusion and of

 1    conspiracy with respect to no-poach.  We're going to take

 2    apart -- we're going to dissect some of that evidence to

 3    show Your Honor, that in order for them to be able to

 4    proceed on a class-wide basis, they have to carry that

 5    burden.

 6            THE COURT:  So I'm eager to hear your analysis of

 7    that.  Let me ask you one more question.  It may be more

 8    than one, but at least one question.  It's related to the

 9    question I asked Mr. Walker.  In a conspiracy case, there's

10    rarely direct evidence.  Sometimes.  The evidence in a

11    smoking room or the e-mail between the CEOs.  Most often,

12    the jury is asked to decide whether on balance, the evidence

13    supports the inference of the existence of the agreement,

14    whether it's been established.  I'm actually not -- I think

15    conspiracy is clear and convincing evidence, but I'm not

16    sure.  We'll deal with this when we to get to it.  But

17    whether it's a preponderance or clear and convincing, the

18    question will be whether there -- it seems to me what you're

19    going to ask me to do in a moment is decide -- before

20    summary judgment -- with certain data points in the

21    constellation, whether a jury could reasonably infer the

22    existence of the conspiracy, which you have not -- which you

23    say the plaintiffs haven't established independently.

24            But isn't that where the -- isn't that where the

25    rubber is going to meet the road in this case, in the

```
1    rigorous analysis?  Is whether there's enough that a
2    reasonable jury could support -- could find the inference.
3            MR. KASOWITZ:  Two things, Your Honor.  Yes.  In a
4    situation where discovery is now closed, after it's been
5    going on for three years, where there have been, literally,
6    millions of pages of documents produced, 90 depositions
7    taken, and all of this work done -- we've got a record here
8    -- and there's not one email that says, hey, we've got this
9    conspiracy here, and you as -- and you as the -- you, in the
10   plants, you've got to carry it through; okay?  So that's one
11   piece.  And that does go to the issue of your -- of the
12   Court's gatekeeper function at this point, in making a
13   determination as to whether or not the case can be tried as
14   a class action case.
15           But the other piece, in any event, whether you
16   accept the -- whether you accept that proposition or not,
17   the reality of the evidence that's been presented, including
18   Dr. Singer's report, is that this is a highly-localized
19   industry with respect to decisions about grower pay.
20           And the evidence is going -- the evidence is going
21   to be clear that the way that decisions are made is that
22   they bubble up from the plant level, and the decisions are
23   made at the plant level based on a variety of factors.  And,
24   sure, do they go up to -- do they go up to corporate and get
25   signed off on?  Yeah.  They go up there, they get signed off
```

1    on as a matter of course, but those -- but the suggestions

2    are always taken.

3           And the evidence that has been presented that's on

4    this record, Your Honor, is that any of the no-poach

5    agreements that have been entered into, including in

6    Delmarva, have all been locally based.

7           THE COURT:  So I think this is my last question

8    before you launch into your presentation.

9           MR. KASOWITZ:  It's okay, Your Honor.

10          THE COURT:  I'm breathless with anticipation.  But

11   all of the evidence you're talking about is class-wide

12   proof.  So help me -- put my eyes on the target you want me

13   to focus on before you begin.  This is important at this

14   stage because why?  What -- you're going to establish a

15   failure of the plaintiffs' class certification proof how?

16          All this evidence about how things worked, what

17   plants did, what levels were approved, who meant what,

18   whether there was a conspiracy, that's a class-wide issue.

19   Every integrator -- every grower, rather, their case would

20   rise or fall on the existence of the conspiracy based on the

21   same proof.  No?

22          MR. KASOWITZ:  No.  No, Your Honor.  We're going

23   to do it the same way that it was done in *wheeler.*  We're

24   going to do it the same way that Judge Folsom did it.

25   That's not just an analogous situation.  That's the same

1   situation.  That's the same situation.

2          THE COURT:  I don't know.  I know what our record

3   is here.  That's what I'll evaluate, is our record in this

4   case.

5          MR. KASOWITZ:  Well, in *wheeler*, Judge Folsom --

6   in *wheeler*, Judge Folsom was faced with the exact two

7   claims, the same claims.  A no-poach claim, which sought to

8   be certified on a class-wide basis, but the class was much

9   narrower, Your Honor.  It was all of Arkansas and a little

10  bit of Texas.  And the way that he -- the way that the claim

11  was framed was on the basis of -- sort of allocating markets

12  between growers; okay?  But it was no-poaching when you read

13  the decision.

14         And then Agri Stats, dealt with Agri Stats as

15  well.  And he dealt with -- and he dealt with whether or not

16  that also constituted -- you know, that could be -- a case

17  based on exchange of that information could be tried on a

18  common -- on a class-wide basis.

19         And what he concluded, Your Honor, was that the

20  factors affecting decision-making with respect to grower pay

21  are so -- so completely individualized and localized, that

22  you couldn't do it.  Because you couldn't -- you know, was

23  it -- take your point, Your Honor.  Inferences.  Okay.

24         People don't go and just say they're going to --

25  you know, they're going to engage in some bad behavior and

1  then -- and then -- you know, and then go prevent a grower

2  from poaching.  They're going to -- you know, they're not

3  going to -- they're not going to talk about it; all right?

4          So then what inferences can be drawn if grower pay

5  in a particular location is suppressed.  And what Folsom --

6  and what Judge Folsom --  who's very well respected -- what

7  he said was, well, you've got a lot of different factors

8  that impact on price.  So can you infer from a suppression

9  of price?  If the price goes down, can you infer that that's

10  a result of a no-poach?  Can you infer if the price goes

11  down, that that is a result of the exchange of Agri Stats

12  information?  He's saying you can only make those inferences

13  based on individual situations with respect to each grower,

14  to see what was happening with respect to each grower.

15  Because with respect to each grower in each particular

16  locale, there's so many other factors that can affect

17  whether that price is suppressed.  So --

18          THE COURT:  Let's get into your proof, should we,

19  before we break?  We'll break in about ten minutes to let

20  our court reporter stretch her fingers, but let's get

21  started.

22          MR. KASOWITZ:  I didn't do any proof yet, Your

23  Honor?

24          THE COURT:  I'm sorry?

25          MR. KASOWITZ:  I didn't do any proof yet?

1            So, Your Honor, as I was -- as I was saying, that,

2    you know, the most that plaintiffs can do, with one or two

3    exceptions, are to point to emails reflecting a limited

4    number of handshake deals, where there are deals not to

5    solicit each other's growers.  And these involve local

6    plants, for a limited period of time, in localized

7    geographic markets.  They don't in any way reflect the

8    overarching agreement that plaintiffs are alleging here.

9            And when you take a look at it -- when you take a

10   look at their proof, which we're going to do in a second, it

11   really confirms the opposite of what they're seeking to have

12   this Court do, which is that the inquiry here is really on

13   an individualized basis.

14           Now, I think the threshold issue before turning to

15   that is -- Your Honor -- Your Honor presented the question

16   to plaintiffs, you know, just a little bit ago, which is,

17   you know, what's the -- what's the burden?  What's the

18   standard?  What has to be demonstrated by the plaintiffs on

19   a class certification hearing in order to meet their burden?

20           And *Wal-Mart* is very clear.  *Wal-Mart* held in 2011

21   that the plaintiffs bear the burden of "affirmatively

22   demonstrating" through "convincing proof" that the putative

23   class "in fact" meets the requirements of 23(b)(3) and the

24   other -- and the other elements.  And convincing proof.  And

25   that means they have to show, in fact, that those

1    requirements are met.

2            Now, the plaintiffs say that *Wal-Mart* is

3    inapplicable for a couple of reasons.  First, they say it's

4    23(b)(2) case for class-wide injunctive relief, and it

5    involves a discrimination claim -- a discrimination claim --

6    I'm sorry, Your Honor -- not an antitrust claim.

7            But that -- that effort fails.  First of all, the

8    burden that the plaintiffs have to meet under 23(b)(3) is

9    more exacting than the standard under 23(b)(2).  And there's

10   nothing in *Wal-Mart* that indicates that the nature of the

11   claim changes the standard for class certification in an

12   antitrust case compared with a discrimination case, as they

13   argue.

14           *Wal-Mart* sets forth a general standard and the

15   standard applies directly to this case.  In *Wal-Mart,* the

16   Supreme Court held that the legality of thousands of

17   individual hiring decisions, at thousands of *Wal-Mart*

18   stores, could not be determined on a class-wide basis

19   without convincing proof of a corporate "pattern or practice

20   of discrimination."

21           This is what the Supreme Court said:  "Without

22   some glue holding together the alleged reasons for all those

23   decisions together, it will be impossible to say that

24   examination of all the class members' claims for relief will

25   produce a common answer to the crucial question why was I

1  disfavored."

2         It's the exact same issue here, Your Honor.

3  Without some glue holding together all those grower-pay

4  decisions, it will be impossible to say that examination of

5  the 24,000 putative class members' claims for relief will

6  produce a common answer to the crucial question of whether

7  and why any particular grower had its pay suppressed.

8         And, indeed, Your Honor, this case is even less

9  appropriate for class certification because it involves not

10  just whether a single company had an alleged corporate

11  pattern and practice, but whether 21 different companies had

12  an alleged corporate pattern or practice of acting as a

13  single cartel.  And in conducting the rigorous analysis that

14  *Wal-Mart* requires, there's no question that the Court needs

15  to delve into the merits of the case.

16         The plaintiffs argue that the Court is not

17  supposed to consider whether there's evidence of an

18  overarching agreement.  They say that's for the jury.  I

19  just heard it a little bit ago.

20         But under Rule 23 and *Wal-Mart,* that's not the

21  case.  If there's insufficient evidence -- and, here, there

22  is no evidence of this overarching agreement -- then the

23  class can't be certified.  And in conducting this rigorous

24  analysis, it's up to this Court to determine whether there

25  is a threshold amount of evidence permitting certification.

1          *Wal-Mart* went a little further and it said class

2     determination -- "Class determination generally involves

3     considerations that are enmeshed in the factual and legal

4     issues comprising the plaintiff's cause of action.  If the

5     courts rigorous analysis "overlaps with the merits of the

6     plaintiff's underlying claim," the Supreme Court in *Wal-Mart*

7     said that can't be helped.

8          Now, the plaintiffs have been arguing that whether

9     there's an overarching agreement to suppress grower payments

10    can only be decided by the jury, because a jury can find on

11    a class-wide basis that there was or was not any conspiracy,

12    which is what they call, I think, a fatal similarity.  But

13    that argument turns Rule 23 on its head, Your Honor.

14          Basically, that argument would basically take away

15    the Court's function as a gatekeeper, and it basically

16    eliminates Rule 23.  It says any time that you have

17    well-pleaded allegations of class conduct -- or class

18    violative conduct, you just go to a jury trial and figure

19    out -- let the jury decide.  And if the plaintiffs win, they

20    win, and if they lose, they lose.  No need for Rule 23

21    whatsoever.

22          So, now, I'm going to go into --

23          THE COURT:  That's not entirely right, is it?  I

24    mean, think if there's adequate evidence from which a jury

25    could reasonably find the existence of a conspiracy, the

1   conspiracy -- the existence of a conspiracy will, by

2   definition, focus on the intent and conduct of the alleged

3   co-conspirators, does it not?

4          I mean, that's just -- I don't know how to avoid

5   that fact.  The existence -- that will be common proof.  The

6   conspiracy either exists or it doesn't exist.  And whatever

7   the scope, whoever alleged to be the victims of the

8   conspiracy, how they're impacted may be individualized

9   questions.  But in any conspiracy case, the threshold

10  question will be was there an agreement.  Is it not the

11  threshold question just as a matter of fact in a conspiracy?

12         Now, that may not be -- that may not control.

13  That may not predominate.  But I don't understand how you're

14  saying that fact in a conspiracy turns Rule 23 on its head.

15         MR. KASOWITZ:  I'm not saying that fact turns it

16  -- Your Honor, my apology.  I wasn't clear.

17         THE COURT:  Well, I'm sure I misunderstood.

18         MR. KASOWITZ:  No, no, no, no, no.  I'm sure I

19  said it.  I said it wrong.  I made a mistake.

20         I'm not saying that that fact turns Rule 23 on its

21  head.  I'm saying what the plaintiffs are proposing here,

22  which is because of that fact, that they don't really need

23  to go through the Rule 23 exercise.  They've pled -- you

24  know, they've pled enough in their complaint.  They survived

25  the motion to dismiss.  So now consideration by the jury as

 1   to whether or not there's a conspiracy on a class basis can

 2   be done by the jury, and they either win or lose, up or

 3   down.  That's what I'm saying.  I'm sorry.

 4           THE COURT:  Now, I understand.  Thank you.  It's

 5   10:30, and I think we're right on the cusp of your

 6   presentation of evidence, not proof.  Let's take a -- we're

 7   on a schedule today.  Let's try to keep this to ten minutes

 8   and come back, and we'll pick up right here, Mr. Kasowitz.

 9           MR. KASOWITZ:  Thank you.

10           (Recess taken.)

11           THE COURT:  At this rate, we're never going to get

12   to your discussion of evidence, but I do have another

13   threshold question for you before we get into it.

14           In terms of framing, we're not at Rule 56 stage

15   yet, but if I conclude that there's sufficient evidence of

16   the overarching conspiracy to survive summary judgment,

17   hypothetically, what's the impact of that decision for class

18   certification in your arguments here?

19           MR. KASOWITZ:  It doesn't -- it doesn't mean that

20   certification should be granted, Your Honor.  It's just that

21   it's a -- it's a ruling on the merits.  Because the reality

22   is that even if there are claims that are going to proceed,

23   the issue is that they shouldn't be permitted to proceed on

24   this record on a class-wide basis.

25           So the significance of this discussion -- I mean,

1   the significance of getting into the facts in this

2   discussion is that whether or not the -- you know, whether

3   or not there was a no-poach agreement reached, you know, in

4   a couple of -- between two integrators in a particular

5   location, all of the -- all of the evidence that is going to

6   relate to that will be highly individualized so that, sure,

7   you can have a case, and those no-poach plaintiffs -- or the

8   no-poach plaintiff can bring an action, but it's not going

9   to be either, A, in a representative capacity, or, B, as a

10  member -- as a putative member of the class.  That's the --

11  that's the point.

12          And I think that going through this -- going

13  through this exercise -- at least we're going to do it for a

14  few of these entries that Dr. Singer made -- will

15  demonstrate that.  That whether or not there, you know, a

16  violative agreement to no-poach, you're only going to be

17  able to assess it and ascertain whether it was and whether

18  there was an impact on an individual basis.

19          THE COURT:  I'm a little leery about the exercise

20  you're about to start into because I want to make sure we

21  make good use of our time.  But I think I understand it.

22  And there's a reason you've framed it this way, rather than

23  characterizing the evidence and explaining to me why each of

24  the pieces of evidence cited by the plaintiffs -- mostly

25  referring to Dr. Singer's materials -- is insufficient to

```
 1   show the existence of the overarching conspiracy, but if you
 2   want to illustrate with some points, then we can do that.
 3           MR. KASOWITZ:  Yeah.  And that's the point.  I
 4   mean, we've listened to very broad, general statements that
 5   are -- have been presented to the Court as sort of
 6   assumptions of fact.  Well, Your Honor, we have all this
 7   evidence.  We have all this evidence of this overarching
 8   conspiracy.  There were all these emails, there's all these
 9   communications.  I really think it's important to kind of --
10   to drill down on it.
11           So Dr. Singer summarizes this evidence at Appendix
12   Table 27, page 218.  But -- and this -- this is important,
13   Your Honor.  Before we look at the specific examples, it's
14   important to -- Dr. Saravia has done some work in analyzing
15   this.  And even if we assume -- even if we assume that
16   everything in Dr. Singer's chart reflects a no-poach
17   agreement, we just concede that with what the -- we concede
18   what the plaintiffs are saying about it.  If you add all of
19   the references that Dr. Singer has in his chart -- and he's
20   got like nine different incidents -- you -- they only
21   reflect no-poach agreements covering half of the plants.
22           So they only reflect no-poach agreements covering
23   75 out of 147 of the plants that are at issue in a national
24   case.  And this is -- this is Saravia report at paragraphs
25   62 through 66, Your Honor.  And just -- and what Dr. Saravia
```

1  did was to assume counterfactually that all of Dr. Singer's

2  entries reflected a no-poach agreement -- that's at

3  paragraph 64 -- and where the companies, but not the plants,

4  were specified in the chart.  In other words, it was just a

5  reference to one of the integrators, not to any specific

6  plant.  Dr. Saravia assumed, for purposes of her analysis,

7  even without any evidence, that each one of those company's

8  plants was covered by a no-poach agreement.  So if there was

9  a reference to a company, then all of their plants --

10  Dr. Saravia assumed for purposes of this analysis -- was

11  covered by a no-poach.

12          So if you give Dr. Singer and the plaintiffs here

13  not only the benefit of every doubt, but further and then

14  some, the conclusion is that, at most, half of the plants in

15  the country were covered by an alleged no-poach agreement

16  and half were not.

17          And then, as you can tell, what's going to come

18  next, 50 percent is nowhere near sufficient, Your Honor, to

19  justify certifying a class.  No court has ever certified a

20  national class where 50 percent of the putative class

21  members were uninjured.

22          And Mr. Torres, I think, cited some cases

23  yesterday -- I'm not going to go into all of them now --

24  where if as low as 10 percent of a class were uninjured,

25  that would mandate denial of class certification.  There was

1   back and forth about it, Your Honor.  There was discussion

2   about 15 percent.  There was discussion about some dictum in

3   *Black.*  But 50 percent, no question that that would mandate

4   denial of class certification.

5          Now, let's turn to Dr. Singer's appendix table,

6   and let's turn to the first example he has.  The first

7   example he has, the first entry, which is on page 218,

8   relates to a no-poach agreement between Kevin Crider, who,

9   in 2015, was a live production manager at Pilgrim's

10  Mayfield, Kentucky, plant, and his counterpart at a Tyson's

11  in Obion County, Tennessee.  And these plants were within 45

12  miles of each other.

13         Now, on its face, this particular agreement

14  doesn't amount to an agreement between two companies, let

15  alone the 21 companies.  It relates only to the discussions

16  between these managers at these plants.  And in this first

17  entry, Singer summarizes testimony about an August 27th,

18  2015, email between Mr. Crider and his boss, Matthew Herman,

19  in which Mr. Herman says, "Make sure we have thoroughly

20  reviewed any Tyson -- former Tyson grower -- former Tyson

21  grower before any commitments are made."

22         To which Mr. Crider replies, "We typically have

23  not tried to cross lines.  Shane and I have a good

24  relationship and we try to stay out of each other's area."

25         Now, Your Honor, Shane is the -- is the -- is

1   Mr. Crider's counterpart at the Tyson plant in Tennessee.

2   And contrary to what plaintiffs would have this Court

3   believe -- because they're featuring this in Dr. Singer's

4   report -- Mr. Crider's response doesn't evidence any

5   agreement or anything illegal.  Crider is telling his boss

6   that he and a Tyson plant manager try to refrain from hiring

7   from each other's growers, plainly because they don't want

8   to trigger retaliatory hiring from each other.  That's

9   legitimate.  It's conscious parallelism.  And it's not

10  illegal under -- under antitrust laws.

11          Now, the Supreme Court in *Bell Atlantic v. Twombly*

12  has made clear that independent parallelism doesn't

13  establish the kind of contract or conspiracy that's

14  required.  And that proof of a Section 1 conspiracy has to

15  include "evidence tending to exclude the possibility of

16  independent action."

17          Now, in any event, Your Honor, even if Crider's

18  exchange here with Shane was evidence of an agreement --

19  which we submit it's not.  On its face, it's not -- it

20  evidences only local dealings between two employees of

21  competing chicken companies, production plants, in the

22  northwest corner of Tennessee, where it borders with

23  Kentucky.  Whether those dealings amounted to a

24  non-solicitation agreement that was suppressing grower pay

25  in a 50-square-mile area is an inherently individualized

1  inquiry, which could only be determined with respect to the
2  local proof.

3          So our position is, Your Honor -- I don't want to
4  belabor it -- but whether or not you credit -- whatever --
5  plaintiffs will say, well, this is an egregious -- you know,
6  this is egregious conduct, we can draw inferences from it,
7  everything else.  We say, on it's fact, it's -- hey, he and
8  I -- I don't go after -- I don't go after his -- I don't go
9  after his growers because if I do, then he's going to
10 retaliate.

11         Just like, Your Honor, you know, there are some
12 big law firms that we compete with, that do litigation like
13 we do.  And I don't go after -- you know, I don't go after
14 some of the lawyers at those places.  I don't want them
15 coming after me.

16         Completely, there's absolutely nothing
17 inappropriate or illegal about that.  It's not rooted in an
18 agreement.

19         So -- but whether or not, whatever the merits are,
20 you're going to have to look at the proof at that plant;
21 you're going to have to look at the dealings between these
22 people; you're going to have to look at what the past
23 conduct has been in that place; and then you're going to
24 have to look at impact evidence, you know, with respect to
25 the grower, and whether or not there was an impact and the

 1  like.

 2          And so, in any event, whatever is happening in the

 3  northwest corner of Kentucky and Tennessee is not going to

 4  be relevant to what's happening in Delmarva.

 5          THE COURT:  Unless it is.  I mean, how do you make

 6  the proof -- how do you make a proof of a nationwide

 7  conspiracy between integrators without examining evidence of

 8  discreet agreements -- trying to establish for a jury enough

 9  discreet agreements, in enough parts of the country, among

10  enough integrators for a jury to assess whether or not the

11  plaintiff has established the existence of a broader

12  conspiracy?

13          MR. KASOWITZ:  Yeah.  But then you have to link it

14  up, Your Honor.  Under *Wal-Mart* -- under *Wal-Mart*, you've

15  got to find -- you've got to find the glue.  And my only

16  point, Your Honor, look, a trial is a trial; okay?  But here

17  we know what the record is because discovery is done and

18  they've -- and the function right now is can this -- can

19  proceed as a class.  Sure.  You're right, Your Honor.  In

20  order to look at an -- to determine whether or not there's

21  an overarching conspiracy that's illegal, you're going to

22  look at what's happening on the ground.  But then what

23  you're going to have to find is a link between them, the

24  glue.

25          And we submit, Your Honor, that on the record --

1    that the record in front of this Court -- and it's a big

2    record -- and there's a lot -- you know, there's a

3    tremendous amount of work that's been done.  Lots and lots

4    of trees have been felled.  With respect to this record,

5    there's not enough to get to that glue on this record.  On

6    this record, it's an individualized inquiry.

7            Now, Your Honor, let me turn to another example.

8    And I'm going to do this quick.  It's not going to take --

9    I'm not going through all of them.  But I think that these

10   are instructive.

11           The next on Dr. Singer's table, the second

12   paragraph in the first entry.  This is really the

13   plaintiffs' star witness, so to speak.  This is Delmarva.

14   And so -- you know, look, the plaintiffs' argument is that

15   as Delmarva goes, so goes the entire country.  They say

16   that, you know, there's a no-poach agreement in Delmarva,

17   and because Singer claims that on certain variables that he

18   selected, Delmarva is similar to the rest of the country,

19   then the rest of the country is also impacted by the

20   no-poach agreement.

21           Respectfully, we disagree.  But the point here is

22   that Singer -- and I just want to emphasize -- I'm not going

23   to go through what was done yesterday, but I do want to

24   focus on one particular thing.

25           Singer ignores the really critical variable, which

1    is the actual, total payments to growers in the rest of the
2    country were -- what those payments actually were during the
3    relevant time period.  Those payments to growers in the rest
4    of the country were not suppressed, Your Honor.  They
5    increased.  And that was shown by Dr. McCrary, and that's
6    not disputed by -- that's not disputed by plaintiffs.

7             Nor is it disputed by plaintiffs that the fact
8    that Delmarva was the most concentrated chicken growing area
9    in the country, by far, prevents that -- prevents the
10   extrapolation that the plaintiffs are trying to do.

11            So I want to bring this home here, Your Honor.
12   Two of the named plaintiffs in our case, Karen and Marc
13   McEntire, were growers for the Pilgrim's Nacogdoches plant
14   in East Texas in 2013, and there were no other chicken
15   companies in the area.

16            And what the plaintiffs are saying is that Mr. and
17   Mrs. McEntire are in the same class and entitled to recover
18   the same 4 percent as the growers in Delmarva, based on the
19   same Delmarva evidence, even though there were no other
20   chicken companies in Nacogdoches and no other chicken
21   company trying to poach the McEntires.

22            And not only that, the plaintiffs invoked Delmarva
23   as the reason to certify a national class in which the
24   McEntires would not only be included, but would serve as
25   class representatives.  Of course, as Your Honor knows,

1    Pilgrim's was not in Delmarva.

2          So we've got two extreme circumstances, Your

3    Honor, we've got the McEntires located in a place with no

4    competition.  We got Delmarva in a place where there's

5    intense competition.  In between, there are areas all over

6    the country, with varying degrees of competition.

7          As Judge Folsom pointed out in *Wheeler* -- which

8    I'm going to get to in a minute -- certifying a national

9    class here would lead to thousands of minitrials of

10   liability and a fact of damage, which totally defeats the

11   purpose of Rule 23.

12         Let me go on to the next example.  At page 219 of

13   the report, Singer quotes testimony from Pilgrim's, Adam

14   Willis, who's a live operations opmanager at a plant in

15   Northeast Georgia.  And Singer -- Singer doesn't just quote

16   from Willis, he puts it in bold to make sure that we know

17   how important he thinks this is, Your Honor.  The quote,

18   according to Dr. Singer, reads:

19              "QUESTION:  Where is that an unwritten rule?  At

20              Pilgrim's Pride?

21              "ANSWER:  The chicken business, in general,

22              everybody."

23         And that's a reference to Mr. Willis's deposition

24   transcript at page 217.

25         Now, Dr. Singer would clearly have this Court

 1   believe that the unwritten rule that Mr. Willis is

 2   testifying to, "in the chicken business, in general,

 3   everybody," referred to and was evidence of the plaintiffs'

 4   industry-wide, nationwide, purported no-poach agreement.

 5          But, Your Honor -- and I'm a little surprised

 6   about this -- I find it surprising that Mr. Willis was not

 7   referring to any no-poach agreement.  The words that

 8   Dr. Singer omitted from Mr. Willis's testimony make that

 9   clear.

10          Mr. Willis had earlier testified, at page 244 of

11   his transcript, "It's an unwritten word.  It's also an

12   unwritten word that you never go on anybody's farm while

13   they're have -- while they have chickens to try and recruit

14   that grower."

15          That part was in Dr. Singer's report, but he

16   leaves out the continuation of that testimony, which

17   explains what Mr. Willis was really talking about.  Quote --

18          If we have -- do we have that, Michael?  Good.

19     Okay.  "The reason we do that is because the

20   biosecurity to prevent the spread of diseases from their --

21   may be a farm they've been on to our farm.  We even have

22   signs that say, stop, do not enter biosecurity area.  He had

23   service reps going on our farms recruiting growers.  Yeah.

24   It was all servicemen that I remember recruiting growers

25   while we had birds.  Now, had we not had birds, he's welcome

 1  to go on that farm because he can't spread no disease to me
 2  when I ain't got birds there, but not when there's birds
 3  there.  He should never go on that farm.  They shouldn't,
 4  but they did."
 5          That's the Willis transcript at page 208.
 6          Now, let's go back to the sentence that Dr. Singer
 7  put in bold when Mr. Willis was asked about the unwritten
 8  rule and answered in bold "The chicken business, in general,
 9  everybody."  But Dr. Singer left out the rest of
10  Mr. Willis's sentence.
11          The rest of Mr. Willis's read:  "Because of the
12  threat of AI."
13          MR. ROSS:  Which is --
14          MR. KASOWITZ:  Excuse me.  Sorry.  Your Honor, AI
15  is avian influenza, as one of my partners was trying to
16  inform me because he thought I forgot.
17          The unwritten rule that Mr. Willis was testifying
18  about, the one that he said governed "the chicken business,
19  in general, everybody," was not no-poach agreements, as
20  Dr. Singer would have this Court believe, but keeping people
21  off growers' farms when there are birds in the house in
22  order to prevent the spread of avian influenza.
23          Now, the plaintiffs in their reply brief go even
24  further in distorting Mr. Willis's testimony.  While Singer,
25  in his report, put a bracket around the period, denoting the

```
 1   omission -- which I think is bad enough -- the plaintiffs in
 2   their brief ended the sentence as if that were the entire
 3   quote, which they say constitutes class-wide proof of a
 4   no-poach agreement.  They say that at -- their reply brief
 5   at page 6.
 6         Plaintiffs gave no indication whatsoever that they
 7   were omitting Mr. Willis's words, demonstrating that his
 8   testimony had to do with avian influenza.  It had nothing to
 9   do with the no-poach agreement.
10         Certainly, it's not evidence of impact or of
11   class-wide proof of a no-poach agreement, which we think
12   that the plaintiffs have been disingenuous about with
13   respect to that.
14         Now, look, what -- the plaintiffs rely on no-poach
15   agreements and the -- and the Agri Stats, but what they
16   really are trying to do for class certification purposes is
17   to make reference to a lot of broad statements that they
18   think supports the argument that Singer is trying to make.
19   And our purpose in looking in a granular way at some of this
20   is to demonstrate that it's not as it has been represented,
21   Your Honor, and, in any event, needs to be determined on an
22   individual basis.
23         One more example.  Let's look -- let's look at
24   Sanderson, which is one of the companies that settled.  In
25   the second entry in the Sanderson section of the appendix,
```

1    the plaintiffs quote from portions of the deposition

2    testimony of Joe Sanderson, Jr., who's the Sanderson CEO.

3    And Sanderson was asked about a hypothetical phone call from

4    a Sanderson competitor to one of his employees, giving the

5    employee a heads-up that one of Sanderson's growers is now

6    growing for that hypothetical competitor but was not

7    recruited.

8            Mr. Sanderson was asked in the deposition, "Well,

9    what do you think about that?  Is that okay with you?  What

10   do you think?"

11           And Sanderson testifies, "My guy didn't talk to

12   the guy.  He said thanks for calling.  The other guy made

13   the call.  No big deal.  We didn't have a conversation.  No

14   big deal.  Neighborly.  Didn't want to start a fight.

15   Didn't want ill feelings.  Neighborly.  Yes, neighborly.

16   Didn't want to start a fight.  It's a Mississippi thing to

17   do."

18           And that's at page 123 of Mr. Sanderson's

19   transcript.

20           So the fact that plaintiffs have included this

21   entry within this appendix, which is supposed to the best of

22   the best examples of a supposed illegal no-poach scheme of

23   nationwide proportions, I think says it all about how this

24   needs to be viewed from a class certification basis.  And I

25   think that their last sentence there says it all as well.

1    "It's a Mississippi thing."  This is a local matter.

2              Now, as I said, I'm not going to go through all of

3    these.  Those are the ones I'm going to go through.  But

4    what we've done has been to sort of tabulate, you know, what

5    -- what buckets that all of these -- all of these incidents

6    fall into.

7              And there are 35 entries in this appendix.  17 are

8    plainly -- plainly-involved, localized situations on their

9    face, including eight in Delmarva.  They no way evidence a

10   nationwide -- on their face, Your Honor, a nationwide or

11   industry-wide agreement.  16 evidence, at most, unilateral

12   action or conscious parallelism.  And some of those 16,

13   including the Sanderson one, don't seem to evidence much at

14   all.  Two don't involve putative class members at all, two

15   of these examples.  One is Case Farms, which involves a

16   non-grower employee, and the other is Wayne, which involves

17   a breeder grower, not a broiler grower.

18             Now, I'm going to turn to the information sharing

19   agreement.  As I said before, there's no evidence that the

20   local plant managers who were principally responsible for

21   grower-payment decisions, no evidence that they were

22   instructed by their companies to use Agri Stats or any other

23   data to suppress grower pay or that of the plant managers

24   and the like.

25             Now, I believe, Your Honor -- and I made this

1    point before -- that had there been a national,

2    industry-wide agreement over an 11-year period between and

3    among 21 companies, for the purpose of basically suppressing

4    grower pay, then there would be something.  There would be

5    communications, emails, instructions, directions to the

6    plants, something that would -- that would be instructing

7    about, you know, what to do.  I mean, I've done a bunch of

8    big antitrust cases over the years, and I've never seen a

9    case that didn't involve that, even when there wasn't an

10   industry-wide conspiracy and the like.

11          But what's -- I think, again, getting to the

12   specifics of what's important for our purposes, for class

13   certification, no matter what, no matter what the

14   interpretations are that are given to those emails, which

15   here don't exist, 21 companies in the plants used Agri Stats

16   in a bunch of different ways.  Some of the companies used

17   the information to decide to increase grower payments.

18          And if you look at Koch, and the March 30th, 2022,

19   deposition of Dennis Gordon of Koch -- he worked at the

20   Montgomery plant -- he says that he thought that in their

21   plant, that Koch was too low on pay, so he was -- you know,

22   he looked at the information, he said, for the purpose of

23   trying to get to a recommendation to go up and the like.

24   And by contrast, several other integrators testified that

25   Agri Stats didn't impact on their decision-making on grower

pay at all.

The CEO of Simmons testified that Simmons had never used Agri Stats in connection with a decision to lower or to decline to raise grower pay. And that's David Jackson, his deposition, at pages 237 through 238.

And Lon Beasley, who's the grow-out manager at the House of Raeford, testified that Agri Stats was not useful in setting grower pay because of all of the different factors impacting price in the local markets. What he said was, "We're all doing different things, and we are all in different areas, and we all have different costs. So, really, I can't sit here and look at Agri Stats and tell anything about it. I mean, it costs. Costs are different in every area."

Now, Beasley's testimony reflects the fact that decisions concerning pay were made at the local -- at the local plant level, and they depended -- and they were dependent on a bunch of different factors, cost of lumber, fuel, feed, and other overhead, as well as competition from other plants and integrators.

And so Randy Stroud, Pilgram's head of live operations, he testified that grower pay, "really doesn't relate very well to the Agri Stats average because the average is for all. It is the average of the averages of all complexes and areas, and so it really has more to do

1    with how we compete in that local market, not Agri Stats'

2    average."  And that's -- his deposition is at pages 30

3    through 33.

4            He also testified in his 30(b)(6), that "Grower

5    pay varies terribly from one geographic location to another,

6    and that the Agri Stats numbers, because they're average

7    numbers, they're not very helpful really to determine what

8    your competition in the area is paying."  And that's his

9    30(b)(6) at page 170.

10           Now, just to underscore the point that this is

11   local decision-making, Mr. Stroud testified that in talking

12   about a decision to change price paid to growers, "Usually,

13   it bubbles up from the complex.  The broiler manager, live

14   production manager, will feel there's a need to address or

15   to basically -- they propose a pay increase when competition

16   or need for the houses, or it will come up through the

17   complex.  The complex manager, they get him onboard."  And

18   then Stroud testified that that would get approval at

19   corporate headquarters.

20           Your Honor, I want to -- I want to -- setting

21   forth, you know, some of these facts and showing how the

22   kinds of factors that determine how pay is impacted, and

23   that it's locally, I want to turn to *wheeler,* because

24   *wheeler* was dealing with precisely this situation.  And I'll

25   just -- I'll go through it pretty quickly, but I'll deal

1   with the reasons that the plaintiffs have argued in their
2   papers that *wheeler* doesn't apply here, which I think are
3   not meritorious.
4          So *wheeler* was not a national class, as we said.
5   It was limited to Arkansas and Northeast Texas.  It wasn't
6   among 21 companies, it was only two.  It didn't involve 147
7   plants, only nine.  But even in that much narrower context,
8   the court found that individual issues predominated, and the
9   court rejected the theory that the plaintiffs, you know,
10  present here, Your Honor, that the class could nonetheless
11  be certified because there was a supposed overall
12  suppression of grower payments.
13         Your Honor pointed out the first day in a question
14  that, well, even if things are different at different
15  plants, you know, plaintiffs' theory is that there's an
16  overall suppression of pay.  So how does that impact on
17  class certification?  And it does impact on -- it doesn't
18  override the individual issues, Your Honor, as Folsom -- as
19  Judge Folsom held:  "Although, plaintiffs argue that this
20  factor is overcome by simply looking at the overall
21  percentage that defendants' antitrust violations suppress
22  all base prices, the court is unpersuaded because plaintiffs
23  cannot prove with class-wide evidence that an increase in
24  base price would make growers better off."
25         And, you know, what the court was holding was that

1    because these payment decisions are so localized, there's

2    simply no way to show -- had the theoretical suppression

3    been present -- that the growers would have received any

4    more money.  It's at least as likely, that given local

5    factors, that impact pay, that the local decision-makers

6    would have paid them the same amount or more.

7            Judge Folsom also identified other individual

8    issues precluding class certification in circumstances that

9    are identical to those present here, Your Honor.  For

10   example, he found that merely determining whether growers

11   compete with each other would require an individualized

12   analysis based on factors specific to that complex.

13           And the court rejected plaintiffs' argument that

14   due to defendants' collusion, putative class members were

15   harmed by their inability to switch complexes.  The judge

16   rejected the argument because some growers were unable to

17   switch, due to geographic limitations, while others were

18   able to do so.

19           As Judge Folsom put it:  "The resulting conclusion

20   is that plaintiffs are unable to demonstrate this fact of

21   damages without delving into the individualized traits of

22   each complex or grower locale."

23           Because the plaintiffs couldn't -- couldn't

24   demonstrate fact of damage on a class-wide basis, Folsom

25   said -- held:  "Individual" -- oh, he also held that

1    individual computation of damages was -- would have to be

2    the case.  "Individual computation of damages is also

3    inevitable because different compensation schemes are

4    utilized for conventional houses, tunnel-ventilated houses,

5    and premium houses."

6           And, in short, Folsom -- Judge Folsom correctly

7    found:  "Such a scenario" -- which is exactly what we have,

8    here Your Honor -- "would require a multitude of minitrials

9    and precludes class certification."

10          Now, because -- because *wheeler* is on point, the

11   plaintiffs come forward with a number of reasons that it

12   shouldn't apply here.  As a starter, they criticize the

13   plaintiffs' counsel in *wheeler* for developing "virtually no

14   evidentiary record" and offering "no economic analysis

15   compared to the robust evidentiary showing here."  That's at

16   page 15 of their reply brief.

17          And Your Honor saw that in their brief and picked

18   up on that and asked yesterday whether *wheeler* is

19   distinguishable because of a lack of -- lack of an

20   evidentiary record.  Well, I want to answer your question,

21   Your Honor.  The answer is no.

22          It's evident from Folsom's decision that there was

23   a very extensive factual record before him.  The court

24   described the nature of the industry, displayed a keen

25   awareness of how growers' pricing and payment worked.  The

1    decision extensively referred to and provided document

2    references for numerous, individual fact issues that are

3    also present here, such as growers switching integrator

4    plants, competitive radius of those plants, disparate grower

5    pay based on different housing classes, and a number of

6    other differences.

7            Now, Your Honor, not only was there a lack of --

8    was there no lack of an evidentiary record in *wheeler,* there

9    was actually a very robust evidentiary record there.

10           Michael.

11           At the class certification hearing, the court

12   admitted into evidence over a hundred exhibits and rebuttal

13   exhibits, including deposition transcripts, grower

14   contracts, party declarations, grower pay settlement sheets,

15   cost comparison analyses, grower ranking reports, grower

16   waiting lists, email inquiries by individuals interested in

17   becoming independent growers, and so forth.

18           So it's not accurate to say that there was an

19   inadequate record in *wheeler* as a reason for not applying a

20   case which is fully on -- you know, fully and squarely on

21   all fours with the case here.

22           A couple of other things.  The plaintiff said

23   there was no -- one of the other distinctions was, they said

24   there was no nationwide discovery in *wheeler.*  *wheeler*

25   wasn't a nationwide class.  And they also tried to

1    distinguish *wheeler* because they said there was no analysis

2    of a grower's nationwide mobility.  Again, not a national

3    class.

4            Excuse me, Your Honor.

5            One of the issues that took up some time yesterday

6    was the question of market, and whether market is -- whether

7    the appropriate market needs to be -- is a requirement for

8    the plaintiffs to prove at this stage, at class

9    certification.

10           And the plaintiffs, at page 15, of their reply

11   brief, they criticize *wheeler* and say it's distinguishable

12   because they say there was "no economic analyses of the

13   geographic scope of the market."

14           Well, I think they can't have it both ways,

15   Your Honor.  They can't say, on the one hand -- they can't

16   claim that proving a national market is an obligation that

17   they don't have at class certification.  And then, on the

18   other hand, seek to distinguish *wheeler* because the

19   plaintiffs there didn't do exactly what the plaintiffs here

20   say they don't need to do.  One or the other.  But in

21   *wheeler,* you know, they claimed that that -- that wasn't

22   done.

23           They also -- they also criticize *wheeler,* claiming

24   that there wasn't the development of the -- you know, of a

25   proper evidentiary record.  But, again, that's -- they're

1   trying to have it both ways.  They say here, that they don't

2   need to develop an evidentiary record, that that's for trial

3   for determinations in front of the jury.  But, on the other

4   hand, they claim that -- they sort of criticize *Wheeler* and

5   claim that it's distinguishable because there wasn't an

6   evidentiary record.

7           So, look, I -- Your Honor, we think that *Wheeler*

8   is an important case.  It's obviously not the only support

9   that mandates denial of class certification at this stage.

10  We think that the holding in *Wal-Mart* by the Supreme Court

11  is clearly -- it clearly mandates class certification as

12  well, as well as a number of other cases.

13          But in these circumstances, we believe the class

14  certification should be denied.

15          A couple of just very, very quick things,

16  Your Honor.  I think that Your Honor asked whether the jury

17  -- earlier, whether the jury can say, did Pilgrim's enter

18  into a conspiracy, when there was discussion about what a

19  jury form would look like.  Did Pilgrim's enter into a

20  conspiracy with one or more integrators?  And I think that

21  the issue is not going to be one or more integrators or two

22  integrators.  The allegations of the complaint and all of

23  the studies that Singer -- that Singer performed were based

24  on a full industry of 21 integrators.  So I don't know what

25  the consequence was of Your Honor's question, but I think

1   that, you know, for purposes of class certification, that's

2   the -- you know, that's the -- the set of parties that we're

3   -- that we're involved with.

4           THE COURT:  Thank you, Mr. Kasowitz.

5           Mr. Walker, any response before we take up the

6   remaining issues?

7           MR. WALKER:  I will try to keep it very, very

8   brief.  And I'll just start, I think, where they started,

9   which is the evidence of the conspiracy.

10          And if you could put up the jury instruction real

11  quick on conspiracy.

12          The evidence of a conspiracy doesn't require a

13  smoky room with all 21 integrators meeting there and a

14  memorandum memorializing their agreement to suppress grower

15  pay.

16          An agreement, as Your Honor said at the beginning,

17  is a commitment to a common scheme.  The evidence need not

18  show that its members entered into any formal or written

19  agreement.  It may be entirely unspoken.  I think there's

20  case law about a wink and a nod.  You can become a member

21  without full knowledge of all the details of the conspiracy,

22  the identity of its members, the part such members played.

23  You don't necessarily have to have met each other, directly

24  stated what the object or purpose, stated the details or

25  means.  The evidence must show that the alleged members of

1  the conspiracy came to an agreement or understanding among

2  themselves to accomplish a common purpose.

3         We think we have lots of evidence, direct and

4  circumstantial, of showing, both through the no-poach and

5  through the information sharing, to suppress grower pay.

6  And we think we've met our prima facie showing right now

7  with evidence that's common to the class as a whole.

8         THE COURT:  Before you move from that point to

9  Mr. Kasowitz's point.  Dr. Singer's analysis of impact and

10  class-wide damages assumes nationwide impact.  Some of the

11  integrators don't operate nationally.  But, for example, if

12  the evidence at trial supported a conclusion that Pilgrim's

13  conspired with one or more co-conspirators, but not 21

14  co-conspirators, wouldn't we be left with at least the

15  prospect, if not the likelihood, that some portion of the

16  country might be unaffected.  If there were portions of the

17  country that were only -- only had certain integrators in

18  them.  And then we're left without -- then we're left with a

19  mismatch between Dr. Singer's analysis and the jury's

20  finding, are we?

21         MR. WALKER:  I don't think so.  Is your question

22  if some number of the co-conspirators or alleged

23  co-conspirators were found not to have participated in the

24  conspiracy, how do we back out those damages?

25         THE COURT:  So I assume, but don't know this, that

1    not every integrator operates throughout the country.  And

2    so if we start removing integrators from the conspiracy

3    because of a lack of proof, and we're left with nine

4    integrators, then we could geographically superimpose the

5    part of the country that those nine integrators operate in,

6    and we could also isolate some portion of the country where

7    they don't.  And we could find that there were some growers

8    in the -- in some part of the country, geographically, where

9    none of the co-conspirators were said to have engaged in a

10   conspiracy to suppress grower wages.  And then doesn't

11   Dr. Singer's model include -- I'm going to make this up --

12   Oregon and Washington, where a jury might say we didn't find

13   that there was an integrator operating who was part of the

14   conspiracy.

15          MR. WALKER:  If that is what comes to pass at

16   trial, or I suppose at summary judgment, you back out those

17   damages.  Those class members can be identified and you back

18   out those damages.  And Dr. Singer includes in his report

19   just a mechanical method for doing that, which is --

20          THE COURT:  By integrator locale.  So he can

21   identify -- has identified -- and could easily identify and

22   quantify at trial, damages, removing six integrators from

23   the conspiracy --

24          MR. WALKER:  Yes.

25          THE COURT:  -- if there were regions of the

 1    country then left without a grower -- excuse me -- that
 2    included growers in those regions.
 3            MR. WALKER:  He can identify the regions where the
 4    integrators operate, obviously, and he can also identify the
 5    regions where the growers are.
 6            THE COURT:  All right.  Do the plaintiffs intend
 7    to offer proof at summary judgment or at trial that 21
 8    integrators are part of the conspiracy as alleged in the
 9    amended complaint?
10            MR. WALKER:  Yes, Your Honor.
11            THE COURT:  Okay.
12            MR. WALKER:  And, you know, to Mr. Kasowitz's
13    point about the tables in Dr. Singer's report, those cover
14    every one of the integrators.  And I -- it's true that we
15    don't have a direct admission from every one of these
16    integrators, but we have a host of evidence that it's
17    consistent with the conspiracy, if not a direct admission,
18    and then there's other circumstantial evidence in the case,
19    like the switching analysis, like the -- you know, the
20    industry being conducive to cartelization.  I mean, I'm not
21    going to go through all of that again, because I actually
22    think in the end, what *Black* says is any of this rebuttal
23    evidence is just class-wide evidence.  Whether the
24    conspiracy exists is a class-wide issue.  Whether -- and
25    each plaintiff, if they went individually or as a class,

1    would provide the same evidence.  And if the jury finds that

2    they don't believe that Pilgrim's Pride conspired with any

3    of these other integrators to be in a conspiracy, we lose as

4    a class.  That's -- that's what the evidence means.  But

5    that's the same as if we had one plaintiff making the case

6    against Pilgrim's Pride and the co-conspirators.

7              Just a few clean-up points.  Your -- the

8    discussion about pleading the Fifth at the depositions, I

9    just wanted to clarify.  They were acquitted before -- the

10   Penn and Lovette depositions came after their acquittal.

11   And, of course, you know, we would dispute whether -- yeah.

12   So, Your Honor, that's the date of their acquittal, and the

13   depositions are in the record.  They were, I believe, on the

14   24th and -- 27th and 29th.  But that's neither here nor

15   there.  I would say that the -- you know, the statement that

16   the acquittals might come into evidence, we obviously would

17   dispute that.  But also Pilgrim's, as a company, pleaded

18   guilty in that case, and, obviously, we would want to make

19   sure that came in if their individual executives' acquittals

20   came in too.

21             I want to briefly touch on the *Wal-Mart* case.

22   Mr. Kasowitz said that *Wal-Mart* demands that there be a

23   corporate-level pattern and practice here that we can prove.

24   Pattern and practice is a Title VII legal standard.  That's

25   what *Wal-Mart* is talking about.  In addition, it's a

 1   discrimination case which involves each plaintiff.  You have
 2   to know what the -- what the reasons were for their demotion
 3   or, I guess, lack of promotion.  The court just said it's
 4   highly individualized.  That is a case where you really have
 5   to look at the interaction between every plaintiff and every
 6   store manager to understand the theory of harm.  That's not
 7   our theory of harm here, that's not the case, in addition to
 8   that case not being a 23(b)(3) case.
 9           I want to make a couple of points.  Mr. Kasowitz
10   -- about the different competition in different areas.
11   Mr. Kasowitz mentions the McEntires.  How could they
12   possibly be harmed by the no-poach.  Interestingly, the
13   McEntires actually sold their farm to a couple from
14   California, which really goes to our point that even if
15   growers need to be located near a complex so their birds
16   don't die en route to the slaughtering facility, the
17   conspirators compete with each other nationwide, and they
18   compete for growers nationwide, and people will look to what
19   pay is and move to an area.  And that is sort of the thrust
20   behind this idea that there's really a nationwide market
21   here, even if the growers have to be physically located
22   close to their plants.
23           Mr. Kasowitz says pay wasn't suppressed.  You look
24   at these charts that Dr. McCrary has that show pay going up
25   over time.  The relevant fact, of course, is to the but-for

 1   world, not to yesterday; right?  Pay can go up over time.

 2   Just like he says they were looking at Agri Stats when they

 3   raised pay.  The question is what would pay be but for the

 4   conspiracy; right?  Not what -- was the pay higher or lower

 5   than yesterday.

 6           I would say for the *wheeler* case, the expert's

 7   report there was about 30 pages, but there's --

 8           Sam, I don't know, maybe we could just put it up

 9   briefly.

10           There's one portion of the report where he says --

11   he didn't do the work; right?  Dr. Singer did the work.  And

12   part of this is not an insult to the expert here.  This was

13   just how expert reports were back then.  But he just says

14   here, I'm going to get some data, and it's going to show

15   what I need to show.  And the court said, I don't think what

16   you're talking about, this data here, Census Bureau data and

17   settlement sheets, can show what you're going to show.

18           Well, Dr. Singer has done the work.  And that's

19   one of the reasons in this case we wanted a schedule where

20   all this class and merits discovery is done -- and the

21   expert reports are class and merits report, because we want

22   to be able to show that, yes, not only do we have evidence

23   capable of proving class-wide impact, we have evidence it

24   does prove class-wide impact.

25           And, you know, I don't want to get into really

1    rebutting all of the evidence that Mr. Kasowitz went

2    through.  I would say as a high level, first of all, this

3    avian influenza biosecurity thing is irrelevant.  And, no,

4    you can't have a procompetitive justification for a per se

5    illegal no-poach.  The companies could come up with any

6    purported reason they want to agree not to go after each

7    other's employees, but that doesn't come into the evidence.

8              Aside from that, the document -- the documents

9    that are direct evidence of a no-poach here, I don't know if

10   any of them -- maybe one sort of mentions biosecurity, but

11   all of the biosecurity, quote/unquote, evidence here comes

12   usually rebuttal testimony from witnesses.  None of the

13   direct evidence mentions biosecurity.  The document that

14   Mr. Willis was testifying about didn't mention biosecurity,

15   and he acknowledged in his deposition that, yes, what this

16   sounds like here in this document is just me talking about

17   not going -- or asking for them not to go on our growers'

18   farms.

19             But the larger point is all of this is class-wide

20   evidence.  All of this is going to be something that the

21   jury considers when they decide whether we've proved the

22   existence of a conspiracy or not.  We think we'll do it,

23   they think we won't, but, regardless, at class

24   certification, all that means is that it's a common issue

25   for the class.

```
 1              And I think that's everything for me, Your Honor.
 2              THE COURT:  Thank you, Mr. Walker.
 3              So I can sort of plan a little bit.  What is it
 4    Mr. Madden plans to cover, if we get into it?
 5              MR. MADDEN:  It's the class waiver and release
 6    point that they made, that they claim defeats predominance
 7    in the case.
 8              THE COURT:  Is that a live issue in the case,
 9    Mr. Kasowitz?
10              MR. KASOWITZ:  They're waking me up.  They think
11    I'm -- they think I fell asleep, Your Honor.  So he was
12    saying I had a question.
13              I know.
14              Not to me, it's not, Your Honor.  Not saying we
15    waive the ability to argue it at some point, but I don't
16    view it among the most important considerations that are
17    present for, Your Honor.
18              THE COURT:  I understand.  Is there something you
19    would like to say then in response to Mr. Walker's brief
20    rebuttal?
21              MR. KASOWITZ:  Yeah, a couple of things.
22              THE COURT:  Please.
23              MR. KASOWITZ:  Look, with respect to Singer's
24    report and with respect to -- the whole case comes down to
25    Singer; right?  It all comes down to Singer.  So the fact is
```

 1   they don't have the evidence that they say they have in

 2   order to be able to establish a class-wide impact on all

 3   class members for the purpose of being able to certify a

 4   national class.  So it all comes down to what Singer says.

 5   And Singer says we can look at this very small part of the

 6   country, and we can extrapolate from it.  We can talk about

 7   regressions and models and everything else, but that's what

 8   he's doing.  He's extrapolating from Delmarva to the rest of

 9   the country.

10           So how he does it is really important.  And it

11   goes to -- whatever the arguments are about whether or not

12   his opinion should be admitted or struck, for the purpose of

13   class certification, even if he's not disqualified, the

14   reality is that this is not a dependable -- this is not a

15   dependable opinion, because the most important factor, the

16   thing that he -- that we're talking about here, which is

17   grower pay, is the one thing that he doesn't look at in that

18   model.

19           And I'm not arguing -- I understand what the

20   plaintiffs' theory is.  They say everything was suppressed.

21   So even if it's higher, it could have been suppressed more.

22   I get that.  But there has not been one iota of an

23   explanation, either yesterday or today, as to why Dr. Singer

24   didn't look at overall grower pay.

25           If you're going to say that there's a no-poach

 1    agreement everywhere in the country, among 21 integrators,
 2    among 147 plants, affecting 24,000-plus growers, then you
 3    would think that you would be looking at grower pay,
 4    actually, as the factor, not ten different variable
 5    constituents that may or may not influence grower pay.
 6    Grower pay.
 7            And so what it says to me -- stripping away
 8    everything else, what it says to me is, this is a very, very
 9    weak case for class certification.  It's one that ought to
10    be denied.  And if the best that they have is an example of
11    the country where they can't demonstrate that that is
12    representative of the entire country and of all of the
13    variables that we would have in the country, that's an
14    additional reason, in addition to everything else that we
15    talked about, that it would be inappropriate for these
16    claims to then proceed on a class-wide basis.
17            Because, you know, it's easy for plaintiffs to
18    say, hey, Your Honor, we don't have to worry about that.  We
19    don't have to worry about it here.  We'll do it at trial.
20    We'll do it at trial.  Respectfully, this is exactly where
21    we need to worry about it.
22            THE COURT:  Two points.  Let me make sure I
23    understand.  First, you mean Dr. Singer didn't look at
24    grower pay with respect to class-wide impact?  He did for
25    damages.

 1            MR. KASOWITZ:  He didn't look -- right.  He didn't

 2    look at grower pay for the purpose of ascertaining whether

 3    or not he could take his -- whether or not he can take his

 4    Delmarva experience and extrapolate it to the entire

 5    country.

 6            THE COURT:  So explain to me why that is so

 7    fundamental to that analysis that it makes it unreliable.

 8    Why, in evaluating the -- not assuming that anything he said

 9    is right, but as I understand it, here's an area where the

10    no-poach is alleged to have broken down for a period of

11    time.  I'm going to evaluate and study that space and see

12    what happened.

13            And then he argues you can extrapolate the result

14    across the country.  Now, maybe you can and maybe you can't.

15    But why does it matter what grower pay was in Texas during

16    the period that we're studying the effect of removing the

17    no-poach in one geographic area?

18            MR. KASOWITZ:  Sure.

19            THE COURT:  Why?

20            MR. KASOWITZ:  I'm delighted to, Your Honor.  It's

21    important because the factor -- the variable he does look

22    at, which are these different constituents, says to him,

23    hey, there's no increase.  This -- these particular

24    coefficients are exactly the same across the entire country

25    as they were in Delmarva.  So because that's true -- and in

1   Delmarva, during that period of time, from 2013 to 2015, the

2   no-poach broke down, and there was a big -- and there was a

3   big increase, but there was no big increase -- or no change

4   with that -- with that line for the whole period, from 2008

5   to 2019.  Because that's true, that must mean -- this is his

6   argument -- that must mean that a no-poach continued to be

7   in effect that whole period of time.

8          If he had looked at grower pay, Your Honor, what

9   he would have seen was not this line that says that -- that

10  no-poach is -- continues to be in effect, what he would have

11  seen was grower pay is going up like crazy.  And it's even

12  going up faster and more sharply than it is in Delmarva.

13         So what that says, Your Honor, is that for --

14  being able to extrapolate that there was a no-poach, a broad

15  50-state, no-poach agreement, affecting every single grower

16  in the country, based on that analysis, without even looking

17  at what grower pay really was, and considering the fact that

18  it went up in the country, it's irresponsible, Your Honor.

19         THE COURT:  Well, I don't think -- maybe I

20  misunderstand.  I don't think Dr. Singer is going to testify

21  at trial that there's a 50-state, no-poach agreement -- that

22  he's a sponsoring witness for that fact.  I think he's going

23  to assume that fact for purposes of his model and his

24  analysis, but isn't -- what you just pointed out, isn't that

25  two economists disagreeing about whether you controlled for

1    the correct variables in doing your analysis, and that --

2          MR. KASOWITZ:  No.

3          THE COURT:  That is a jury question.

4          MR. KASOWITZ:  No, Your Honor, absolutely not.

5    That is a question that goes -- respectfully, Your Honor,

6    absolutely not that's a jury question.  That's a question

7    that shows -- the answer to which, which we still don't

8    have; okay? -- the answer to which shows that what

9    Dr. Singer was doing was looking for factors that would make

10   this theory work.  It's an odd theory, Your Honor.  It's an

11   -- I know Your Honor pointed out yesterday that, well, you

12   know, you could take -- I mean, you can, as a matter of --

13   you know, I guess, theory or -- or statistics, take a small

14   sample and extrapolate it to a big one.  Sure, you can.  Of

15   course, you can.  But then what you need to do is to make

16   sure that that small sample is going to be appropriately and

17   reasonably representative of what the big universe is;

18   right?  And he has purposely, I'm afraid -- respectfully, I

19   say this -- he's purposely avoided the one most important

20   factor to do that.

21          So I wouldn't be having this -- I wouldn't be

22   having this discussion -- I've never met the man.  I don't

23   care.  I wouldn't be having this discussion about him.  I'm

24   sure he's a good guy.  But I wouldn't be having this

25   discussion about him except on the basis of that one thing.

1    We're going to certify a national class against a company in

2    a case where everybody else has settled, to be arguably

3    responsible for all of these damages.  It sounds like to me

4    Your Honor -- all these alleged damages.  It sounds like to

5    me, Your Honor, that's a very, very thin reed upon which to

6    base a national class, especially when -- especially when

7    Pilgrim's wasn't even in Delmarva.

8              Now, I don't need to respond to the thing about

9    conspiracy stuff.  I get it; okay?

10             But those are the facts here.  So it's a very,

11   very thin reed to build this entire construct on for the

12   purpose of then prosecuting a case in front of a jury.

13             Thank you, Your Honor.

14             THE COURT:  Thank you.

15             Everybody who has spent much time in federal court

16   knows that the real decision-maker usually sits about six

17   feet away from the judge.  So we're going to take a brief

18   recess while I consult with my clerk.  Stay in the

19   courtroom, please.  We're not going to be long, probably,

20   and we'll be back and see if there's something more to

21   cover.  Thank you.

22        (Recess taken.)

23             THE COURT:  Trying to be consistent when we can.

24             Yesterday, when taking up Pilgrim's *Daubert*

25   motion, I asked the plaintiffs if they had -- Pilgrim's if

1  they had anything they wanted to add.

2          It's your motion on the class certification.  Is

3  there anything more from the plaintiffs to close?  I don't

4  have a specific question.

5          MR. WALKER:  You know, Your Honor, I don't think

6  we have anything else to add.  Thank you, though, for the

7  opportunity.

8          THE COURT:  So we'll see each other again, by

9  Zoom, I think, in August for a fairness hearing we have

10  scheduled with the Sanderson settlement.

11          You've given us a lot to think about in these

12  motions, and the outcome is significant, and we're hammered.

13  And so all of that is a warning that you're not going to get

14  a ruling from us next week.  I can assure you that we take

15  these motions and these issues seriously.

16          I've greatly appreciated your argument the last

17  two days.  It has really brought into focus, I think, some

18  things that were a little unclear to me in the papers.

19  I think I pretty clearly understand your respective

20  positions.

21          And, you know, early in this case, when we got

22  together in the courtroom downstairs, I said, from time to

23  time -- and I just -- I want to circle back to it today, and

24  I just want to recognize this for what it is.  It is just a

25  joy to be in a courtroom with such talented lawyers.  It's

1   really the best experience from a judicial perspective in

2   court when you engage in this discussion with real experts

3   who are here to try to educate and persuade.  I appreciated

4   your briefs and I especially appreciated your argument, and

5   I'll look forward to seeing you-all on a screen in August.

6          Thanks for your time.  We'll be in recess.

7          (PROCEEDINGS CONCLUDED.)

8

9                  REPORTER'S CERTIFICATE

10          I, Joanna Smith, Registered Professional Reporter

11   and Certified Shorthand Reporter, in and for the State of

12   Oklahoma, do hereby certify that the foregoing is a correct

13   transcript from the official proceedings in the

14   above-entitled matter.

15

16             CERTIFIED:   /s/Joanna Smith_____
                            Joanna Smith, CSR, RPR
17                          United States Court Reporter
                            101 North 5th Street
18                          Muskogee, Oklahoma  74401
                            joanna_smith@oked.uscourts.gov
19

20

21

22

23

24

25